# VLADECK, RASKIN & CLARK, P.C.

VALDI LICUL
212.403.7311
VLICUL@VLADECK.COM

March 7, 2019

**VIA ECF**

The Honorable Judge Ronnie Abrams
U.S. District Court for the Southern District of New York
40 Foley Square, Courtroom 1506
New York, NY 10007

      Re:    Cardaci v. Van Eck Associates Corp. et al.
              Case No.18 Civ. 09705 (RA)

Dear Judge Abrams:

In accordance with the Court's Order and Notice of Initial Conference dated February 22, 2019, ECF No. 14, Plaintiff, Catherine Cardaci, and Defendants, Van Eck Associates Corp. ("VanEck"), and Jan van Eck submit this joint letter. The initial pretrial conference is scheduled for March 14, 2019 at 3:15 p.m. Id.

I.    Description of the Case

    A.    Plaintiff's Recitation of Claims

Cardaci was Chief Marketing Officer at VanEck from November 2014 until September 18, 2018.[1] (Compl. ¶¶ 9, 22, ECF No. 1). Throughout her employment, Cardaci reported directly to Jan van Eck, VanEck's Director and Chief Executive Officer ("CEO"). (Id. ¶ 23). VanEck is a family-owned investment management company that was founded by Jan van Eck's father and is characterized by a flat organizational structure. (Id. ¶¶ 24, 26, 28). Cardaci was the first C-Suite level female professional in the VanEck's history to report directly to the CEO. (Id. ¶ 29).

Soon after Cardaci began working for VanEck, women at the company began to complain to her about various bias-related issues. (Id. ¶ 30). For instance, a group of women held a meeting with Cardaci during which these women relayed concerns about, inter alia, inequities in the design and enforcement of VanEck's leave policies. (Id. ¶¶ 32-37). Cardaci went to Bruce Smith, VanEck's Chief Financial Officer, to inform Smith about the "women issue[s]" that had been raised, but Smith told Cardaci that Jan van Eck would not budge and that Jan van Eck would be unreceptive and angry if she brought these concerns to him. (Id. ¶¶ 38-44). Cardaci also heard complaints about sex-related inequities in pay. (Id. ¶¶ 44-48). Cardaci reported these pay issues to VanEck's Human Resources department ("HR"), but HR ignored the complaint. (Id. ¶ 49). The underpayment of Cardaci's female peers was not surprising. Indeed, on information and belief, Cardaci was paid less than her male predecessor, Harvey Hirsch, even though Hirsch had the same responsibilities as Cardaci and a less-senior title. (Id. ¶¶ 50-53).

---

[1] Because of VanEck's flat organization structure, Jan van Eck exercises considerable control over all facets of the company's decision-making, including those concerning compensation. (Compl. ¶ 28).

The Honorable Ronnie Abrams
March 7, 2019
Page 2

Beyond being paid less than male peers, Cardaci and other women at VanEck encountered other forms of inequitable treatment, including: (1) exclusion from work events, including those hosted at Jan van Eck's home; (2) inequitable scrutiny of work and job performance; (3) dismissive and abusive treatment by male colleagues; (4) exclusion from meetings and other professional events; and (5) inequitable treatment with respect to promotions. (See id. ¶¶ 54-84). In one particularly egregious incident, Jan van Eck questioned Cardaci's recommendation to promote a female subordinate by asking, "What if she gets pregnant?" (Id. ¶ 62). Jan van Eck initially denied Cardaci's request to promote the subordinate and only assented after Cardaci made several subsequent requests to him and complained about the pregnancy comment to HR. (Id. ¶¶ 63-66). Cardaci complained about many of these issues to HR, her complaints were ignored. (Id. ¶¶ 67, 76-79, 83-84).

On the contrary, not long after Cardaci complained to HR about Jan van Eck's pregnancy comment, Cardaci received a negative performance review that was light on specifics and informed Cardaci that her annual bonus would be increased minimally, despite others, including Cardaci's underperforming male subordinate, receiving substantial increases. (Id. ¶¶ 68-73).

Given VanEck's biased atmosphere towards women and the undue scrutiny applied to requests for leave from female employees, it is not surprising that Cardaci's obligation to serve on a grand jury for this Court was treated unfairly. (Id. ¶ 85). On April 6, 2018, Cardaci informed HR and Jan van Eck that she had been selected to serve on a Southern District of New York grand jury and, thus, needed to take scheduled, intermittent leaves from work. (Id. ¶¶ 86-87). Cardaci's grand jury service required that she miss certain meetings, and although Jan van Eck made accommodations to other employees who needed to miss scheduled meetings, he did not afford Cardaci the same consideration. (Id. ¶ 89). Instead, when Cardaci directly requested updates from Jan van Eck, her requests were ignored, (id. ¶ 90), and Cardaci's performance began to be met with unfair scrutiny and additional baseless reviews lacking in substance, (id. ¶¶ 91-96).

