UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

CATHERINE CARDACI,

Plaintiff,

- against -

VAN ECK ASSOCIATES CORPORATION & JAN VAN ECK

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 18 Civ. 09705

FIRST AMENDED COMPLAINT

PLAINTIFF DEMANDS A TRIAL BY JURY

Plaintiff, Catherine Cardaci ("Cardaci"), by her attorneys, Vladeck, Raskin & Clark, P.C., complaining of Van Eck Associates Corporation ("VanEck") and Jan van Eck (collectively, "Defendants"), alleges as follows:

## NATURE OF CLAIMS

1. Cardaci is a female marketing professional who has had a long and successful career in marketing. By the time Cardaci came to VanEck in November 2014 as VanEck's Chief Marketing Officer ("CMO"), Cardaci had worked in the industry for more than three decades and had held executive-level positions for several respected financial services companies.

2. Cardaci was the first C-Suite level female professional in the VanEck's history to report directly to Jan van Eck, VanEck's Chief Executive Officer ("CEO").

3. Although Cardaci's arrival at VanEck should have been a sign of progress, within months, a group of female employees at VanEck met with Cardaci to relay problems of gender bias they faced at the company and to ask for Cardaci's support. During the years that followed, Cardaci learned the seriousness of VanEck's problems, which included among other things

prejudice in assessment of women's requests for leave, pay disparity, and inequitable evaluation of female employees' performance.

4. Biased treatment of women pervaded all levels of the organization. Indeed, last year Jan van Eck told Cardaci that Cardaci should not promote a junior female employee because "What if she gets pregnant?" VanEck also paid Cardaci, the most senior female employee, less than her male predecessor who had a less senior title.

5. When Cardaci complained to Human Resources about the bias treatment she and other women encountered, her complaints were brushed aside or ignored.

6. Given the prejudiced atmosphere towards women at VanEck and the scrutiny to which female employees' requests for leave were judged, it came as no surprise when the company told Cardaci that she was being fired just one week after Cardaci gave notice that her grand jury service at the Southern District of New York had been extended.

7. Cardaci brings this action to remedy these abuses. Specifically, Cardaci brings claims to remedy violations of the Equal Pay Act (the "EPA"), 29 U.S.C. § 206(d); the equal pay provisions of Section 194 of the New York Labor Law ("NYLL"), N.Y. Lab. Law § 194 (the "NYEPA"); the anti-retaliation provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3); the anti-retaliation provisions of the New York Labor Law, N.Y. Lab. Law § 215(1)(a); the anti-discrimination and anti-retaliation provisions of New York State Human Rights Law (the "NYSHRL"), N.Y. Executive Law § 290 et seq.; the anti-discrimination and anti-retaliation provisions of New York City Human Rights Law (the "NYCHRL"), Administrative Code of the City of New York § 8-107 et seq.; the Jury System Improvements Act (the "JSIA"), 28 U.S.C. § 1875; and the anti-discrimination and anti-retaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.

## PARTIES

8. Cardaci is a female marketing professional who resides and is domiciled in New York.

9. Cardaci was employed by VanEck from November 2014 until September 18, 2018, when she was unlawfully discharged.

10. VanEck is an asset and investment management company that is incorporated and organized under Delaware law and has a principal place of business in New York, New York.

11. Jan van Eck is the Director and CEO of VanEck.

12. Cardaci and Jan van Eck worked at VanEck's main offices in Manhattan, and throughout her tenure at VanEck, Cardaci reported directly to Jan van Eck.

13. At all relevant times, VanEck was Cardaci's employer within the meaning of the EPA, the NYSEPA, the NYSHRL, the NYCHRL, and the JSIA.

14. At all relevant times, Jan van Eck was Cardaci's employer within the meaning of the EPA, the NYSEPA, the NYSHRL, the NYCHRL, and the JSIA.

15. Jan van Eck's conduct during Cardaci's employment makes him subject to aider and abettor liability under the NYSHRL and the NYCHRL.