On August 7, 2018, Cardaci informed HR and Jan van Eck that her jury service had been extended until at least February 2019. (Id. ¶ 97). Nine days later, Cardaci was fired. (Id. ¶ 98). Jan van Eck told Cardaci that the company was going in a "different direction" and that he wanted Cardaci to work through the end of the year to oversee the transitioning of her duties. (Id. ¶¶ 99-100, 102). Cardaci was to be paid her standard salary through the end of 2018 as well as receive a lump sum payment, which Cardaci understood represented the anticipated 2018 bonus that she would have earned for working the entire year. (Id. ¶ 103). Cardaci retained counsel, who sent a demand letter to VanEck asserting potential discrimination and retaliation claims. (Id. ¶¶ 104-05). After receiving Cardaci's demand letter, the company informed Cardaci that she was being fired immediately, (id. ¶ 106) and refused to pay Cardaci her 2018 bonus.

As asserted in the Complaint, Defendants' conduct violated the following laws: (1) the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), and § 194 of the New York Labor Law ("NYEPA") prohibiting unequal pay based on sex; (2) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3), and the New York Labor Law ("NYLL"), N.Y. Lab. Law § 215(1)(a), prohibiting retaliation in response to complaints of equal pay violations; (3) the New York State Human Rights

The Honorable Ronnie Abrams
March 7, 2019
Page 3

Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq., prohibiting sex discrimination and retaliation for complaints of sex discrimination; and (4) the Jury System Improvements Act (the "JSIA"), 28 U.S.C. § 1875, prohibiting discrimination and retaliation for federal jury service.[2]

      B.      <u>Defendants' Recitation of Their Defenses</u>

Cardaci alleges in her Complaint that she (1) received unequal pay, (2) was terminated because her grand jury service was extended, and (3) was retaliated against for supposedly complaining about bias-related issues other women – not Cardaci herself – experienced on the job.

*Equal Pay Claim.* In January 2014, VanEck announced that Harvey Hirsch, VanEck's Chief Marketing Officer, would retire. VanEck undertook a search and obtained Cardaci's resume from an executive placement firm. Cardaci negotiated the terms of her at-will employment which are set forth in a letter dated October 30, 2014.

Cardaci did not receive unequal pay to a male comparator. Cardaci negotiated a salary of $250,000 per year – $50,000 more than Hirsch was paid (the only male comparator she compares herself with in the Complaint) – and guaranteed bonuses of $150,000 (paid in early 2015), and $250,000 (paid in early 2016).

Other compensation was discretionary and based on VanEck's bonus metrics. Cardaci received discretionary bonuses of $350,000 and $379,750 for the years 2016 and 2017 (paid in 2017 and 2018, respectively). VanEck uses the annual McLagan market data surveys in determining overall compensation. VanEck explains that a "merit bonus is based on individual performance and accomplishment of performance goals during the year." VanEck's "goal is to provide compensation that meets the market median (50th percentile for both salary and total compensation when employees are fully proficient and consistent by meeting expectations. Employees consistently performing above expectations and proficient in their role may be rewarded with higher compensation (not to exceed 75th percentile)." VanEck also considers the contribution made by the employee to the profitability of the Exchange Traded Funds ("ETF") product sector ("ETF Profit") and the active product sector ("Corporate Profit").

Unlike Hirsch, who was more experienced and was instrumental in developing and growing VanEck's ETF business, Cardaci did not have experience marketing ETFs. It was expected, however, that she would learn ETFs, a major part of VanEck's business. She never did.

Cardaci's performance also was wanting in digital marketing, as was her leadership, innovation and management of the marketing department. Cardaci was counseled where

---

[2] Plaintiff has filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Once her charge has been administratively exhausted, Cardaci intends to move to amend the Complaint to interpose discrimination and retaliation claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. Plaintiff's Title VII claims will not require any additional discovery beyond the discovery required for Plaintiff's other claims, and, therefore, addition of Plaintiff's Title VII claims will not delay the adjudication of this case. VanEck has not yet received the EEOC charge.

improvement was needed. In her 2015 review, Cardaci was reminded that a pitch book was not redone, that projects for which she had responsibility were "Really not good," and that "[i]n general, [she exhibited] lower energy than the ETF business needs." In 2016, the point was made again that she exhibited "lower energy than the ETF business needs."