## JURISDICTION AND VENUE

16. The Court has original jurisdiction over Plaintiff's EPA, FLSA, and JSIA claims pursuant to 28 U.S.C. § 1331.

17. The Court has supplemental jurisdiction over Plaintiff's NYEPA, NYLL, NYSHRL, and NYCHRL claims pursuant to 28 U.S.C. § 1367, for these claims arise from a common nucleus of operative fact as Plaintiff's EPA, FLSA, and JSIA claims.

18. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the unlawful practices complained of herein occurred within the Southern District of New York.

19. Pursuant to Section 8-502(c) of the NYCHRL, Plaintiff has caused a copy of the Complaint to be served on the Corporation Counsel of the City of New York and the New York City Commission on Human Rights.

## FACTUAL ALLEGATIONS

### I. Background

20. Cardaci is a 57-year-old, female marketing professional who has had a long and successful career in marketing for financial services companies.

21. Cardaci's career has spanned more than three decades during which she has held executive-level marketing and communications positions for a number of well-respected financial services companies, including Bankers Trust Company, AIG Global Investment Corporation, Diversified Investment Advisors, Zurch Scudder Investments, BlackRock, Citigroup Asset Management, Western Asset Management, and HSBC Global Asset Management.

22. Cardaci started working for VanEck in November 2014, when she accepted the position of VanEck's CMO.

23. In this role, Cardaci reported directly to Jan van Eck, VanEck's Director and CEO.

24. VanEck is a family-owned investment management company that manages equity and fixed income investment portfolios for its clients, which include investment companies, pooled investment vehicles, pension and profit-sharing plans, charitable organizations, and state or municipal government entities. VanEck invests not only in public equity and fixed income markets across the globe but also alternative investment markets, including hard assets, real estate, precious metals, and natural resources.

25. VanEck has approximately 250 employees globally, the majority of whom are based in VanEck's New York City offices.

26. VanEck was founded in 1955 by John van Eck, Jan van Eck's father.

27. Jan van Eck started his career at VanEck in 1992, and he has been Director and CEO of VanEck since 2010. Jan van Eck also heads VanEck's Corporate Management Committee.

28. VanEck has a flat organizational structure,[1] and Jan van Eck exercises control over virtually all facets of the company's decision-making, including those concerning employee compensation.

II. Gender Bias at VanEck

29. When she started working at VanEck, Cardaci became the first C-Suite level female professional in the VanEck's history to report directly to the CEO, Jan Van Eck. Cardaci was the only female member of VanEck's ETF[2] Management Committee and one of only two women on VanEck's Active Management Committee. The other woman on the Active Management Committee reported to Cardaci.

30. In light of Cardaci's position as the most senior female executive at VanEck, women at the company soon began to turn to her with complaints about the treatment of women at VanEck.

A. "Women of 25 Meeting"

[1] A "flat organizational structure" is characterized by limited numbers of supervisory layers between the bottom level of the organization and the executive management of the organization.

[2] An exchange-traded fund or "ETF" is marketable security tracking an index, commodity, bonds, or basket of assets like an index fund. Unlike a mutual fund, an ETF trades like a common stock on a stock exchange. Management of ETFs is part of VanEck's business.

31. In December 2014, about one month after Cardaci had started, a female ETF Product Specialist at VanEck organized a meeting for Cardaci and group of about twenty less senior women at the company.

32. At the meeting, which was called the "Women of 25 Meeting," less senior female employees in attendance asked that Cardaci advocate for improvements in VanEck's work environment, which they said was characterized by various forms of unequal treatment to women.

33. A topic of importance at the meeting was VanEck's leave and flexible work arrangement policies, which women in attendance said were discriminatory both in design and enforcement.

34. Several women said that VanEck's limited leave and flexible work arrangement options had a greater negative impact on the company's female workers, many of whom had children or needed to take maternity leave, than VanEck's male workers.

35. Moreover, several women said that leaves and flexible work arrangements were permitted inequitably.

36. For example, women at the meeting reported that leave requests by men for various needs were evaluated less critically than those made by women and, more importantly, that leave requests particular to women's needs, such as childbirth and maternity leaves, were harshly criticized by those in senior management.