Performance concerns persisted. In March 2018, during a review of her 2017 performance, Cardaci was told that "digital marketing (25% of a job) was in a bad spot," she needed to make more of an effort to get up to speed on technology, and she needed to present positive ideas on "red flag" issues.

Cardaci's performance did not improve. In a mid-2018 performance review, Cardaci was told that there were "major concerns" with her performance. They included: "no breakthrough [on lead generation] initiatives;" no articulation of "any social media strategy;" a lack of "a mindset to showcase and distribute the content we provide" "beyond VanEck's own website;" a lack of generating ideas to product management; "nonexistent project management, poor communication with other departments"; and a "lack of vision for improvements" in digital marketing."

*Termination Claim.* As a result of ongoing performance issues, VanEck decided to terminate Cardaci's employment in July 2018 for legitimate, non-discriminatory and non-retaliatory business reasons, and before VanEck learned that her grand jury service was extended.

On July 18, 2018, VanEck's head of Human Resources ("HR"), Megan Rapple, noted the impending termination. On July 31, 2018, Rapple prepared a separation agreement. The meeting, which was to be held on August 2, was moved to August 16 when both Mr. van Eck and HR were in the office. Cardaci was advised that her employment was terminated on August 16, offered a generous separation package, with payments and benefits of about $550,000, and given more than 30 days to consider and accept the package. She declined.

Cardaci's grand jury service, which began in April 2018, was never a concern. VanEck's Employee Handbook specifically "encourages employees to fulfill their civic responsibilities by serving jury duty," pays in full for 15 days of jury duty service, and may extend payment, as it did for Cardaci.

Cardaci's grand jury service was extended by letter dated August 7, 2018, *after* VanEck decided to terminate Cardaci's employment and had prepared her separation agreement in July. Cardaci's grand jury service had nothing to do with the termination of her employment.

*Retaliation Claim.* VanEck has a well-publicized discrimination complaint procedure. Cardaci never filed any complaint of discrimination with HR – either for herself or anyone else. Nor did any woman do so.

VanEck maintains personnel policies to ensure a work environment free from discrimination and retaliation. VanEck's Employee Handbook, which Cardaci received when she joined VanEck and which is on its intranet, details its anti-discrimination policies and complaint procedure. Cardaci did not engage in any protected activity and no adverse employment action was taken based on any (non-existent) protected activity. There was no retaliation.

The Honorable Ronnie Abrams
March 7, 2019
Page 5

While the Complaint alleges bias towards unnamed women at VanEck, all long before and unrelated to VanEck's decision to end Cardaci's employment for insufficient performance, Defendants categorically deny those allegations in their Answer including, for example, that other women encountered inequitable treatment or that Mr. van Eck questioned Cardaci's promotion recommendation for a subordinate by asking "what if she gets pregnant?" (The subordinate was promoted). (Answer, e.g., ¶¶ 3-6, 30, 40-46, 49-51, 53-67, 74-80, 83-85, 89-91, ECF No. 8).

II.   Jurisdiction & Venue

This Court has subject-matter jurisdiction over Plaintiff's alleged EPA, FLSA, and JSIA claims pursuant to 28 U.S.C. § 1331 because those claims arise under federal law. For the same reason, the Court will have subject-matter jurisdiction over Plaintiff's Title VII claims. The Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise from a common nucleus of operative fact as Plaintiff's other claims. Venue is proper pursuant to 28 U.S.C. § 1391 because the alleged unlawful practices at issue occurred in this District.

III.   Contemplated Motions[3]

As indicated above, Plaintiff intends to bring a motion for leave to amend the Complaint to add Title VII claims. Plaintiff has no other contemplated motions at this time. On completion of discovery, Defendants anticipate filing a motion for summary judgment.

IV.   Discovery

Pursuant to the Second Amended Standing Administrative Order, see ECF No. 12, the parties have exchanged certain documents and information.

V.   Settlement Prospects

Before the filing of the Complaint, the parties engaged in informal settlement discussions. The parties mediated pursuant to the Alternative Dispute Resolution Mediation Program, see ECF No. 12, on January 24, 2019. The mediation was unsuccessful, but the parties remain willing to engage in further settlement talks.

VI.   Length of Trial

The parties anticipate that trial in this matter would last approximately 7 days.

Respectfully submitted,

_____/s/_____

Valdi Licul

VL/yag

---

[3] There are no outstanding motions at this time.

1002974 v1