37. Furthermore, women at the meeting explained that women returning from childbirth and maternity leaves faced negative repercussions for their leaves, including, among other things, diminishment of responsibilities and unduly negative performance evaluations.

38. Concerned about the issues that were raised in the meeting, Cardaci arranged a meeting with Bruce Smith, VanEck's Chief Financial Officer, who at the time managed Human Resources ("HR") functions at VanEck.

39. Smith is a member of VanEck's Corporate Management Committee.

40. During her meeting with Smith, which took place on or about February 3, 2015, Cardaci told Smith about the various concerns raised during the Women of 25 Meeting and that it was considered a "women issue" and not simply a dispute about the generosity of leave policies.

41. Smith took a hard line in response, insisting the Jan van Eck would not budge on the issue.

42. Smith warned Cardaci that she should not approach Jan van Eck with these issues, explaining that Jan van Eck would not be receptive and could become angry.

43. Cardaci heeded Smith's warning and did not pursue the issue with Jan van Eck at the time.

44. During the course of her time at VanEck, however, Cardeci observed a number of women who not only experienced discriminatory treatment in relation to leave policies like those raised in the "Women of 25 Meeting" but also suffered other forms of discriminatory treatment.

B. Discrimination in Pay

45. During her time at VanEck, Cardaci learned that several female employees were being paid less than their male peers.

46. For example, a female Deputy Portfolio Manager in Precious Metals, complained to Cardaci that despite posting superior investment returns than male colleagues with similar job titles and duties, she was not compensated commensurate with her performance.

47. Based on Cardaci's understanding of the female Deputy Portfolio Manager's division, she understood the male employees to whom the female Deputy Portfolio Manager was comparing herself to include: David Austerweil, a Deputy Portfolio Manager in Emerging Markets Debt; Angus Shillington, a Deputy Portfolio Manager, Emerging Markets Equity; Carlos Nogueira, Deputy Portfolio Manager, Emerging Markets Debt; and Barak Laks, Deputy Portfolio Manager, Guided Allocation ETFs.

48. The female Deputy Portfolio Manager also informed Cardaci that she had spoken with a female Analyst in Hard Assets and a female Analyst in Emerging Markets Equity who were also being paid less than their male counterparts with similar job titles and responsibilities whom Cardaci understood to be Alan Shih, an Analyst in Hard Assets, and Daniel Cho, an Analyst in Fixed Income ETFs.

49. Upon learning of these pay issues, Cardaci reported what she described as "gender-related" morale and pay problems to HR. VanEck ignored Cardaci's complaints.

50. Indeed, Cardaci was also a victim of VanEck's discriminatory pay practices.

51. Throughout her time at VanEck, Cardaci was paid less than her male predecessor, Harvey Hirsch, who was VanEck's Senior Vice President of Marketing from 2007 until about the time of Cardaci's hiring in 2014.

52. Cardaci assumed Hirsch's responsibilities when she was hired.

53. On information and belief, Hirsch was paid more than Cardaci throughout his employment at VanEck.

C. <u>Other Discriminatory Treatment</u>

54. In addition to routinely being paid less than their male counterparts, women at VanEck, including Cardaci, regularly faced other forms of biased treatment.

55. For instance, men-only social events were common at VanEck.

56. Jan van Eck regularly hosted men-only social outings, which included recreational activities, barbeques, and visits to his home.

57. Cardaci was not invited to these outings, even though several of her male subordinates, were invited and attended social events at Jan van Eck's home.

58. The work performance of women at VanEck was also routinely assessed more critically than that of their male peers.

59. For example, during Cardaci's time at VanEck, several female sales professionals who were performing comparably to or better than their male peers were unfairly targeted for purported performance deficiencies.

60. VanEck, however, routinely retains male employees whose performance evidences greater failings. for several years, mediocre male performers such as the Head of US Distribution and the Head of US Institutional Distribution have failed to meet sales objectives and goals but have not been criticized for these failings like their female sales peers.

61. Beyond evaluation of performance, women were often seen as a liability in VanEck's workforce.

62. For instance, in or about September 2017, Cardaci discussed the promotion of a 33-year-old female subordinate with Jan van Eck. In response to Cardaci's inquiry regarding promotion, Jan van Eck asked, "What if she gets pregnant?" Cardaci responded, "Well, I suppose she will have the baby, take maternity leave and either come back or not come back to work."

63. Jan van Eck told Cardaci in sum and substance that he would not give Cardaci permission to promote the subordinate at that time.

64. Less than a week after the comment was made, Cardaci complained to HR about Jan van Eck's pregnancy comment.

65. Notwithstanding Jan van Eck's belief that the prospect of pregnancy should preclude a woman from professional advancement and Cardaci's fear of retaliation, Cardaci continued to recommend the subordinate for promotion and ask Jan van Eck for approval to promote the subordinate.

66. Although Jan van Eck delayed for several weeks, he ultimately gave Cardaci approval to promote the subordinate, which he did while still conveying his general disapproval.

67. Despite Cardaci's complaint to HR, Megan Rapple, VanEck's Vice President and Global Head of Human Resources, did not act on the complaint or otherwise respond to it.

68. On or about February 12, 2018, about four months after Cardaci promoted the female subordinate over Jan van Eck's initial objections, Jan van Eck gave Cardaci her first ever performance review.

69. During the performance review meeting, Jan van Eck told Cardaci that her performance was "eh" but did not provide any specific details for his evaluation or otherwise elaborate.

70. During the more than three years she had worked at VanEck before this meeting, Cardaci had not received a negative performance review or otherwise been informed that her performance was lacking.

71. In addition, at the performance review meeting, Jan Van Eck told Cardaci that her annual bonus percentage would be increased only minimally and would be below anticipated levels based on the company's profitability.

72. Indeed, Cardaci's bonus was increased by 8% even though several male members of her team received significantly greater relative bonuses of up to 55%.

73. Importantly, one of Cardaci's direct reports and a consistent underperformer who received a 2017 performance review stating he "needs improvement," received a bonus increase of 22%.

74. Indeed, Jan van Eck treated Cardaci, his first and only female direct report and a member of two Management Committees, far more dismissively than his male direct reports and the male members of Management Committees.

75. For example, Jan van Eck regularly held one-on-one meetings with his male direct reports and male Management Committee members. Even though Cardaci routinely requested one-on-one meetings with Jan van Eck to discuss important work issues, Jan van Eck regularly ignored Cardaci's requests.

76. Cardaci complained to HR about the issue on several occasions. However, these complaints were ignored.

77. Indeed, when Cardaci told Rapple that Jan van Eck treated Cardaci and other women differently, Rapple conceded that may be the case but rather than investigate, Rapple told Cardaci that Cardaci should "camp out at his door" and acknowledged that she too "camp[s] out at [Jan van Eck's] door."

78. Cardaci also told HR about Jan van Eck's routine exclusion of her and other female employees from professional conferences and social outings and requested assistance.

79. These complaints were also ignored or occasioned a response that offered little to no useful guidance.

80. Other male employees at VanEck engaged in similar biased and abusive treatment of Cardaci.

81. For instance, two senior male VanEck employees based in Europe were regularly dismissive of Cardaci in their interactions with her and on several occasions yelled at Cardaci.

82. In Cardaci's observations, both of these senior male VanEck employees did not engage in similar behavior in their interactions with her male colleagues.

83. Cardaci complained to Rapple and others in HR about this behavior, but as with her complaints about Jan van Eck, nothing was done, and the abusive conduct continued.

84. Cardaci also complained to Jan van Eck directly about this treatment. Jan van Eck, as to be expected given his own dismissive treatment of Cardaci, ignored Cardaci's complaints.

III. Cardaci's Grand Jury Service and Unlawful Firing

85. Given the biased atmosphere towards women at VanEck and the scrutiny to which female employees' requests for leave were judged, it came as no surprise that Cardaci's need to take leave to perform her civil responsibilities was met with disapproval.

86. On April 6, 2018, Cardaci sent an e-mail to Rapple and Jan van Eck notifying them of grand jury service at the United States District Court for the Southern District of New York.

87. Cardaci was selected to serve on a grand jury and, therefore, needed to take scheduled, intermittent leaves from work.

88. Because of her grand jury service, Cardaci needed to miss certain regularly scheduled meetings, including ETF Management Committee meetings.

89. Even though Jan van Eck regularly gave accommodations or sent notes and/or update information to those who needed to miss Committee or other work meetings, Jan van Eck did not do so for Cardaci.

90. On the contrary, on occasions when Cardaci asked Jan van Eck for update information regarding meetings she needed to miss because of grand jury service, Jan van Eck ignored Cardaci's requests.

91. Instead, Jan van Eck began retaliating against Cardaci for her grand jury service.

92. On or about July 6, 2018, Jan van Eck held another unexpected performance review meeting with Cardaci. During the meeting, Jan van Eck told Cardaci, for the first time, that she was "not good at digital" and that she "d[idn't] know enough about ETFs." As was the case with the first performance meeting, Jan van Eck did not provide specific examples of these purported failings or elaborate.

93. Given that issues concerning Cardaci's purported performance with digital and knowledge of ETFs had not been raised before and that Jan van Eck proffered no concrete examples of such issues, these criticisms were baseless.

94. The July 2018 negative performance review meeting was followed by two negative marketing reviews, which Cardaci received in quick succession on July 19, 2018 and August 3, 2018.

95. In meetings concerning these negative marketing reviews, Jan Van Eck again outlined subjective criticisms of Cardaci's performance without identifying concrete examples.

96. Before these reviews, Cardaci had never received a negative marketing review.

97. On August 7, 2018, Cardaci informed Rapple and Jan van Eck that her grand jury service had been extended to at least February 2019.

98. Nine days later, on August 16, 2018, Jan van Eck fired Cardaci.

99. Jan van Eck told Cardaci that the company was going in a "different direction" and that he "did not want to go behind [Cardaci's] back and start an executive search for a new CMO

without [Cardaci] knowing." Jan van Eck said he was "tired of doing everything for himself, identifying and requesting data, coming up with ideas," a criticism Cardaci had not heard until after she had to serve grand jury duty.

100. Jan van Eck also stated that he wanted Cardaci to work in the office until the end of the year to manage the transition of her duties.

101. Jan van Eck proffered no other explanations for his decision to fire Cardaci, but rather said that Cardaci had contributed a lot to the company.

102. VanEck proposed that Cardaci continue working through the end of 2018 while VanEck searched for a new CMO and that Cardaci would be formally terminated on December 31, 2018. Cardaci was expected to manage the transition of her duties during this time.

103. During this time, VanEck would pay Cardaci her salary through the end of 2018 as well as her 2018 bonus.

104. After being notified of her firing, Cardaci retained counsel.

105. On August 30, 2018, Cardaci's counsel hand-delivered a letter to Jan van Eck asserting potential claims for equal pay discrimination, sex discrimination, and violation of the JSIA.

106. Shortly thereafter, VanEck accelerated the termination of Cardaci's employment, firing her on September 18, 2018.

## FIRST CAUSE OF ACTION

### Pay Discrimination under the EPA

107. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 106 of this Complaint as if set forth herein.

108. By the acts and practices described above, Defendants, in violation of the EPA, have discriminated against Plaintiff by paying male employees higher wages than Plaintiff for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

109. Defendants' conduct was willful, and Defendants knew that its actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

110. Plaintiff has suffered and will continue to suffer damages as a result of Defendants' willful and unlawful conduct.

## SECOND CAUSE OF ACTION

### Retaliation under the FLSA

111. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 110 of this Complaint as if set forth herein.

112. By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the FLSA.

113. Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

114. Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION

### Pay Discrimination under the NYEPA

115. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 114 of this Complaint as if set forth herein.

116. By the acts and practices described above, Defendants, in violation of the NYEPA, have discriminated against Plaintiff by paying male employees higher wages than Plaintiff for equal work in a job which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

117. Defendants' conduct was willful, and Defendants knew that their actions constituted unlawful violation of equal pay laws and/or showed reckless disregard for Plaintiff's statutorily protected rights.

118. Plaintiff has suffered and will continue to suffer damages as a result of Defendants' willful and unlawful conduct.

## FOURTH CAUSE OF ACTION

## Retaliation under the NYLL

119. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 118 of this Complaint as if set forth herein.

120. By the acts and practices described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYLL.

121. Defendants' conduct showed reckless disregard for Plaintiff's statutorily protected rights.

122. Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## FIFTH CAUSE OF ACTION

## Discrimination Based on Sex under the NYSHRL

123. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 122 of this Complaint as if set forth herein.

124. By the acts described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of the NYSHRL.

125. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

SIXTH CAUSE OF ACTION

Retaliation under the NYSHRL

126. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 of this Complaint as if set forth herein.

127. By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYSHRL.

128. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

SEVENTH CAUSE OF ACTION

Discrimination under the NYCHRL

129. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 128 of this Complaint as if set forth herein.

130. By the acts described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment and subjected Plaintiff to a hostile work environment on the basis of her sex in violation of the NYCHRL.

131. Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

132. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

EIGHTH CAUSE OF ACTION

Retaliation under the NYCHRL

133. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 132 of this Complaint as if set forth herein.

134. By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity under the NYCHRL.

135. Defendants' conduct showed willful and/or wanton negligence, recklessness, and conscious disregard for Plaintiff's statutorily protected rights. Defendants' conduct was reckless to the degree it demonstrated conscious disregard for Plaintiff's statutorily protected rights.

136. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

NINTH CAUSE OF ACTION

Violation of the JSIA

137. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 136 of this Complaint as if set forth herein.

138. By the acts described above, Defendants violated the employment protection provisions of the JSIA.

139. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## TENTH CAUSE OF ACTION

## Discrimination Based on Sex under Title VII

140. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 139 of this Complaint as if set forth herein.

141. By the acts described above, Defendants discriminated against Plaintiff in the terms and conditions of her employment on the basis of her sex in violation of Title VII.

142. Defendants' conduct was willful and showed reckless disregard for Plaintiff's statutorily protected rights under Title VII.

143. As a result of Defendants' discriminatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

## ELEVENTH CAUSE OF ACTION

## Retaliation under Title VII

144. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 143 of this Complaint as if set forth herein.

145. By the acts described above, Defendants retaliated against Plaintiff for engaging in protected activity under Title VII.

146. Defendants' conduct was willful and showed reckless disregard for Plaintiff's statutorily protected rights under Title VII.

147. As a result of Defendants' retaliatory acts, Plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damage unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a Judgment:

(a) declaring the acts and practices complained of herein to be violations of the EPA, the NYEPA, the FLSA, the NYLL, the NYSHRL, the NYCHRL, the JSIA, and Title VII;

(b) enjoining and permanently restraining these violations of the EPA, the NYEPA, the FLSA, the NYLL, the NYSHRL, the NYCHRL, the JSIA, and Title VII;

(c) directing Defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated and do not continue to affect Plaintiff's employment opportunities;

(d) directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment of her, and making her whole for all earnings and other benefits she would have received but for Defendants' discriminatory treatment, including but not limited to wages, including back pay and front pay, bonuses, and other lost benefits;

(e) directing Defendants to pay Plaintiff liquidated damages for their violations of the EPA and NYEPA;

(f) directing Defendants to pay Plaintiff compensatory damages, including damages for emotional distress, humiliation, pain and suffering, and injury to professional standing and reputation;

(g) directing Defendants to pay Plaintiff additional amounts as punitive damages;

(h) awarding Plaintiff such interest as is allowed by law, and damages for any adverse tax consequences stemming from an award;

(i) awarding Plaintiff the costs of this action, together with reasonable attorneys' fees; and

(j) awarding such other and further relief as this Court deems necessary and proper.

DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure Rule 38(b), Plaintiff demands a trial by jury in this action.

Dated: New York, New York
May 10, 2019

VLADECK, RASKIN & CLARK, P.C.

By: /s/

Valdi Licul
Vladeck, Raskin & Clark P.C.
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300