UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CATHERINE CARDACI,<br><br>Plaintiff,<br><br>vs.<br><br>VAN ECK ASSOCIATES CORPORATION AND JAN VAN ECK,<br><br>Defendants. | 18 Civ. 09705 (RA)(BCM)<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS AND STATEMENT OF ADDITIONAL MATERIAL FACTS** |

Pursuant to Local Civil Rule 56.1 of the United States District Court for the Southern District of New York and Rule 4.D.i of the Court's Individual Rules and Practices in Civil Cases, Plaintiff, Catherine Cardaci ("Cardaci"), submits this Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts and Statement of Additional Material Facts ("Pl. 56.1") in opposition to the motion for summary judgment made by Defendants, Van Eck Associates Corporation ("VanEck") and Jan van Eck ("Mr. van Eck").[1]

1. VanEck is an investment adviser registered with the U.S. Securities and Exchange Commission that manages exchange-traded funds ("ETFs"), mutual funds, pooled investment vehicles and other investment accounts. Exhibit 12 (Firm Brochure) at Item 4, p. 4.

Plaintiff's Response to Paragraph 1:

Admit. Add that VanEck engages in other financial activities. (Grant Decl. Ex. 27 at 22.)

[1] Deposition transcripts are cited as "[Last name of deponent] Dep." Complete deposition transcripts are attached as Exhibits 1-9 to the Declaration of Yannick A. Grant dated March 11, 2020 ("Grant Decl."). Citations to the Declaration of Catherine Cardaci dated March 11, 2020 are cited as "Pl. Decl." Citations to declarations filed by Defendants with their moving papers and the exhibits attached thereto are cited as "[Last name of declarant] Decl."

2. VanEck has two principal investment product areas: ETFs and actively managed investments, such as mutual funds ("Active"). Exhibit 2 (van Eck Dep.) at 70:6-18; Exhibit 14 (Firm Management and Oversight).

Plaintiff's Response to Paragraph 2:

Admit.

3. Currently, ETFs are approximately 75% of VanEck's business. Exhibit 5 (Phillips Dep.) at 44:18-22.

Plaintiff's Response to Paragraph 3:

Admit.

4. In 2018, VanEck had more than 200 employees. Exhibit 13 (Form ADV) at Item 5.

Plaintiff's Response to Paragraph 4:

Admit.

5. Mr. van Eck is VanEck's Chief Executive Officer and President. Exhibit 2 at 57:2-5.

Plaintiff's Response to Paragraph 5:

Admit.

6. VanEck maintains personnel policies regarding discrimination and retaliation. VanEck's Employee Handbook details its anti-discrimination and anti-retaliation policies and its complaint procedure. Exhibits 15-17 (Employee Handbooks) at VE000559-562, VE000323-326, VE000407-410; Exhibit 1 (Cardaci Dep.) at 26:9-28:25.

Plaintiff's Response to Paragraph 6:

Admit in part and deny in part. Admit that VanEck's Employee Handbooks state equal employment and non-harassment policies as well a complaint procedure. (Koepp Decl. Exs. 15-17). Deny the implication that VanEck upholds its policies as written and that VanEck's employees comply with VanEck's stated policies. (See, infra, ¶¶ 293-94, 303, 312, 318, 334,

338-39, 344, 358-61, 375-86, 394, 397-99.) Add that VanEck's complaint procedure, as set for in its Employee Handbook, directs any employee "who believes that he or she has been discriminated against or subjected to discriminatory conduct or harassment . . . or believes that he or she has witness such conduct" to "promptly report the incident to [his or her] direct manager, a manager of another department[,] or Human Resources." (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408.) VanEck's complaint procedure does not require that complaints be in writing (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; Rapple Dep. at 29:12-18), and Cardaci understood that VanEck's policies did not require reports of discriminatory conduct to Human Resources be in writing (Cardaci Dep. at 213:15-21). VanEck's complaint procedure provides that "all complaints will be investigated promptly and thoroughly" and that those "found to have engaged in discriminatory conduct or harassment . . . will be subject to discipline." (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; see also Rapple Dep. at 29:12-18.) VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

7. Plaintiff Catherine Cardaci ("Cardaci") was employed at VanEck starting on November 10, 2014 as its Chief Marketing Officer ("CMO"). Exhibit 1 at 12:16-19.

Plaintiff's Response to Paragraph 7:

Admit.

8. Cardaci was notified of her termination on August 16, 2018. Exhibit 1 at 258:14-17, 263:9-22; Exhibit 67 at Pl. 000149; Exhibit 3 (Rapple Dep.) at 194:9-195:10.

Plaintiff's Response to Paragraph 8:

Admit in part and deny in part. On August 16, 2018, Cardaci was told that her employment at VanEck would be ending, but Cardaci was not told that her employment would be ending effective as of that date. (Cardaci Dep. at 258:10-17, 263:9-18; see, infra. Pl. Resp. ¶ 161.)

9. During her employment, Cardaci managed a department of approximately 30 employees. Exhibit 19 (November 2014 organizational chart); Exhibit 20 (December 2015 organizational chart); Exhibit 21 (December 2016 organizational chart); Exhibit 22 (December 2017 organizational chart); Exhibit 23 (September 2018 organizational chart).

Plaintiff's Response to Paragraph 9:

Admit in part and deny in part. Admit that Cardaci managed a department of approximately 30 employees based in the United States. (Koepp Decl. Exs. 19-23.) During her employment Cardaci also managed approximately four VanEck marketing employees based in Europe. (Pl. Decl. ¶ 7.)

10. During her employment, Cardaci was responsible for and managed four divisions in the Marketing Department: ETF Product Development (headed by Ed Lopez ("Lopez")); Active Product Development (headed by Kristen Capuano (("Capuano")); Digital Marketing (headed by Anthony Vitalone ("Vitalone") from May 2016) and Marketing Communications (headed by Laura Jones ("Jones") from the fall of 2017). Exhibits 19-23; Exhibit 9 (Jones Dep.) at 41:7-16, 43:13-15.

Plaintiff's Response to Paragraph 10:

Admit in part and deny in part. Admit that these were the divisions of VanEck's Marketing Department in 2018. (Koepp Decl. Ex. 23.) Deny that this was the structuring of the Marketing Department throughout Cardaci's employment at VanEck. (Koepp Decl. Exs. 19-22; Pl. Decl. ¶ 8.)

11. Harvey Hirsch ("Hirsch") was Cardaci's predecessor at VanEck. Exhibit 11 (Plaintiff's Amended Responses to Defendants' Requests for Admission) at Response 2.

Plaintiff's Response to Paragraph 11:

Admit.

12. Hirsch had a Master's in Business Administration ("MBA") from Northwestern University. Exhibit 4 (Hirsch Dep.) at 20:12-19, 21:7.

Plaintiff's Response to Paragraph 12:

Admit.

13. Hirsch testified that marketing is "much more than just communications" and includes "product development, pricing, distribution [and] public relations." Exhibit 4 at 25:4-8, 15-17.

Plaintiff's Response to Paragraph 13:

Admit.

14. Hirsch's experience with product development included developing Underoos, a men's and boy's underwear line for which he coined the famous tagline "Underwear that's fun to wear," Exhibit 4 at 29:7-30:10, and conceiving for JCPenney Financial Services a joint venture with First National Bank to market financial services – checking, savings, CDs – in JCPenney stores. Exhibit 4 at 30:13-31:7.

Plaintiff's Response to Paragraph 14:

Admit. Add that none of Hirsch's experience prior to consulting for VanEck in a starting in 2003, involved marketing ETFs. (Hirsch Dep. at 21:8-33:16.)

15. Hirsch began consulting for VanEck in or around 2003. Exhibit 24 (Hirsch retirement press release).

Plaintiff's Response to Paragraph 15:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact,

admit that Hirsch began consulting for VanEck in or around 2003. (Hirsch Dep. at 21:8-24, 33:21-34:5, 140:25-141:10.)

16. Hirsch became a full-time employee of VanEck in May 2007. Exhibit 25 (Hirsch offer letter) at VE003984.

Plaintiff's Response to Paragraph 16:

Admit.

17. Hirsch became CMO at VanEck in May 2007. Exhibit 4 at 35:5-36:16.

Plaintiff's Response to Paragraph 17:

Admit.

18. When Hirsch became VanEck's CMO, the Marketing Department had four employees, including Hirsch. Exhibit 4 at 36:20-37:4.

Plaintiff's Response to Paragraph 18:

Admit.

19. When Hirsch became VanEck's CMO, VanEck was entering the ETF business. Exhibit 4 at 39:6-16.

Plaintiff's Response to Paragraph 19:

Deny. VanEck entered the ETF business in 2006, before Hirsch became CMO in 2007. (van Eck Dep. at 58:9-15, 115:11-16; Smith Dep. at 26:23-25, 46:2-5; Grant Decl. Ex. 36 at VE000893.)

20. Hirsch's salary during his employment was $200,000 annualized. Exhibit 38 (Cardaci/Hirsch compensation summary chart); Exhibit 40 (Hirsch compensation spreadsheets).

Plaintiff's Response to Paragraph 20:

Admit.

21. When Hirsch became VanEck's CMO, VanEck had approximately $1.3 billion in assets under management ("AUM"). Exhibit 24.

Plaintiff's Response to Paragraph 21:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part.

Hirsch became CMO in May 2007 (Koepp Decl. Ex. 25 at VE003984; Hirsch Dep. at 33:21-34:2), and Hirsch retired from this position in August 2014 (Hirsch Dep. at 35:13-21). As Hirsch served as CMO for seven years and three months and the evidence cited by Defendants refers to a "12-year" period of time (Koepp Decl. Ex. 24), the period includes time when Hirsch was not CMO. Nevertheless, admit that 12 years before Hirsch's retirement in 2014, in or about 2002, VanEck had approximately $1.3 billion in AUM. (Hirsch Dep. at 140:25-141:21.)

22. In 2011, Hirsch played an instrumental role in the HOLDRS transaction, an acquisition of six funds from Merrill Lynch that added approximately $2.3 billion in AUM and $8 million in recurring revenue each year to VanEck. Exhibit 24; Exhibit 4 at 76:12-78:16, 80:2-20; Exhibit 5 at 266:7-13.

Plaintiff's Response to Paragraph 22:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 24), Plaintiff objects to those facts as Defendants have not established

foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

Admit that Phillips, an interested witness whose favorable testimony should be disregarded at this stage,[2] described Hirsch as being "instrumental" in the HOLDRS transaction "from a marketing and sales support standpoint." (Phillips Dep. at 266:7-13.) Admit that Hirsch testified that he and Allison Lovett, a former VanEck Marketing employee, did marketing and sales support work for the HOLDRS transaction, a transaction that added 2.3 billion in AUM and approximately $8 million of annual recurring revenue to VanEck. (Hirsch Dep. at 76:3-78:19.) Mr. van Eck, not Hirsch, had the idea for the HOLDRS transaction. (Hirsch Dep. at 76:12-77:14.)

23. During Hirsch's employment, VanEck dramatically expanded its presence in the ETF marketplace, introducing more than 60 new ETFs – including multiple industry "firsts" – under the Market Vectors brand, and rising to become one of the largest ETF families in the U.S. and worldwide. Exhibit 24; Exhibit 4 at 127:20-128:14 (describing the launch of VanEck's first ETF – GDX, a gold ETF – as "the onset of the rapid growth of the ETF business"); Exhibit 2 at 112:3-9 (recalling Hirsch's role in building the ETF business).

Plaintiff's Response to Paragraph 23:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 24), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

---

[2] See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 151 (2000) ("[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe [when resolving a motion for summary judgment] . . . [T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" (citation omitted)); see also In re Dana Corp., 574 F.3d 129, 152 (2d Cir. 2009) (concluding that it was reversible error to rely on favorable testimony of interested witness for summary judgment).

Deny that VanEck's first ETF – GDX, a gold ETF, was launched during Hirsch's employment; VanEck entered the ETF business by launching GDX in 2006, before Hirsch was CMO. (van Eck Dep. at 58:9-15, 115:11-16; Smith Dep. at 26:23-25, 46:2-5; VE000893.) Admit that Mr. van Eck, an interested witness, testified that Hirsch was "there for almost the entire time" during the building of the ETF business and that it was a "team effort to try and get some of the big steps forward." (van Eck Dep. at 112:3-9.) Mr. van Eck admitted that there are fewer opportunities for creating new ETFs today. (van Eck Dep. at 124:18-125:17.)

24. Mr. van Eck testified that Hirsch "cared a lot about the business," "was good in talking about products, always thinking about new things in the early days of the ETF industry," and "had good input into the story behind the fund." Exhibit 2 at 123:16-124:17.

Plaintiff's Response to Paragraph 24:

Admit that Mr. van Eck, an interested witness, so testified. Add that Mr. van Eck admitted that during Hirsch's tenure as CMO, there were some bad aspects to digital marketing and frustrations with the management style of Heather MacLeod, the head of digital marketing at the time. (van Eck Dep. at 126:22-129:8, 172:15-22.) VanEck retained a consultant to seek improvements in digital marketing during this time. (van Eck Dep. at 129:9-131:20.) Mr. van Eck admitted that McLeod had performance issues. (van Eck Dep. at 131:21-132:9.)

25. Adam Phillips ("Phillips"), Chief Operating Officer for VanEck's ETF business, testified that Hirsch "constantly was being proactive with ideas" and "pulled off some really big initiatives." Exhibit 5 at 266:2-6.

Plaintiff's Response to Paragraph 25:

Admit that Phillips, an interested witness, so testified.

26. Phillips testified that Hirsch "participated in all of [VanEck's] strategic conversations," "dove into the investment merits of everything," and generally "was very, very helpful." Exhibit 5 at 266:14-18.

Plaintiff's Response to Paragraph 26:

Admit in part and deny in part. Phillips, an interested witness, testified that Hirsch "participated in all of [VanEck's] strategic conversations," "dove into the investment merits of everything," and "was very, very helpful," with respect to the HOLDRS transaction. (Phillips Dep. at 265:20-266:18).

27. Phillips testified that Hirsch and Cardaci worked at two different eras in VanEck's history: Hirsch helped guide VanEck through "meteoric growth" and built the Marketing Department, whereas Cardaci inherited the department. Exhibit 5 at 267:19-269:15.

Plaintiff's Response to Paragraph 27:

Admit that Phillips, an interested witness, so testified.

28. Phillips testified that Hirsch was "much more proactive;" Cardaci "was more reactionary." Exhibit 5 at 268:20-21.

Plaintiff's Response to Paragraph 28:

Admit that Phillips, an interested witness, so testified.

29. Phillips testified that Hirsch was a "tremendous positive contributor," a "strong voice" and "created ETF product management." Exhibit 5 at 268:21-269:8.

Plaintiff's Response to Paragraph 29:

Admit that Phillips, an interested witness, so testified.

30. Phillips testified that "across the board," Cardaci was not "nearly as strong," whereas Mr. van Eck testified that Hirsch had a great "energy level." Exhibit 5 at 269:9-15; Exhibit 2 at 126:7-18.

Plaintiff's Response to Paragraph 30:

Admit in part and deny in part. Admit that Phillips, an interested witness, so testified. Mr. van Eck, an interested witness, testified that he "loved [Hirsch's] energy level," not that Hirsch had a great energy level. (van Eck Dep. at 126:7-9.)

31. Capuano testified that Mr. van Eck "respected Harvey as an important person that helped launch the ETF business" and that Hirsch was deeply "involved in the nuts and bolts in the head of marketing job," including selecting ETF tickers. Exhibit 8 (Capuano Dep.) at 133:17-134:6.

Plaintiff's Response to Paragraph 31:

Admit in part and deny in part. Capuano's testimony that Mr. van Eck "respected Harvey as an important person that helped launch the ETF business" is inadmissible speculation not based on personal knowledge. Capuano admitted that Mr. van Eck did not tell her that and that she had no basis for that opinion. (Capuano Dep. at 133:10-135:17.) Admit that Capuano, an interested witness, testified that Hirsch was deeply "involved in the nuts and bolts in the head of marketing job," including selecting ETF tickers. (Capuano Dep. at 133:21-134:6.)

32. Capuano testified that when she joined VanEck in 2007, Hirsch was part of a small group of decision-makers and "there was definitely a sense that Harvey was well liked and well respected in his position at the firm." Exhibit 8 at 134:16-22.

Plaintiff's Response to Paragraph 32:

Admit in part and deny in part. Capuano, an interested witness, testified that when she started at VanEck, there were "a few senior decision-makers at that time," and "a sense that Harvey was well liked and well respected in his position at the firm." (Capuano Dep. at 134:7-22.) Capuano did not testify that Hirsch was part of a small group of decisionmakers at VanEck generally. (Capuano Dep. at 134:7-22.) Capuano testified that she believed Mr. van Eck, Phillips, and Hirsch collectively made decisions concerning the ETF business at the inception of the ETF

business but acknowledged that she could not assess Hirsch's specific role in running the ETF business because, as she understood, the decisions were made collectively. (Capuano Dep. at 136:10-137:4.)

33. Capuano testified that Hirsch "was a good product marketer" who knew how to gain market share and "was good with tickers and tag lines and sales points and things like that." Exhibit 8 at 137:9-15.

Plaintiff's Response to Paragraph 33:

Admit in part and deny in part. Capuano, an interested witness, testified that Hirsch "understood the swiftness with which you have to do certain things from a marketing standpoint, to gain market share," not that Hirsch knew how to gain market share generally. (Capuano Dep. at 137:9-15.)

34. Hirsch had the idea to use the ticker "MOO" for VanEck's agricultural business ETF, which became "a giant success" and "the talk of the industry." Exhibit 4 at 60:2-20.

Plaintiff's Response to Paragraph 34:

Admit in part and deny in part. Hirsch did not testify that he conceived personally of the "MOO" ticker idea. (Hirsch Dep. at 59:7-60:20.) Admit that the VanEck Marketing Department had the idea to use the ticker "MOO" for VanEck's agricultural business ETF, which became "a giant success" and "the talk of the industry." (Hirsch Dep. at 59:7-60:20.) Add that towards the end of Hirsch's tenure as CMO, there were significant losses in MOO assets in the first quarter of 2014 which resulted in the ETF bonus pool running low compared to the prior year's levels. (Grant Decl. Ex. 29.)

35. Hirsch retired from VanEck in August 2014. Exhibit 4 at 35:20-21, 133:3-12.

<u>Plaintiff's Response to Paragraph 35</u>:

Admit.

36. When Hirsch retired from VanEck in August 2014, the Marketing Department had grown to approximately 30 employees. Exhibit 19.

<u>Plaintiff's Response to Paragraph 36</u>:

Admit.

37. When Hirsch retired from VanEck, approximately half of the marketing employees were women and half were men. Exhibit 19.

<u>Plaintiff's Response to Paragraph 37</u>:

Deny. The evidence cited by Defendants does not identify the gender of any of the marketing employees. (Koepp Decl. Ex. 19.)

38. When Hirsch retired from VanEck, the firm had more than 60 ETFs. Exhibit 26 (ETF.com article).

<u>Plaintiff's Response to Paragraph 38</u>:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, deny. In 2014, the year Hirsch retired (Hirsch Dep. at 35:13-21), VanEck had approximately 35 ETFs. (van Eck Dep. at 117:22-25.)

39. Hirsch's 12-year tenure was a time of extraordinary growth for VanEck, with AUM climbing from approximately $1.3 billion to more than $32 billion. Exhibit 24.

Plaintiff's Response to Paragraph 39:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part.

Deny that Hirsch tenure as CMO lasted 12 years; Hirsch became CMO in May 2007 (Koepp Decl. Ex. 25 at VE003984; Hirsch Dep. at 33:21-34:2), and Hirsch retired from this position in August 2014 (Hirsch Dep. at 35:13-21). Admit that during the 12 years before Hirsch's retirement in 2014, from in or about 2002, VanEck's AUM grew from approximately $1.3 billion to more than $32 billion. (Hirsch Dep. at 140:25-141:21.)

40. When announcing Hirsch's retirement, Mr. van Eck stated: "Over the years he has … made major contributions to our growth and profitability and has had an enormous impact on the firm's marketing strategy and tactics as well as on the organization and staffing of our Marketing Department." Exhibit 27.

Plaintiff's Response to Paragraph 40:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit.

41. Before joining VanEck, Cardaci held marketing and communications positions at Thomas McKinnon Asset Management LP, Bankers Trust Company, AIG Global Investment Corporation, Diversified Investment Advisors, Zurich Scudder Investments, BlackRock, Citigroup Asset Management, Western Asset Management and HSBC Global Asset Management, and she consulted for Morgan Stanley Investment Management. Exhibit 28 (Cardaci email and resume) at Pl. 001374-1376.

Plaintiff's Response to Paragraph 41:

Admit. Between 1984 and 2012, a period of 28 years, Cardaci held marketing and communications positions at nine employers. (Koepp Decl. Ex. 28; Pl. Decl. ¶ 9.)

42. Cardaci was self-employed for 22 months prior to joining VanEck. Exhibit 28 (Cardaci email and resume) at Pl. 001374-1376.

Plaintiff's Response to Paragraph 42:

Admit. After leaving HSBC Global Asset Management in December 2012, Cardaci did independent marketing consulting work from January 2013 to November 2014, including work for Morgan Stanley Investment Management. (Koepp Decl. Ex. 28; Pl. Decl. ¶ 10.)

43. Cardaci had approximately 10 jobs from August 1984 through November 2014, when she joined VanEck. Exhibit 1 at 16:16-19; Exhibit 28 (Cardaci resume) at Pl. 001374-1376.

Plaintiff's Response to Paragraph 43:

Admit. Between 1984 and 2012, a period of 28 years, Cardaci had marketing and communications positions at nine employers. (Koepp Decl. Ex. 28; Pl. Decl. ¶ 9.)

44. Cardaci does not have an MBA (as Hirsch had) or any degrees beyond college. Exhibit 1 at 307:2-4; Exhibit 4 at 20:12-19, 21:7.

Plaintiff's Response to Paragraph 44:

Admit.

45. Cardaci did not market ETFs at any of her prior jobs before joining VanEck. Exhibit 11 at Response 16.

Plaintiff's Response to Paragraph 45:

Admit. Add that Hirsch did not have experience marketing ETFs before joining Van Eck in a consulting capacity. (See, supra, Pl. Resp. ¶ 14.)

46. Cardaci's prior experience was primarily in marketing communications, not in ETF product development or digital marketing. Exhibit 2 at 159:9-12; Exhibit 1 at 76:13-16 ("there was a learning curve" on digital marketing); Exhibit 29 (Cardaci stating in 2018 regarding a job prospect that "I do think this is digital and I am not well-versed in the technical requirements"); Exhibit 30 (email from Cardaci dated January 7, 2015 requesting a tutorial on digital metrics) at VE004048.

Plaintiff's Response to Paragraph 46:

Deny. Cardaci's prior experience extends beyond marketing communications, and includes institutional marketing (RFPs, consultant relations, active product development and positioning), global marketing management, strategic branding and value proposition development, and digital and print content development. (Pl. Decl. ¶ 11.) Although there was a learning curve for Cardaci with respect to certain facets of digital marketing relevant for marketing at VanEck, including certain digital metrics (Cardaci Dep. at 76:13-16; Koepp Decl. Ex. 30), Cardaci did have experience in digital marketing (Cardaci Dep. at 189:15-190:6.) With respect to Cardaci's e-mail dated December 20, 2018 (Koepp Decl. Ex. 29), the technical requirements Cardaci did not have were with respect to digital systems operations that were relevant for that subscription marketing job, not digital marketing generally. (Pl. Decl. ¶ 12.) Add that Mr. van Eck did not consider digital experience to be a must have for the CMO position. (Grant Decl. Ex. 24.)

47. Mr. van Eck expected that, in time, Cardaci would become educated on ETF product marketing. Exhibit 2 at 159:13-22.

Plaintiff's Response to Paragraph 47:

Admit that Mr. van Eck, an interested witness, so testified. Add that Mr. van Eck believed Cardaci's "background with marketing actively managed funds would be brought to bear." (van Eck Dep. at 159:8-17, 182:22-183:2.) Cardaci took steps to expand her ETF knowledge while she was employed at VanEck and got up to speed quickly. (Cardaci Dep. at 191:24-194:4.)

48. Cardaci was hired by VanEck pursuant to a negotiated offer letter dated October 30, 2014 (the "Offer Letter"). Exhibit 31 (Offer Letter); Exhibit 32 (emails negotiating terms of Offer Letter); Exhibit 1 at 23:9-25:7.

Plaintiff's Response to Paragraph 48:

Admit in part and deny in part. Cardaci was not hired "pursuant to" the Offer Letter. After Mr. van Eck decided to hire Cardaci (Grant Decl. Ex. 17), Mr. van Eck directed that certain terms he and Cardaci negotiated concerning minimum guaranteed bonuses to be paid to Cardaci in 2015 and 2016 be incorporated into the Offer Letter (Cardaci Dep. at 23:9-25; van Eck Dep. at 156:11-158:4; Grant Decl. Ex. 20; Koepp Decl. Ex. 31). Cardaci also negotiated terms in her Offer Letter concerning post-termination non-compete obligations. (Koepp Decl. Ex. 32.)

49. Cardaci was an at-will employee. Exhibit 31 at Pl. 000129.

Plaintiff's Response to Paragraph 49:

Admit.

50. Throughout her tenure at VanEck, Cardaci reported directly to Mr. van Eck. Exhibits 19-23.

Plaintiff's Response to Paragraph 50:

Admit.

51. Cardaci communicated with Delores McLaughlin ("McLaughlin"), then Director of Human Resources ("HR"), regarding the Offer Letter. Exhibit 32.

Plaintiff's Response to Paragraph 51:

Admit.

52. Before signing the Offer Letter, Cardaci negotiated a salary of $250,000. Exhibit 31 at Pl. 000129; Exhibit 1 at 23:9-25:7.

Plaintiff's Response to Paragraph 52:

Admit.

53. Cardaci's salary was $50,000 more than Hirsch's. Exhibit 38; Exhibit 39 (Cardaci compensation spreadsheets); Exhibit 40; Exhibit 11 at Response 1; Exhibit 4 at 122:21-22; Exhibit 1 at 288:5-7.

Plaintiff's Response to Paragraph 53:

Admit.

54. Before signing the Offer Letter, Cardaci negotiated guaranteed bonuses of $150,000 to be paid in 2015 and $250,000 to be paid in 2016. Exhibit 32; Exhibit 1 at 23:9-25:7.

Plaintiff's Response to Paragraph 54:

Admit in part and deny in part. Cardaci negotiated minimum guaranteed bonuses to be paid in 2015 and 2016. (Cardaci Dep. at 23:9-25; van Eck Dep. at 156:11-158:4; Grant Decl. Ex. 20; Koepp Decl. Ex. 31).

55. Before signing the Offer Letter, Cardaci negotiated a reduced non-compete period from six months to three months. Exhibit 31 at Pl. 000130; Exhibit 32.

Plaintiff's Response to Paragraph 55:

Admit.

56. The Offer Letter reflects a $250,000 salary, guaranteed bonuses of $150,000 paid in 2015 and $250,000 paid in 2016 and a three-month non-compete. Exhibit 31.

Plaintiff's Response to Paragraph 56:

Admit in part and deny in part. Cardaci's Offer Letter reflects negotiated minimum guaranteed bonuses to be in paid in 2015 and 2016. (Cardaci Dep. at 23:9-25; van Eck Dep. at 156:11-158:4; Grant Decl. Ex. 20; Koepp Decl. Ex. 31.)

57. Compensation at VanEck is made up of four components: base salary, merit bonus, corporate profit share bonus (also referred to as "Active"), and ETF profit share bonus. Exhibit 33 (Rapple compensation presentation) at VE004719.

Plaintiff's Response to Paragraph 57:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that compensation at VanEck is presently made up of four components: base salary, merit bonus, Active profit sharing; and ETF profit sharing. (Phillips Dep. at 69:10-74:2; van Eck Dep. at 86:2-8:4.)

58. Merit bonus is based on individual performance and accomplishment of performance goals. Exhibit 34 (Rapple merit bonus emails).

Plaintiff's Response to Paragraph 58:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for

admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, deny. Market compensation is considered in determining merit bonuses. (van Eck Dep. at 94:4-95:11; Smith Dep. at 36:22-39:2; Rapple Dep. at 51:19-52:24; Phillips Dep. at 109:20-110:16.) An employee's performance, but not her accomplishment of specific performance goals, is sometimes, but not always, considered in determining merit bonuses. (van Eck Dep. at 95:5-17; Smith Dep. at 38:8-39:6.)

59. VanEck's goal is to provide compensation that meets the market median according to the McLagan survey for both salary and merit bonus when employees are fully proficient and consistently meeting expectations, and to provide higher merit bonuses when employees consistently perform above expectations. Exhibit 33 at VE004719; Exhibit 34; Exhibit 3 at 51:24-25.

Plaintiff's Response to Paragraph 59:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Exs. 33-34), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

VanEck intends that its employees' salary and merit bonuses target the median of market compensation, which VanEck determines by reviewing McLagan survey data. (van Eck Dep. at 94:4-95:11; Smith Dep. at 36:22-39:2; Rapple Dep. at 51:19-52:24; Phillips Dep. at 109:20-110:16; Capuano Dep. at 227:14-228:3.) Performance is not always considered in merit bonus determinations. (van Eck Dep. at 95:5-17; Smith Dep. at 38:8-39:6.) McLagan survey data can be ignored. (Phillips Dep. at 115:4-117:22, 121:20-122:4; Rapple Dep. at 71:7-72:22.) Even if an employee is exceeding expectations, the employee may not receive salary and merit bonus

compensation exceeding the market median. (Smith Dep. at 38:11-20; Koepp Decl. Ex. 34 ("Employees consistently performing above expectations and proficient in their role may be rewarded with higher compensation (not to exceed 75th percentile).")) Prior to Rapple's hiring in 2015, McLagan data was not always given to department heads for making merit bonus recommendations or used. (Rapple Dep. at 70:12-23; Smith Dep. at 40:10-17.)

60. Department heads at VanEck make recommendations for salary and merit bonus for employees who report to them. Exhibit 7 (Vitalone Dep.) at 99:12-14, 110:11-15; Exhibit 5 at 68:18-25, 101:2-6, 103:23-25; Exhibit 8 at 221:11-17; Exhibit 4 at 90:13-17; Exhibit 3 at 51:16-18; Exhibit 6 (Smith Dep.) at 31:22-32:10.

Plaintiff's Response to Paragraph 60:

Admit.

61. Mr. van Eck, in consultation with VanEck's Chief Financial Officer and HR, accepts or adjusts the department heads' recommendations for salary and merit bonus of employees. Exhibit 4 at 86:23-87:5, 92:8-13; Exhibit 3 at 61:9-11, 71:9-23; Exhibit 6 at 33:16-34:24, 35:15-23.

Plaintiff's Response to Paragraph 61:

Admit.

62. The size of the Active and ETF profit share pools is determined largely by VanEck's profitability and performance versus peers in a given year. Exhibit 35 (bonus pools memo); Exhibit 36 (bonus emails) at VE004758-4760.

Plaintiff's Response to Paragraph 62:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for

admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, deny.

VanEck uses a formula to determine the size of the ETF profit pool, and VanEck's performance compared to peers is not a factor in that formula. (van Eck Dep. at 86:19-87:19, 88:5-89:15; Koepp Decl. Ex. 35). The ETF profit pool is a percentage of the profits of VanEck's ETF business in a given year, excluding the revenues and losses of two of VanEck's gold ETFs. (van Eck Dep. at 88:5-19.) Because of variability in the profitability of VanEck Active business, the size of the Active profit pool is discretionary and not calculated using a formula. (van Eck Dep. at 87:5-88:4; Koepp Decl. Ex. 36.)

63. The size of the ETF profit share pool has varied over the years, as have the number of pool participants. Exhibit 37 (ETF profit pool chart); Exhibit 5 at 267:19-268:8.

Plaintiff's Response to Paragraph 63:

Admit.

64. The following chart sets out the size of the ETF profit pool from its inception in 2011 through 2017, as well as the number of participants and the amount of profit share per participant if they had shared equally in the pool. Exhibit 37.

| Year | Size of pool | Number of participants | Amount per Participant |
|---|---|---|---|
| 2011 | $8,843,484 | 41 | $215,694 |
| 2012 | $5,737,937 | 72 | $79,693 |
| 2013 | $5,364,609 | 74 | $72,494 |
| 2014 | $4,491,288 | 85 | $52,838 |
| 2015 | $3,545,566 | 82 | $43,238 |
| 2016 | $3,654,386 | 103 | $35,479 |
| 2017 | $6,749,493 | 111 | $60,806 |

Plaintiff's Response to Paragraph 64:

Admit.

65. VanEck employees who contribute to VanEck's Active business are eligible for the Active profit share, and employees who contribute to VanEck's ETF business are eligible for the ETF profit share. Exhibit 35; Exhibit 36 at VE004756-4757.

Plaintiff's Response to Paragraph 65:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part. An employee is eligible for ETF profit sharing if that employee, based on his or her role, is involved in VanEck's ETF business, and an employee is eligible for Active profit sharing if that employee, based on his or her role, is involved in VanEck's Active business. (Phillips Dep. at 70:13-72:4, 73:13-75:9, 77:11-78:25; see also Koepp Decl. Ex. 35).

66. Mr. van Eck and Charles Cameron, senior portfolio manager, determine the amount of an employee's Active profit share. Exhibit 3 at 60:11-61:11; Exhibit 6 at 27:14-28:11; Exhibit 8 at 119:11-13; Exhibit 36 at VE004756-4759.

Plaintiff's Response to Paragraph 66:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Exs. 33-34), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

Admit that Cameron participates in discussions concerning the amount of employees' Active profit share (Rapple Dep. at 60:5-61:11), but Mr. van Eck determines the

amount of Active profit share for his direct reports. (Smith Dep. at 43:4-12, 45:15-25; van Eck Dep. at 103:8-104:15.)

67. Mr. van Eck and Phillips determine the amount of an employee's ETF profit share. Exhibit 3 at 60:11-61:11; Exhibit 6 at 27:14-28:11; Exhibit 8 at 119:7-10; Exhibit 36 at VE004756-4759.

Plaintiff's Response to Paragraph 67:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Exs. 33-34), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

Admit that Phillips participates in discussions concerning the amount of employees' ETF profit sharing (Rapple Dep. at 60:5-61:11; Phillips Dep. at 69:2-9; van Eck Dep. at 89:16-25), but Mr. van Eck determines the amount of ETF profit share for his direct reports. (Smith Dep. at 43:4-12, 45:15-25; van Eck Dep. at 103:8-104:15.) Phillips did not make recommendations as to Cardaci's ETF profit shares. (Phillips Dep. at 163:22-164:14.)

68. The following chart shows Cardaci's and Hirsch's compensation during their respective employment with VanEck. Exhibits 38-40.

**Cardaci**

| Year | Total | Salary | Merit | ETF Profit | Corp. Profit |
|---|---|---|---|---|---|
| 2014[1] | $400,000 | $250,000 | $150,000 | 0 | 0 |
| 2015 | $565,000 | $250,000 | $250,000 | $35,000 | $30,000 |
| 2016 | $600,000 | $250,000 | $290,000 | $35,000 | $25,000 |
| 2017 | $629,750 | $250,000 | $290,000 | $52,250 | $37,500 |
| 2018[1] | $250,000 | $250,000 | 0 | 0 | 0 |

**Hirsch**

| Year | Total | Salary | Merit | ETF Profit | Corp. Profit |
|---|---|---|---|---|---|
| 2007[1] | $600,000 | $200,000 | $200,000 | 0 | $200,000 |
| 2008 | $400,000 | $200,000 | $100,000 | 0 | $100,000 |
| 2009 | $600,000 | $200,000 | $100,000 | 0 | $300,000 |
| 2010 | $750,000 | $200,000 | $200,000 | 0 | $350,000 |
| 2011 | $1,000,000 | $200,000 | $200,000 | $600,000 | 0 |
| 2012 | $750,000 | $200,000 | $150,000 | $400,000 | 0 |
| 2013 | $710,000 | $200,000 | $150,000 | $360,000 | 0 |
| 2014[3] | $200,000 | $200,000 | 0 | 0 | 0 |

Plaintiff's Response to Paragraph 68:

Admit in part and deny in part. Hirsch's total compensation for 2007 was $675,000 because he received a $75,000 sign-on bonus. (Hirsch Dep. at 69:21-70:7; Koepp Decl. Ex. 25; Koepp Decl. Ex. 40 at VE004903-08.) Admit the remainder.

69. One year of Hirsch's compensation, 2011, was an outlier because he was instrumental in the HOLDRS transaction, 2011 was very profitable, and there were fewer ETF pool participants than in subsequent years. Exhibit 4 at 126:15-127:5, 128:21-129:9; Exhibit 2 at 140:15-141:11; Exhibit 6 at 48:16-23; Exhibit 5 at 267:19-268:8.

Plaintiff's Response to Paragraph 69:

Deny. Hirsch's 2011 compensation was not an outlier. Accounting for the number of participants and the size of the pool, Hirsch's 2011 ETF profit share bonus of $600,000 was 2.78 times the average share of $215,694. (Koepp Decl. Exs. 37-38.) In 2012 and 2013, Hirsch's ETF profit bonuses, $400,000 and $360,000 respectively, were 5.019 times and 4.96 times the average shares for those years. (Koepp Decl. Exs. 37-38.) Conversely, Cardaci ETF profit share bonuses were always less than the average share. (Koepp Decl. Exs. 37-38 (2015: (Cardaci:

[3] For the years 2007, 2014 and 2018, the salary amounts shown are what Cardaci and Hirsch, respectively, would have been paid as salary for the entire year.

$35,000 / Average: $43,238) 2016: (Cardaci: $35,000 / Average: $35,479) 2017: (Cardaci: $52,250 / Average: $60,806.)) This includes 2017, when the total size of the ETF bonus pool, $6,749,493, the highest it had been since 2011, when the total pool was $8,843,484. In 2017, VnnEck's AUM were at an all-time high. (Grant Decl. Ex. 31; Rapple Dep. at 58:2-23.) In no year did Cardaci earn as much as Hirsch in ETF and Corporate profit pool earning. (See, supra, Pl. Resp. ¶ 68.)

70. Cardaci did not know how much Hirsch was paid when she drafted the First Amended Complaint, Dkt. No. 19 ("FAC"). Exhibit 1 at 102:10-13.

Plaintiff's Response to Paragraph 70:

Admit. Plaintiff alleged that, on information and belief, Hirsch was paid more than she was. (Koepp Decl. Ex. 10 at ¶¶ 50-54.) Cardaci was, in fact, paid less than Hirsch. (Koepp Decl. Ex. 38; see, supra, Pl. Resp. ¶ 68.)

71. As part of the normal course of business, Mr. van Eck provides ongoing feedback to his direct reports when he feels something needs to be said about performance. Exhibit 2 at 192:21-193:2.

Plaintiff's Response to Paragraph 71:

Deny. VanEck has a standard business practice for reviewing employee performance. (Rapple Dep. at 41:23-42:14; Smith Dep. at 24:14-25:7; Hirsch Dep. at 64:24-65:15.) Mr. van Eck does not adhere to this process. (Rapple Dep. at 42:15-43:15; van Eck Dep. at 82:25-83:12.) Mr. van Eck was supposed to adhere to this process. (Grant Decl. Ex. 28.) Mr. van Eck does not provide ongoing feedback to his direct reports concerning performance: Phillips admitted he had not had a performance review with Mr. van Eck since 2012 and that he

only gets periodic feedback about certain matters (Phillips Dep. at 59:9-60:4); Smith admitted that he could not recall a single performance issue discussion with Mr. van Eck (Smith Dep. at 25:8-17); Hirsch admitted that he did not have any formal performance reviews with Mr. van Eck, stating that Mr. van Eck would "signal" views on performance, which Hirsch said he understood because of the length of his time he had been in the business (Hirsch Dep. at 65:10-22).

72. Mr. van Eck gives feedback and sets expectations for his direct reports. Exhibit 2 at 77:7-23.

Plaintiff's Response to Paragraph 72:

Admit in part and deny in part. Admit that Mr. van Eck, an interested witness, so testified. Mr. van Eck provides only "periodic" feedback about certain matters (Phillips Dep. at 59:9-60:4; Pl. Decl. ¶ 13.) Mr. van Eck does not set expectations for his direct reports: Mr. van Eck did not set expectations for Cardaci concerning her performance (Pl. Decl. ¶ 13.); Smith admitted that he could not recall a single performance issue discussion with Mr. van Eck (Smith Dep. at 25:8-17); Hirsch described feedback about past matters, not expectation setting. (Hirsch Dep. at 65:10-66:8.)

73. Mr. van Eck discusses performance and compensation with his direct reports at the same time, usually around February. Exhibit 2 at 78:9-17.

Plaintiff's Response to Paragraph 73:

Deny. Smith admitted that he could not recall any performance discussion with Mr. van Eck and that he did not have an annual meeting with Mr. van Eck concerning

compensation. (Smith Dep. at 25:8-26:9.) Hirsch and Phillips admitted that they did not have annual performance reviews. (Phillips Dep. at 59:9-60:4; Hirsch Dep. at 65:10-15.) Mr. van Eck did not have a meeting with Cardaci during which he assessed Cardaci's general performance until 2018. (Pl. Decl. ¶ 15.)

74. Mr. van Eck typically does verbal performance reviews with his direct reports and writes notes to himself to identify priorities and articulate his thoughts to his direct reports. Exhibit 2 at 83:21-85:8.

Plaintiff's Response to Paragraph 74:

Deny. Mr. van Eck does not have annual performance reviews with his direct reports. (See, supra, Pl. Resp. ¶ 73.) Although Mr. van Eck, an interested witness, testified that he makes notes about purported performance meeting with direct reports, he admitted that he occasionally makes or alters his notes after the fact. (van Eck Dep. at 85:5-21.)

75. Phillips testified that Mr. van Eck reviewed his performance throughout the year through conversations and has not had a formal review since prior to 2012. Exhibit 5 at 59:9-60:4.

Plaintiff's Response to Paragraph 75:

Admit in part and deny in part. Phillips, an interested witness, testified that Mr. van Eck provided feedback "periodically." (Phillips Dep. at 59:9-17.)

76. Hirsch testified that he did not get formal performance reviews from Mr. van Eck, but he knew when his performance was "good" or "wanting" because Mr. van Eck would "signal it" and give "feedback" as needed. Exhibit 4 at 65:10-66:19.

Plaintiff's Response to Paragraph 76:

Admit in part and deny in part. Hirsch testified that Mr. van Eck provided feedback about particular matters concerning the marketing department and that Mr. van Eck "signal[ed]" his views on Hirsch's performance in a manner Hirsch said he understood based on his time in the business. (Hirsch Dep. at 65:10-66:19.) Hirsch did not confirm that the feedback was as needed. (Hirsch Dep. at 65:10-66:19.)

77. Hirsch testified that "if there's something that I had some questions about, I raised them with [Mr. van Eck]. I was completely open with him and he would explain his reasoning, and so I understood … where he was coming from." Exhibit 4 at 62:14-19.

Plaintiff's Response to Paragraph 77:

Admit.

78. Megan Rapple ("Rapple"), Global Head of HR, testified that Mr. van Eck has typically had "performance conversations" with his direct reports rather than written reviews. Exhibit 3 at 42:25-43:12.

Plaintiff's Response to Paragraph 78:

Admit that Rapple, an interested witness, so testified but deny the truth of that testimony. Rapple testified that these conversations would happen in February, coinciding with VanEck's standard performance review process. (Rapple Dep. at 43:18-44:23), but Smith did not recall a single "performance issue type discussion[]" (Smith Dep. at 25:8-13), and Phillips and Hirsch admitted to not having annual performance reviews (Phillips Dep. at 59:9-60:4; Hirsch Dep. at 65:10-15).

79. VanEck Chief Financial Officer Bruce Smith ("Smith") testified that he did not recall any formal performance review meetings with Mr. van Eck. Exhibit 6 at 25:8-17.

Plaintiff's Response to Paragraph 79:

Admit. Smith admitted that he did not recall did not recall a single "performance issue type discussion[]" with Mr. van Eck. (Smith Dep. at 25:8-13.)

80. Mr. van Eck provided feedback to Cardaci during her employment about her performance. Exhibit 1 at 131:2-4, 132:18-19, 139:23-140:2, 144:8-9 ("Thanks for your feedback. Very helpful indeed."), 151:4-5. For example (Exhibit 41), Mr. van Eck advised Cardaci that:

(a) the VanEck brand should not be invisible and "fixed immediately." VE004057.

(b) there was "lots of branding improvement possible here" and not to omit the fund tagline: "designed to be investible." VE004061.

(c) higher dividend yield information needed to be "on social media." VE004066.

(d) he needed an update on the branding project, as he had not seen "anything from the last several weeks." VE003525.

(e) a final roadshow presentation for Emerging Markets Equity ("EME") products and performance reports for ANGL, a VanEck ETF, should have gone to the sales force. VE004099-4100.

(f) the "marketing material library project seems to be failing badly," and that they should discuss. VE002606.

(g) the most recent research on the VanEck website was a year old, and asked if it could be fixed. VE004178.

(h) her press release failed to mention ANGL, which had the best performance since inception. VE004197.

(i) digital analytics would be helpful for their next meeting and noted the lack of write up on several funds. VE004286.

(j) the UCITS ETFs content was "woefully inadequate," and requested several items. VE004302.

(k) while the business plan focused on targeting individuals, "we are only achieving at a 'D' level in terms of quantity, quality and 'projection' for the ucits and ETF business." VE002628.

(l) the ETF marketing communication ownership needed to be finalized and that Cardaci's performance reviews were not "very good at identifying strengths and weaknesses." VE002652.

(m) she needed to improve quality of the EM Debt monthly. VE004355.

(n) she should have closed the loop with the sales department before distributing marketing materials. VE004412.

(o) she needed to provide analytics and syndication efforts, such as number of views, emails opened, and noted that there had been no digital marketing analytics update for "many, many months." VE004490.

Plaintiff's Response to Paragraph 80:

Admit in part and deny in part. Admit that Mr. van Eck gave Cardaci feedback about discrete tasks (Pl. Decl. ¶ 13; Cardaci Dep. at 131:2-4), including Mr. van Eck sending Cardaci 15 e-mails, (Koepp Decl. Ex. 41), over the course of Cardaci's nearly four-year-long tenure at VanEck (see, supra, Pl. Resp. ¶¶ 7-8 (admitting that VanEck employed Cardaci from November 2014 to August 2018)). 13 or these 15 e-mails are from 2015 and 2016 (Koepp Decl. Ex. 41), a period of time during which Mr. van Eck admitted Cardaci was not a poor performer (van Eck Dep. at 93:2-19; 168:13-21 ("She wasn't a poor performer for the first couple of years, was my judgment."). Mr. van Eck did not raise performance issues about Cardaci to Rapple before 2017. (Rapple Dep. at 130:14-21.) Mr. van Eck provided positive feedback to Cardaci during the course of Cardaci's employment at VanEck. (Grant Decl. Ex. 42) Mr. van Eck never gave Cardaci a written warning that her employment was in jeopardy prior to firing her. (Rapple Dep. at 152:7-17.)

The disposition testimony specifically quoted by Defendants (Cardaci Dep. at 144:8-9 ("Thanks for your feedback. Very helpful indeed.")), was a response to comments Mr. van Eck provided to performance reviews Cardaci prepared for her direct reports, not a response to Mr. van Eck's feedback about her performance (Cardaci Dep. at 144:2-14; Koepp Decl. Ex. 41 at VE002652).

With respect to the specific emails cited:

a. Admit that on February 10, 2015, Mr. van Eck sent Cardaci an e-mail in which he states, "Renaming funds aside, we did agree to elevate the brand 'Van Eck' after the branding study, so stuff like this (where the brand is invisible) should be fixed immediately." (Koepp Decl. Ex. 41 at VE004057.)

b. Admit that on March 14, 2015, Mr. van Eck sent Cardaci and Lars Hamich an e-mail in which Mr. van Eck writes "Even if we keep with MVIS, lots of branding improvement possible here . . . No Van Eck Global mentioned except last line of footnote 1 . . . No mention of MVIS tagline 'designed to be investable'" (Koepp Decl. Ex. 41 at VE004061), reflecting Mr. van Eck's belief there was opportunity for improved branding of MVIS (Cardaci Dep. at 131:22-133:12.)

c. Admit that on March 18, 2015, Mr. van Eck sent Cardaci an e-mail in which he states, "This kind of stuff is awesome but really un-usable by sales. We need to get stuff like this out on social media. The project managers produce lots of good stuff, but it never gets out there! Let's fix this" (Koepp Decl. Ex. 41 at VE004066), to which Cardaci responded, "Working on it" (Koepp Decl. Ex. 41 at VE004066).

d. Admit that on March 27, 2015, Mr. van Eck sent Cardaci an e-mail in which he states, "Do you have an updated deck on branding stuff? I don't see anything from the last several weeks, but I may be missing it." (Koepp Decl. Ex. 41 at VE003525; see Cardaci Dep. at 133:23-134:14.)

e. Admit that on April 27, 2015, Mr. van Eck sent Cardaci e-mails about presentations distributed by Capuano and Meredith Larson stating that the presentations should also have been sent to VanEck's global sales force distribution list. (Koepp Decl. Ex. 41 at VE004099-100.)

f. Admit that on January 14, 2016, Mr. van Eck sent Cardaci an e-mail in which he states, "The 'marketing material library' project seems to be failing badly Let's discuss," to which Cardaci responded that she would revert on the issue. (Koepp Decl. Ex. 41 at VE002606.) The marketing material library was failing because of problems with VanEck's Information Technology department beyond the purview of

the Marketing Department, issues about which Mr. van Eck was aware. (Cardaci Dep. at 137:15-139:7.)

g. Admit that on January 21, 2016, Mr. van Eck sent Cardaci an e-mail in which he states, "It was pointed out to me that from our home page, under 'Insights' and then 'research', the most recent research is a year old. First, who owns the web site. Second, can this be fixed?" (Koepp Decl. Ex. 41 at VE004178.) Cardaci responded, "Yes, can be fixed," and stated that she was checking with MacLeod, head of digital marketing at the time, as to who was monitoring the site for this type of work. [VE004179]. On the same day, Cardaci followed up with Mr. van Eck by forwarding Mr. van Eck an e-mail she received from MacLeod, in which MacLeod states, "I own it" and that measures were being taken to correct the issue. (Grant Decl. Ex. 45.) Mr. van Eck admitted that MacLeod's management of the digital marketing department led to "frustrations." (van Eck Dep. at 126:19-127:11.)

h. Admit that on March 21, 2016, Mr. van Eck sent Cardaci an e-mail in which he states, "No mention of #1 since inception?," in reference to a press release approved by the Marketing Department about the ANGL ETF. (Koepp Decl. Ex. 41 at VE004197-98.)

i. Admit that on August 4, 2016, Mr. van Eck sent Cardaci an e-mail in which he states, regarding a then forthcoming meeting, "[I]t would be good to have (a) more data (incl digital) on the environment than we did last week . . . and (b) some salesforce feedback from Bill S.," and noted that if they did not have the information the meeting could still move forward, with discussion of those other matters being put off until the following week. (Koepp Decl. Ex. 41 at VE004286.). Admit that in the same e-mail, Mr. van Eck states, "I have noted the lack of short PFXF, ounz and IGEM pieces. Are we prepping some pieces on the new muni funds? Let's discuss." (Koepp Decl. Ex. 41 at VE004286.)

j. Admit that on August 15, 2016, Mr. van Eck sent Cardaci an e-mail in which he states, "As discussed, the content going out to support Ucits [ETFs] is woefully inadequate" and asks Cardaci to address certain particular questions about the issue. (Koepp Decl. Ex. 41 at VE004302.) As indicated by the e-mail's subject line, the content about which Mr. van Eck had questions was Marketing Communications content. (Koepp Decl. Ex. 41 at VE004302.) In response, Cardaci sent Mr. van Eck an e-mail saying she was available to speak and attached a memo addressing Mr. van Eck's questions. (Grant Decl. Ex 46.)

k. Admit that on August 20, 2016, Mr. van Eck sent Cardaci an e-mail in which he states that "[e]veryone seems to be missing that half or so of the flows are coming from individuals" and that projecting outside the website was "a huge opportunity for this business line, but we are only achieving at a 'D' level in terms of quantity, quality, and 'projection' for the ucits ETF business." (Koepp Decl. Ex. 41 at VE002628.) In a responsive e-mail, Cardaci said that she would "absolutely help [Mr. van Eck] with this initiative," that she "would like to meet" to discuss plans moving forward, and that she believed "they were more aligned than suggested." (Grant Decl. Ex. 44.)

l. Admit that on October 24, 2016, Mr. van Eck sent Cardaci an e-mail in which he attaches comments he had to performance reviews Cardaci prepared for her direct reports and said "my main comment on [the reviews] is they weren't very good at identifying strengths and weaknesses . . . [b]ecause in fact I think you feel that some of these individuals were unable to do the jobs they had a year ago." (Koepp Decl. Ex. 41 at VE002652.) Mr. van Eck also said "we need to finalize the ETF [marketing communication] ownership . . . [w]hen are you having lunch with [Lopez] to discuss this." (Koepp Decl. Ex. 41 at VE002652.) Cardaci responding by thanking Mr. van Eck for his feedback on the reviews and saying that she spoke with Lopez last week and was following up with him that week. (Koepp Decl. Ex. 41 at VE002652.)

m. Admit that on November 11, 2016, Mr. van Eck sent Cardaci an e-mail concerning a third-quarter analysis Cardaci prepared in which he states "I appreciate the effort to do this[.] I find it helpful" and advises with respect to his goals for the following quarter that he wants to "[i]mprove quality and set goals for distribution strategy" for "EM Debt monthly." (Koepp Decl. Ex. 41 at VE004355.)

n. Admit that on May 10, 2017, Mr. van Eck sent Cardaci an e-mail asking whether sales marketing materials was distributed before his request and stating, "I would think sales would have input on this. That's the 'closing the loop' stuff that's missing." (Koepp Decl. Ex. 41 at VE004412; see Cardaci Dep. at 145:12-147:18.)

o. Admit that on March 1, 2018, Mr. van Eck sent Cardaci an e-mail stating "In looking at my emails, I haven't gotten a digital marketing analytics update for a whole in many, many months . . . only . . . updates on monthly EM debt subscriptions" and asking what happened. (Koepp Decl. Ex. 41 at VE004490.) Mr. van Eck had given inconsistent instructions as to the analytics he wanted. (Cardaci Dep. at 152:3-153:22.)

81. In his annual notes regarding Cardaci's performance in 2015, Mr. van Eck noted that a pitch book was not redone, Cardaci's projects were "[r]eally not good," and "[i]n general, [she exhibited] lower energy than the ETF business needs." Exhibit 42.

Plaintiff's Response to Paragraph 81:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part.

With respect to the pitch book, the notes state that Mr. van Eck was "not aware whether the pitch book was specifically redone," the notes do not state that the pitch book was not, in fact, redone. (Koepp Decl. Ex. 42.) The pitch book concerns to a particular groups of funds, emerging market equity ("EME"), which is part of VanEck's non-ETF business, (van Eck Dep. at 183:3-14), and Mr. van Eck admitted that the pitch was not a specific project for Cardaci (van Eck Dep. at 183:15-18). Cardaci had informed Mr. van Eck that she and Capuano were encountering certain difficulties updating the EME pitch book because VanEck's EME Portfolio Manager, David Semple, was not cooperating with them, but Mr. van Eck did nothing to address the issue. (Pl. Decl. ¶ 16.)

With respect to comments about Cardaci's projects, Mr. van Eck admitted that the category referred to compliance with a project management process he had implemented, not to the quality of projects generally. (van Eck Dep. at 184:9-21.) With respect to the comment about Cardaci's energy, Mr. van Eck clarified that the statement concerned Cardaci having, in his view, an "overall approach" that was "low energy or less intense" than Hirsch and others that Mr. van Eck knew in the ETF marketing. (van Eck Dep. at 185:22-186:12.) Add that the notes reflect that branding was "[m]oving along nicely" and that "[r]eorganization of marketing/communications was in the right direction." (Koepp Decl. Ex. 42.) Mr. van Eck admitted that Cardaci was not a poor performer during this time. (van Eck Dep. at 168:13-21.) Mr. van Eck did not raise performance issues about Cardaci to Rapple before 2017. (Rapple Dep. at 130:14-21.)

82. In his annual goals notes for 2016, Mr. van Eck noted that Cardaci needed to improve market communications strategy and devote more energy to ETF product development. Exhibit 43.

<u>Plaintiff's Response to Paragraph 82</u>:

Plaintiff objects to this statement of fact because the evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits in part and denies in part.

Nothing in the document reflects Cardaci needing to devote more energy to ETF product development. (Koepp Decl. Ex. 43.) The only reference to energy is the statement "lower energy than the ETF business needs," which is made in a section that appears to have been copied from the 2015 notes. (Compare Koepp Decl. Ex. 42 with Koepp Decl. Ex. 43; see, supra, Pl. Resp. ¶ 81.) Second, the statement about "improvement of [marketing communications] strategy," relates to "articulation and [marketing communication] strategy" for the "business plan." (Koepp Decl. Ex. 43.) Mr. van Eck admitted that Cardaci was not a poor performer during this time. (van Eck Dep. at 168:13-21.) Mr. van Eck did not raise performance issues about Cardaci to Rapple before 2017. (Rapple Dep. at 130:14-21.)

83. Cardaci stated in her Notes for 2016 Performance Review that she needed to "[c]ontinue with improving my ETF knowledge." Exhibit 44.

Plaintiff's Response to Paragraph 83:

Admit in part and deny in part. Admit that in an outline Cardaci made for drafting her annual self-review (Cardaci Dep. at 95:5-16, 97:5-98:4), Cardaci wrote under a section titled "Areas of Development," that she should "[c]ontinue with improving [her] ETF knowledge." (Koepp Decl. Ex. 44.) Cardaci's outline did not state that she needed to do so. (Koepp Decl. Ex. 44.) Cardaci believed continuing to improve her knowledge of ETFs was useful for job, but she

did not believe her existing knowledge of ETFs was deficient. (Pl. Decl. ¶ 17; Cardaci Dep. at 74:4-8.)

84. Looking forward to 2017, Cardaci needed to continue to improve her ETF product knowledge, product development and management. Exhibit 1 at 98:11-13.

Plaintiff's Response to Paragraph 84:

Admit. Add that Cardaci did not, however, need to improve her knowledge of marketing ETFs. (Cardaci Dep. at 98:11-13; see, supra, Pl. Resp. ¶ 83.)

85. Mr. van Eck's concerns about Cardaci's performance accelerated in 2017. Exhibit 2 at 169:4-8.

Plaintiff's Response to Paragraph 85:

Deny. Although Mr. van Eck, an interested witness, so testified, Mr. van Eck did not have concerns about Cardaci before 2017; Mr. van Eck admitted that he did not consider Cardaci to be a poor performer for the first couple of years. (van Eck Dep. at 168:13-21; see, supra, Pl. Resp. ¶¶ 80-82.) Mr. van Eck did not raise performance issues about Cardaci to Rapple before 2017. (Rapple Dep. at 130:14-21.) E-mails complied by Defendants to demonstrate purported negative feedback of Cardaci show that Mr. van Eck's feedback decreased in 2017, as only one of the 15 e-mails were made that year. (Koepp Decl. Ex. 41; see, supra, Pl. Resp. ¶ 80.)

86. Mr. van Eck concluded that Cardaci was not capable of fixing Digital Marketing. Exhibit 2 at 169:4-8.

Plaintiff's Response to Paragraph 86:

Deny. Mr. van Eck, an interested witness, testified that he concluded Cardaci "either wasn't interested or capable of fixing the problems in the digital marketing area." (van Eck Dep. at 169:4-8.) Mr. van Eck testified that he came to this conclusion after investigating over the course of 2017 and 2018 the source of what he perceived were performance problems in the digital department. (van Eck Dep. at 170:10-172:14.)

87. In Mr. van Eck's judgment, Cardaci was not providing enough guidance, did not know what Digital Marketing was supposed to be doing, and Digital Marketing was not delivering what he requested. Exhibit 2 at 171:10-22.

Plaintiff's Response to Paragraph 87:

Admit that Mr. van Eck, an interested witness, so testified. (van Eck Dep. at 171:10-22.) Mr. van Eck testified that he came to this conclusion after investigating over the course of 2017 and 2018 the source of what he perceived were performance problems in the digital department. (van Eck Dep. at 170:10-172:14.)

88. Mr. van Eck concluded Digital Marketing would not get better "without better senior management guidance" than Cardaci was providing. Exhibit 2 at 172:9-14.

Plaintiff's Response to Paragraph 88:

Admit that Mr. van Eck, an interested witness, so testified. (van Eck Dep. at 172:9-14.) Mr. van Eck testified that he came to this conclusion after investigating over the course of 2017 and 2018 the source of what he perceived were performance problems in the digital department. (van Eck Dep. at 170:10-172:14.)

89. Mr. van Eck told Rapple at the beginning of and throughout 2017 that Cardaci had performance issues, was not adding value to the ETF business and Digital Marketing needed improvement. Exhibit 3 at 116:15-117:17.

Plaintiff's Response to Paragraph 89:

Admit in part and deny in part. Admit that Rapple, an interested witness, testified that Mr. van Eck mentioned Cardaci's performance to her in several conversations in 2017. (Rapple Dep. at 116:16-24.) Rapple could not recall when in 2017 Mr. van Eck first mentioned Cardaci's performance. (Rapple Dep. at 116:21-24.) When asked whether she recalled Mr. van Eck's first mention of Cardaci's performance being in the first part of the year or the second part of the year, Rapple said "I would say it started in the first part of the year." (Rapple Dep. at 116:25-117:5.) Rapple never testified that Mr. van Eck first mentioned Cardaci's performance to her at the beginning of the year. (Rapple Dep. at 116:15-117:17.) Rapple admitted that Mr. van Eck had not raised concern about Cardaci's value to the ETF and Active product management business before decision-making concerning 2018 bonuses. (Rapple Dep. at 129:16-24.)

90. Rapple had more than five conversations with Mr. van Eck about Cardaci's performance in 2017. Exhibit 3 at 118:9-13.

Plaintiff's Response to Paragraph 90:

Admit that Rapple, an interested witness, so testified. Rapple testified that she had between 5 and 10 informal discussions with Mr. van Eck during which Cardaci's performance was brought up. (Rapple Dep. at 116:19-24, 118:2-13.) Mr. van Eck did not raise performance issues about Cardaci to Rapple before 2017. (Rapple Dep. at 130:14-21.)

91. On February 9, 2018, Mr. van Eck gave Cardaci an oral performance review for 2017 during which time they also discussed her compensation for 2017. Exhibit 1 at

34:19-36:20; Exhibit 3 at 266:5-11; Exhibit 2 at 196:7-201:7; Exhibit 45 (email reflecting a performance review); Exhibit 10 (FAC) at ¶ 68 (alleging that she had a performance review); Exhibit 46 (email from Cardaci to Phillips) ("He told me to follow up with you regarding my perf review/comp discussion."); Exhibit 47 ("Performance Review Response" prepared by Cardaci following her discussion with Mr. van Eck).

Plaintiff's Response to Paragraph 91:

Admit in part and deny in part. Admit that on February 9, 2018, Cardaci had an oral performance review meeting with Mr. van Eck. (Cardaci Dep. at 34:19-35:12.) Deny that the meeting focused on performance and that discussion of compensation was incidental; the discussion was mostly about compensation (Cardaci Dep. at 35:20-38:11), and the only assessment Mr. van Eck provided for Cardaci's performance was saying that Cardaci had an "eh" year. (Cardaci Dep. at 36:2-20, 37:18-38:4.) Add that this was Cardaci's first ever performance review. (Cardaci Dep. at 35:10-12.)

92. At the 2017 performance review, while Mr. van Eck felt there was good improvement on marketing communications, he told Cardaci he did not see her value added to the ETF or Active businesses. Exhibit 2 at 198:3-6.

Plaintiff's Response to Paragraph 92:

Deny. Although Mr. van Eck, an interested witness, so testified, during the meeting, Mr. van Eck did not discuss there being good improvement in marketing communications or tell Cardaci that he did not see her value added to the ETF or Active businesses. (Pl. Decl. ¶ 18.) The discussion was mostly about compensation. (Cardaci Dep. at 35:20-38:11.) After Mr. van Eck informed Cardaci of her compensation for 2017, Cardaci asked why there was disparity between her numbers and those of her team. (Cardaci Dep. at 35:20-36:6, 36:21-37:9.) Mr. van Eck responded, "Because you had an eh year." (Cardaci Dep. at 36:2-

6.) When Cardaci asked Mr. van Eck what “eh” meant, he did not provide a response or give any examples to support his assessment. (Cardaci Dep. at 36:7-20, 37:18-38:4.) The only comment made during the meeting to justify his “eh” assessment was that 2017 “wasn't like 2016 when you fixed the Heather problem,” referring to Cardaci’s decision to create a separate Marketing Communication department within marketing and to move Heather MacLeod from a position overseeing digital marketing, one in which MacLeod was struggling, to a role managing Marketing Communications. (Cardaci Dep. at 101:2-19.) Cardaci told Mr. van Eck that she felt blindsided and asked Mr. van Eck that if “eh” was indicative of unhappiness with her, why he did not tell her sooner. (Cardaci Dep. at 37:18-38:4.) Mr. van Eck agreed to review Cardaci’s compensation for 2017 and told Cardaci that if she disagreed with the amount of her compensation, she should also speak to Phillips. (Cardaci Dep. at 36:11-37:9; Grant Decl. Ex. 14.)

93. At the 2017 performance review, Mr. van Eck told Cardaci that he was “dissatisfied” with digital marketing. Exhibit 2 at 198:6-9.

Plaintiff’s Response to Paragraph 93:

Deny. Although Mr. van Eck, an interested witness, so testified, during the meeting, Mr. van Eck did not tell Cardaci that he was dissatisfied with digital marketing. (Pl. Decl ¶ 19; see, supra, Pl. Resp. ¶ 92.)

94. At the 2017 performance review, Mr. van Eck told Cardaci that he had not received digital analytics “for years” (Exhibit 2 at 198:14-20), four people left digital marketing during 2017 (Exhibit 2 at 199:2-6) and one individual was hired without technical skills (Exhibit 2 at 199:7-22), all of which was “completely unacceptable.” Exhibit 2 at 202:23-203:7.

Plaintiff's Response to Paragraph 94:

Deny. Although Mr. van Eck, an interested witness, so testified, during the meeting, Mr. van Eck did not tell Cardaci that he had not received digital analytics, discuss departures in digital marketing, comment on the hiring on someone with deficient technical skills, or say that all the foregoing was unacceptable. (Pl. Decl. ¶ 20; see, supra, Pl. Resp. ¶ 92.)

95. According to Cardaci, in the 2017 performance review, Mr. van Eck summed up her 2017 performance as "eh." Exhibit 49 (Cardaci self-evaluation) at Pl. 001245; Exhibit 1 at 36:3-6.

Plaintiff's Response to Paragraph 95:

Deny. The only assessment Mr. van Eck gave of Cardaci's performance during the meeting was that "[she] had an eh year"; the statement was not a summation. (Cardaci Dep. at 36:2-6; see, supra, Pl. Resp. ¶ 92.)

96. Mr. van Eck told Cardaci what her compensation for 2017 was. Exhibit 1 at 35:24-25.

Plaintiff's Response to Paragraph 96:

Admit.

97. Cardaci testified that the 2017 performance review "wasn't positive, but [she] didn't know whether it was really negative or positive." Exhibit 1 at 38:14-15.

Plaintiff's Response to Paragraph 97:

Admit.

98. On the same day, February 9, 2018, after the 2017 performance review, Cardaci met with Vitalone and Jones. Exhibit 50 (meeting email); Exhibit 1 at 42:2-9.

Plaintiff's Response to Paragraph 98:

Admit.

99. Vitalone and Jones both testified that Cardaci told them that she had just received a negative performance review. Exhibit 7 at 257:10-22; Exhibit 9 at 61:2-10, 85:24-87:4, 90:15-91:5, 94:4-10.

Plaintiff's Response to Paragraph 99:

Admit the Vitalone and Jones, interested witnesses, so testified, but deny truth of that testimony. Cardaci did not tell Vitalone and Jones that she had received a "negative performance review." (Pl. Decl. ¶ 21.) During their meeting, Cardaci told Vitalone and Jones about her 2017 compensation and Mr. van Eck's "eh" comment. (Cardaci Dep. at 41:11-42:14.) Cardaci also told Vitalone and Jones that she felt she was being treated unfairly because she is a woman and said that "VanEck is a boys club." (Pl. Decl. ¶ 22; Cardaci Dep. at 42:15-24, 202:2-22; Koepp Decl. Ex. 51 at 5.)[4]

100. Cardaci's total compensation for 2017 was $629,250, a $29,250 increase over 2016. Exhibits 38-39.

Plaintiff's Response to Paragraph 100:

Admit.

101. On February 12, 2018, Cardaci met with Rapple at Cardaci's request to discuss the 2017 performance review and get Rapple's advice about having her 2017 compensation reconsidered. Exhibit 1 at 54:2-55:19.

---

[4] Koepp Decl. Ex 51 are notes that Vitalone kept about Cardaci concerning Cardaci's actions that Vitalone believed were negative. (See Vitalone Dep. at 178:19-195:25, 221:15-20; see Capuano Dep. at 186:20-188:13.) Vitalone told Capuano the notes were a "insurance policy." (Capuano Dep. at 187:24-188:5.)

Plaintiff's Response to Paragraph 101:

Admit in part and deny in part. Cardaci met with Rapple to discuss her 2017 compensation and to get Rapple's advice on how to approach getting her compensation reconsidered, not to discuss her performance review. (Pl. Decl. ¶ 23; Cardaci Dep. at 55:16-56:18).

102. Cardaci told Rapple that Mr. van Eck told Cardaci in the 2017 performance review that there were areas where her performance was not good. Exhibit 3 at 100:25-101:20.

Plaintiff's Response to Paragraph 102:

Deny. Although Rapple, an interested witness, so testified, Cardaci did not tell Rapple that Mr. van Eck had told Cardaci there were areas where Cardaci's performance was not good. (Cardaci Dep. at 54:12-55:5, 55:20-56:18.) Cardaci told Rapple about the February 9, 2018 meeting with Mr. van Eck, Mr. van Eck's "eh" comment, Mr. van Eck's promise to revisit Cardaci's compensation, and Cardaci's understanding that 2017 had been a great year. (Cardaci Dep. at 54:12-55:5.)

103. Additionally, Cardaci told Rapple that Mr. van Eck explained to Cardaci in the 2017 performance review that she was not adding value to the ETF business and digital marketing. Exhibit 3 at 107:9-108:6.

Plaintiff's Response to Paragraph 103:

Deny. Although Rapple, an interested witness, so testified, Cardaci did not tell Rapple that Mr. van Eck had explained to Cardaci during the August 9, 2018 meeting that

Cardaci was not adding value to the ETF business and digital marketing. (Cardaci Dep. at 54:12-55:5, 55:20-56:18; see, supra, Pl. Resp. ¶ 102.)

104. Cardaci did not agree with the assessment of her performance and was seeking guidance from Rapple. Exhibit 3 at 101:11-20; Exhibit 47.

Plaintiff's Response to Paragraph 104:

Admit in part and deny in part. Admit that Cardaci sought Rapple's advice about reconsideration of her 2017 compensation and Mr. van Eck's "eh" comment. (Cardaci Dep. at 54:12-20.) Cardaci did not agree with her 2017 compensation or that she had an "eh" year. (Cardaci Dep. at 54:12-55:10; Rapple Dep. at 101:21-103:9.) Although Rapple, an interested witness, so testified, Cardaci did not seek guidance from Rapple about any assessment of Cardaci's performance beyond Mr. van Eck's "eh" comment. (Pl. Decl. ¶ 24; Cardaci Dep. at 54:12-56:18.)

105. After receiving her performance review on February 9, 2018, Cardaci disparaged Mr. van Eck. Exhibit 1 at 45:17-25, 47:16-48:18; Exhibit 8 at 104:21-24; Exhibit 7 at 256:10-257:4; Exhibit 9 at 90:24; Exhibit 51 (Vitalone spreadsheet) at 5.

Plaintiff's Response to Paragraph 105:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 51), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits. Add that none of these comments were made to Mr. van Eck directly. (Cardaci Dep. at 45:17-25, 47:16-48:18; Pl. Decl. ¶ 25.)

106. Cardaci told Capuano that Mr. van Eck was a "fucking asshole" and that Phillips was "Teflon;" told Vitalone that she had no respect for Mr. van Eck, could not work for him much longer, and would look for a new job; and told Vitalone and Jones that she hated Mr. van Eck, calling him a "fucking asshole" and "idiot" with "no business sense." Exhibit 1 at 45:17-19, 48:19-25; Exhibit 8 at 104:21-24; Exhibit 51 at 5-6.

Plaintiff's Response to Paragraph 106:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 51), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part. Admit that Cardaci told Capuano that Mr. van Eck is "a fucking asshole." (Cardaci Dep. at 45:17-19.) Deny that Cardaci told Capuano that Phillips was "Teflon." (Pl. Decl. ¶ 26.) Cardaci made that comment to Vitalone and Jones. (Cardaci Dep. at 48:19-49:12, 202:2-203:13.) Cardaci did not tell Vitalone that she could not work for Mr. van Eck or that she would look for new job. (Pl. Decl. ¶ 27; Cardaci Dep. at 19:19-20:9.) Admit that Cardaci told Vitalone and Jones that she hated Mr. van Eck and said Mr. van Eck is a "fucking asshole" and "idiot." (Cardaci Dep. at 202:2-203:13.) Deny that Cardaci told Vitalone and Jones that Mr. van Eck had "no business sense." (Pl. Decl. ¶ 28.) Cardaci told them that she believed Mr. van Eck had "no management sense." (Pl. Decl. ¶ 28.)

107. Cardaci again complained about the February 9, 2018 review in another meeting with Vitalone and Jones on February 14, 2018. Exhibit 51 at 6; Exhibit 7 at 259:7-260:13.

Plaintiff's Response to Paragraph 107:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 51), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part. Cardaci does not recall this meeting (Cardaci Dep. at 43:20-25, 204:16-205:25), but admits complaining to Vitalone and Jones about her February 9, 2018 meeting with Mr. van Eck, Mr. van Eck's "eh" comment, her compensation, the disparity between her profit share bonus and Lopez's, and VanEck being a boys club following Cardaci's meeting with Vitalone and Jones on February 9, 2018. (Pl. Decl. ¶ 29; Cardaci Dep. at 204:16-205:25.)

108. On February 15, 2018, Mr. van Eck criticized Cardaci for a change to VanEck's website that was made without procedure, discussion or notification. Exhibit 52 (website emails); Exhibit 2 at 199:25-201:7.

Plaintiff's Response to Paragraph 108:

Admit in part and deny in part. Admit that on February 15, 2018, Mr. van Eck e-mailed Cardaci about a change that had been made to the VanEck website and asked if the change was a mistake. (Koepp Decl. Ex. 52 at VE004477.) Cardaci told Mr. van Eck that the change was not a mistake and that Vitalone had made the change to make the website more mobile-friendly. (Koepp Decl. Ex. 52 at VE004476-77; Cardaci Dep. at 147:19-151:14.) Vitalone, made the change without following process. (Koepp Decl. Ex. 52 at VE004476-77; Cardaci Dep. at 147:19-151:14.) Deny that Mr. van Eck criticized Cardaci for the change; Mr. van Eck acknowledged that Vitalone may "own" the change, asked whether there was study, and requested to see the "process" leading to the change. (Koepp Decl. Ex. 52 at VE004476; Cardaci Dep. at 149:19-151:14; see van Eck Dep. at 200:12-21.)

109. Cardaci again complained about the February 9, 2018 review at a dinner on February 15, 2018. Exhibit 51 at 6; Exhibit 7 at 260:25-262:7.

Plaintiff's Response to Paragraph 109:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 51), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff denies. None of the evidence cited by Defendants, Vitalone's testimony and Vitalone's notes about Cardaci, refers to any discussion of the February 9, 2018 meeting, including Mr. van Eck's "eh" comment and Cardaci's compensation, during the February 15, 2018 dinner. (Koepp Decl. Ex. 51 at 6; Vitalone Dep. at 260:25-262:7.) During the February 15, 2018 dinner, there was discussion about VanEck being an old boys club. (Cardaci Dep. at 216:22-217:12.) In addition, there was discussion of a comment Mr. van Eck made to Cardaci when Cardaci asked for Mr. van Eck's approval to promote Jones. (Cardaci Dep. at 216:22-217:12; see, infra, Pl. Resp. ¶ 198.) After Cardaci asked Mr. van Eck on several occasions for approval to promote Jones, Mr. van Eck said, "What if she gets pregnant?" (Cardaci Dep. at 165:20-166:13, 222:17-223:9.) Cardaci told the others at the dinner about Mr. van Eck's comment and the difficulty posed by Mr. van Eck's concern about the prospect of Jones getting pregnant. (Cardaci Dep. at 217:5-12.)

110. Jones testified that working with Cardaci after February 9, 2018 was "difficult" as "things seemed to spiral" after Cardaci's negative performance review. Exhibit 9 at 61:2-62:3.

Plaintiff's Response to Paragraph 110:

Admit in part and deny in part. Admit that Jones, an interested witness, so testified as to that being her experience working with Cardaci after February 9, 2018. (Jones Dep. at 60:21-62:3.) Jones did not testify about the experience others had working with Cardaci. (Jones Dep. at 60:21-62:3.) Add that Jones testified that she enjoyed working with Cardaci less after February 9, 2018 because Cardaci would complain about others during meetings (Jones Dep. at 61:19-62:3), but admitted that Cardaci was complaining about being treated differently on the basis of sex (Jones Dep. at 62:4-16). Jones admitted she enjoyed working with Cardaci before Cardaci's February 9, 2018 meeting with Mr. van Eck, that she learned a lot about marketing strategy from Cardaci, that she considered Cardaci a mentor, and that she considered Cardaci a good marketer. (Jones Dep. at 60:21-24, 61:11-14, 65:8-66:8.)

111. Capuano testified that Cardaci "really seemed to be disengaged" and did not seem to want to work at VanEck after the February 9, 2018 meeting with Mr. van Eck. Exhibit 8 at 110:8-16, 222:4-12.

Plaintiff's Response to Paragraph 111:

Admit Capuano, an interested witness, so testified but deny that Cardaci was, in fact, disengaged and did not want to work VanEck anymore. Until the time she was fired, Cardaci wanted to work at VanEck. (Pl. Decl. ¶ 30) Even after her meeting with Mr. van Eck on February 9, 2018, Cardaci continued to perform her job with the same level of interest and enthusiasm. (Pl. Decl. ¶ 31.) Capuano admitted that until the time Cardaci was fired, Cardaci continued to perform her job and that she did not know anything that Cardaci was not doing during this time. (Capuano Dep. at 111:25-113:19.)

112. In March 2018, Cardaci told Capuano she was pursuing outside opportunities. Exhibit 8 at 110:22-24.

Plaintiff's Response to Paragraph 112:

Deny. Although Capuano, an interested witness, so testified, Cardaci did not tell Capuano that she was pursuing outside opportunities. (Pl. Decl. ¶ 32.) Cardaci told Capuano and Jones that she had been approached about a potential job. (Pl. Decl. ¶ 32; Cardaci Dep. at 15:3-25, 16:22-18:19; see Capuano Dep. at 110:20-112:7.)

113. In March 2018, Cardaci responded to and met with an executive search firm, and sent her resume. Exhibit 28; Exhibit 1 at 15:3-25.

Plaintiff's Response to Paragraph 113:

Admit. The search firm reached out to Cardaci about a potential opportunity at MSCI, a company that manages indices. (Cardaci Dep. at 15:3-25, 16:22-18:19.) Cardaci had an informational meeting with the recruiting firm but was told the following day that the position was no longer available. (Cardaci Dep. at 18:13-19.) Cardaci did not interview or meet with anyone from MSCI. (Cardaci Dep. at 15:12-17, 18:8-12.)

114. In March 2018, Cardaci told Jones and Capuano that she had a potential job opportunity that would pay $300,000 more than her position at VanEck. Exhibit 8 at 111:7-10; Exhibit 9 at 117:19-23.

Plaintiff's Response to Paragraph 114:

Admit in part and deny in part. Admit that in March 2018, Cardaci told Capuano and Jones that she had been approached about a potential job. (Pl. Decl. ¶ 32; Cardaci Dep. at 15:3-25, 16:22-18:19; see Capuano Dep. at 110:20-112:7.) Deny the Cardaci told Capuano and

Jones that the potential job would pay $300,000 more than Cardaci's job at VanEck. (Pl. Decl. ¶ 33.) Cardaci discussed the range of potential earnings for the job with Capuano and Jones (Pl. Decl. ¶ 33.)

115. On March 27, 2018, Mr. van Eck sent notes assessing Cardaci's 2017 performance to Phillips and Rapple. Mr. van Eck thought digital "needed improvement, through hires, and the 'vision'/strategy side needed clarification." He noted the "'agency of record' that [Cardaci] hired had to be replaced," thus wasting time and money. Mr. van Eck noted that Cardaci was "very weak in the digital marketing area," did not timely identify Vitalone's weaknesses, and "needed to make more of an effort to get up to speed on technology." He was not sure Cardaci could do so, and was "looking to organizational changes." Exhibit 53.

Plaintiff's Response to Paragraph 115:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits in part and denies in part.

Admit that the notes state that digital marketing with respect to operations "needed improvement, through hires, and [that] the 'vision'/strategy side needed clarification." (Koepp Decl. Ex. 53.). Admit that the document states that "'agency of record' that was hired had to be replaced (wasted time and money)." (Koepp Decl. Ex. 53.) The document does not state that Cardaci retained the agency of record. (Koepp Decl. Ex. 53.) Admit that the document states that Cardaci was "very weak in the digital marketing area," and that Cardaci did not identify timely "[Vitalone]'s weaknesses." (Koepp Decl. Ex. 53.) Admit that the document states the Mr. van Eck "thinks [Cardaci] needs to make an effort to get more up to speed on the technology and not rely on other people for that," but that he "can't be sure that it will happen, so [he] was looking to organizational changes as well to address this." (Koepp Decl. Ex. 53.)

116. Mr. van Eck asked Phillips and Rapple to review and comment on his March 27, 2018 assessment. Exhibit 2 at 210:7-17; Exhibit 53.

Plaintiff's Response to Paragraph 116:

Admit.

117. Mr. van Eck's March 27, 2018 notes reflected that Cardaci was not doing her job well. Exhibit 53.

Plaintiff's Response to Paragraph 117:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff denies.

The document outlines positives in Cardaci's performance. (Koepp Decl. Ex. 53 at VE003064.) The document notes Cardaci's "strength" in Marketing Communications, which was showing "better quality over time" and was "compensating" for perceived problems in digital marketing. (Koepp Decl. Ex. 53 at VE003064.) The document also states that "ETF and Active product management were ok[.]" (Koepp Decl. Ex. 53 at VE003064.) Based on percentages assigned to these areas in the document, Marketing Communications, Active Product Management, and ETF Product Management collectively accounted for more than half of Cardaci's job. (Koepp Decl. Ex. 53 at VE003064.) Virtually all of the criticisms in the document, including failure to "identify [Vitalone]'s weaknesses" timely, relate to digital marketing, which accounted for only 25% of Cardaci's job. (Koepp Decl. Ex. 53 at VE003064.)

Nowhere in the document does it state that Cardaci was not performing her job well overall. (Koepp Decl. Ex. 53 at VE003064.)

118. In March 2018, Mr. van Eck believed that "we may have to fire her." Exhibit 2 at 210:7-17.

Plaintiff's Response to Paragraph 118:

Admit that Mr. van Eck so testified. Add the Rapple did not understand Mr. van Eck to be threatening or contemplating firing Cardaci in March 2018. (Rapple Dep. at 144:23-145:6.) Rapple first learned that Mr. van Eck was considering firing Cardaci in late July 2018. (Rapple Dep. at 147:22-149:14.)

119. Phillips agreed with Mr. van Eck's assessment, except he thought Cardaci spent time with the ETF and Active product teams and that this should be reflected. Exhibit 48; Exhibit 2 at 211:10-16; Exhibit 5 at 193:18-194:14.

Plaintiff's Response to Paragraph 119:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 48), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff denies.

Phillips disagreed about more than Cardaci spending time with the ETF and Active product teams. (Koepp Decl. Ex. 48 at VE003068-69; Phillips Dep. at 194:15-197:24.) Phillips disagreed with Mr. van Eck's assessment that Cardaci was not adding value to ETF and Active product management. (Koepp Decl. Ex. 48 at VE003068-69; Phillips Dep. at 194:15-197:24.) Phillips understood that Cardaci played a significant role in helping those departments

run smoothly by being a sounding board and overseeing implementation. (Koepp Decl. Ex. 48 at 3068-69; Phillips Dep. at 194:15-196:23.) Phillips also credited Cardaci's guidance and strong voice on things like sensitive press responses. (Koepp Decl. Ex. 48 at VE003068-69; Phillips Dep. at 196:24-197:24.) Phillips stated that "in sum, [his] grade would be a good over an OK." (Koepp Decl. Ex. 48 at 3068-69.) Phillips also pointed out that VanEck's assessment of Cari's role in Europe may need to be revised because he it was his sense that Cardaci "was pretty involved with Europe marketing." (Koepp Decl. Ex. 48 at VE003068-69.)

Phillips confirmed that by highlighting only certain points of disagreement in his e-mail, he was not implicitly endorsing the truth of the remainder. (Philips Dep. at 193:12-194:14.) In the e-mail, Phillips does not state whether he agrees or disagrees with other points in Mr. van Eck's review. (Koepp Decl. Ex. 48 at VE003068-69.)

120. Rapple also agreed with Mr. van Eck's assessment, except she echoed Phillips's comments, thought there may be a communication issue, and suggested that Mr. van Eck hold biweekly meetings with Cardaci. Exhibit 3 at 104:12-16; Exhibit 48.

<u>Plaintiff's Response to Paragraph 120</u>:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 48), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff denies.

In her response, Rapple does more than echo Phillips's comments, indicate a communications issue, and suggest Mr. van Eck have bi-weekly meeting with Cardaci. (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 137:18-145:6.) Rapple stated that she agreed with Adam's comments, and elaborated by identifying that Cardaci did spend a fair amount of time

with both the ETF product and Active product teams and "serv[ed] as a coach helping to discuss strategy, assist[ed] them with prioritizing work, and assist[ed] with hiring and staff management." (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 137:13-138:6.) With respect to these points, Rapple highlighted Cardaci's work with Lopez in helping Lopez create a new organizational structure and guiding him in conversations with a subordinate. (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 138:7-141:2.) Rapple admitted that Mr. van Eck had not rasied concern about Cardaci's value to the ETF and Active product management business before decision-making concerning 2018 bonuses. (Rapple Dep. at 129:16-24.)

In reference to Mr. van Eck's comments about Europe, Rapple stated that Cardaci "would get involved when there was an issue (for example, digital) and was helpful in figuring out solutions." (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 141:3-17.) Rapple also stated that Cardaci was "involved in the hiring process for various marketing/product roles we recruited for in 2017 helping put together job descriptions and conducting interviews." (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 141:3-17.)

With respect to a communication issue Mr. van Eck referenced in his document he sent to Rapple and Phillips (Koepp Decl. Ex. 53 at VE003064), Rapple reminded Mr. van Eck of Cardaci's complaints about Mr. van Eck not meeting with Cardaci and suggested he agree to bi-weekly, one-on-one meetings with Cardaci, at least for the next few months. (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 142:21-144:23.)

121. Mr. van Eck considered Phillips's and Rapple's comments, but did not change his mind about Cardaci's compensation because "digital marketing was failing" and there were other issues with her performance. Exhibit 2 at 213:16-214:10; Exhibit 48.

Plaintiff's Response to Paragraph 121:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 48), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits that Mr. van Eck, an interested witness, testified that Phillips's and Rapple's input did not change his mind concerning Cardaci's compensation "[b]ecause digital marketing was failing," in his view, and there were other unspecified "issues [he] had with [Cardaci's] performance." (van Eck Dep. at 213:10-22.) Mr. van Eck described Phillips's and Rapple's comments as a "difference of opinion." (van Eck Dep. at 213:10-22.)

122. Mr. van Eck noted that he had four meetings per week with Cardaci and others and that exposure to him was not an issue. Exhibit 48; Exhibit 1 at 240:8-19; Exhibit 54 (compilation of other meetings between Cardaci and Mr. van Eck).

<u>Plaintiff's Response to Paragraph 122</u>:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 48), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits that Cardaci was scheduled to participate in four weekly meeting with Mr. van Eck and others (Cardaci Dep. at 240:8-19), and that Mr. van Eck stated in his e-mail to Rapple and Phillips that he did not believe exposure to him was an issue (Koepp Decl. Ex. 48). Add that in the compilation of other meeting communications cited by Defendants, there are a total of 15 e-mails spanning a period of more than 3 years, from February 2015 to March 2018. (Koepp Decl. Ex. 54.) 12 of those 15 emails are from the years 2015 and 2016, and there are no e-mails reflecting meetings with Cardaci in 2017. (Koepp Decl.

Ex. 54.) Several communications concern the same meeting. (See Koepp Decl Ex. 54 at VE004125-26, VE004494-95.)

123. Mr. van Eck also noted that the quality of Cardaci's contribution in the four one-hour weekly meetings was lacking. Exhibit 48; Exhibit 2 at 213:23-214:7.

Plaintiff's Response to Paragraph 123:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 48), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits that Mr. van Eck, an interested witness, testified that he "knew way more about [Cardaci's] contributions to the ETF products than [Rapple] did." (van Eck Dep. at 213:23-214:7). The testimony cited by Defendants does not reference the quality of Cardaci's input at the meetings. (van Eck Dep. at 213:23-214:7). In his e-mail to Rapple and Phillips, Mr. van Eck states that the quality he wants in Cardaci's communication is Cardaci coming to him with ideas. (Koepp Decl. Ex. 48; see Koepp Decl. Ex. 53.)

124. Mr. van Eck and Cardaci had a follow-up meeting in late March 2018 regarding her performance as CMO. Exhibit 1 at 74:21-75:7.

Plaintiff's Response to Paragraph 124:

Deny. Cardaci had a meeting with Mr. van Eck in on or about March 27, 2018, but that meeting concerned "to-dos" for various divisions of the Marketing department. (Cardaci Dep. at 74:21-75:12.), Mr. van Eck did not discuss Cardaci's performance as CMO or any of the issues outlined in his March 27, 2018 notes with Cardaci during that meeting. (Pl. Decl. ¶ 34;

Cardaci Dep. at 74:21-76:7, 79:8-82:4.) Mr. van Eck testified that that he made his March 27, 2018 document after his meeting with Cardaci to discuss these issues (van Eck Dep. at 219:12-23; see Rapple Dep. at 166:2-167:17; Grant Decl. Ex. 15), but an e-mail from Rapple shows that the conversation described in the document was supposed to have happened after the document was sent to Rapple and Phillips. (Grant Decl. Ex. 15 at VE001853 ("I updated the document to note that this is a recollection of the 2017 performance discussion . . . This is the date you emailed Adam and [me] a copy to review and provide comments. I assume you spoke with her shortly thereafter?"; see Rapple Dep. at 167:5-170:22.) The e-mail also notes that the March document should not be given to Cardaci, indicating that it had not be given to Cardaci in March. (Grant Decl. Ex. 15 at VE001853.) Mr. van Eck also gave conflicting testimony that the meeting happened after he drafted the notes. (van Eck Dep. at 250:12-18.) Rapple was unaware whether Mr. van Eck ever met with Cardaci in to discuss these issues. (Rapple Dep. at 170:5-22.)

125. On April 6, 2018, Cardaci notified Mr. van Eck and Rapple that she had been empaneled on a grand jury at the United States District Court for the Southern District of New York as of April 5, 2018. Exhibit 55.

Plaintiff's Response to Paragraph 125:

Admit. Add that the letter VanEck received from the United States District Court for the Southern District of New York advised that Cardaci should not be penalized in any way for her performance of grand jury service. (Koepp Decl. Ex. 55 at VE002765.)

126. Mr. van Eck acknowledged Cardaci's notification of her grand jury service stating, "Understood." Exhibit 56.

Plaintiff's Response to Paragraph 126:

Admit.

127. VanEck's Employee Handbook "encourages employees to fulfill their civic responsibilities by serving jury duty." Exhibits 15-17 at VE000596-597, VE000360-361, VE000444-445; Exhibit 1 at 26:9-28:25.

Plaintiff's Response to Paragraph 127:

Admit that VanEck's Employee Handbook has a jury duty policy stating that the company "encourages employees to fulfill their civic responsibilities by serving jury duty when required." (Koepp Decl. Ex. 17 at VE0000444.) The policy also states that upon notice of jury service supervisors "may make arrangements to accommodate [employee] absence[s]" resulting from jury service. (Koepp Decl. Ex. 17 at VE0000444.)

128. Cardaci was paid in full during her grand jury duty service. Exhibit 11 at Response 10.

Plaintiff's Response to Paragraph 128:

Deny. Cardaci was paid her base salary for each day of jury service while employed at VanEck. (Koepp Decl. Ex. 11 at Response No. 10.)

129. On July 6, 2018, Mr. van Eck told Cardaci that digital marketing was "badly managed" and she was not "fixing it." Exhibit 2 at 231:5-8.

Plaintiff's Response to Paragraph 129:

Deny. The deposition testimony cited by Defendants (van Eck Dep. at 231:5-8), which comes from an interested witness, is in reference to a mid-year performance meeting held the week before July 27, 2018, not a meeting on July 6, 2018. (van Eck Dep. at 232:14-233:5,

234:16-235:14; Grant Decl. Ex. 16 ("These notes reflect conversations that I had with you last week about your performance and the department's performance."); Koepp Decl. Ex. 60 (draft of July 27, 2018 notes)). During a meeting on July 6, 2018, Jan van Eck told Cardaci, "I'm not going to fix this for you, Cari. You're going to have to do it yourself," and "You have to get better at ETFs and you have to get better at digital." (Cardaci Dep. at 83:22-84:14.) Mr. van Eck did not tell Cardaci during the meeting on July 6, 2018 that digital marketing was badly managed and that she was not fixing it. (Pl. Decl. ¶ 35.)

130. On July 6, 2018, Mr. van Eck told Cardaci that, while marketing communications was going okay, he did not see Cardaci's value add on the product side. Exhibit 2 at 231:19-232:4.

Plaintiff's Response to Paragraph 130:

Deny. The deposition testimony cited by Defendants, (van Eck Dep. at 231:5-8), which comes from an interested witness, is in reference to a mid-year performance meeting held the week before July 27, 2018, not a meeting on July 6, 2018. (van Eck Dep. at 232:14-233:5, 234:16-235:14; Grant Decl. Ex. 16 ("These notes reflect conversations that I had with you last week about your performance and the department's performance."); Koepp Decl. Ex. 60 (draft of July 27, 2018 notes)). During a meeting on July 6, 2018, Jan van Eck told Cardaci, "I'm not going to fix this for you, Cari. You're going to have to do it yourself," and "You have to get better at ETFs and you have to get better at digital." (Cardaci Dep. at 83:22-84:14.) Mr. van Eck did not tell Cardaci during the meeting on July 6, 2018 that he did not see value added on the product side. (Pl. Decl. ¶ 35.)

131. On July 6, 2018, Mr. van Eck communicated to Cardaci that Cardaci's job was in jeopardy. Exhibit 2 at 230:18-21.

Plaintiff's Response to Paragraph 131:

Deny. The deposition testimony cited by Defendants, (van Eck Dep. at 231:5-8), which comes from an interested witness, is in reference to a mid-year performance meeting held the week before July 27, 2018, not a meeting on July 6, 2018. (van Eck Dep. at 232:14-233:5, 234:16-235:14; Grant Decl. Ex. 16 ("These notes reflect conversations that I had with you last week about your performance and the department's performance."); Koepp Decl. Ex. 60 (draft of July 27, 2018 notes)). During a meeting on July 6, 2018, Jan van Eck told Cardaci, "I'm not going to fix this for you, Cari. You're going to have to do it yourself," and "You have to get better at ETFs and you have to get better at digital." (Cardaci Dep. at 83:22-84:14.) Mr. van Eck did not tell Cardaci during the meeting on July 6, 2018 that her job was in jeopardy. (Pl. Decl. ¶ 35.)

132. The July 6, 2018 meeting was a negative performance review. Exhibit 10 at ¶¶ 92-94.

Plaintiff's Response to Paragraph 132:

Admit in part and deny in part. The July 6, 2018 meeting was one planned for discussion about the lack of depth in the digital marketing team. (Cardaci Dep. at 83:22-84:7.) Admit that Mr. van Eck negatively reviewed Cardaci's performance during the meeting by saying "You have to get better at ETFs and you have to get better at digital." (Cardaci Dep. at 84:8-14.)

133. On July 18, 2018, Rapple noted Cardaci's impending termination. Exhibit 57.

Plaintiff's Response to Paragraph 133:

Plaintiff objects to this statement of fact because the evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff denies.

Rapple's July 18, 2019 does not reference Cardaci, and the e-mail states the Rapple wanted to discuss "a possible termination," not an impending or certain termination. (Koepp Decl. Ex. 57.) Rapple admitted that VanEck was considering putting Cadaci on a "performance route" at this time. (Rapple Dep. at 147:22-149:14.)

134. Mr. van Eck gave Cardaci another negative performance review on July 19, 2018. Exhibit 10 at ¶ 94.

Plaintiff's Response to Paragraph 134:

Admit. At the meeting, Mr. van Eck told Cardaci that he was not happy with the marketing department and referenced digital marketing and ETFs generally. (Cardaci Dep. at 86:15-87:3.)

135. In a meeting with them on July 19, 2018, Cardaci noted to Vitalone, Capuano, Jones and Lopez that Mr. van Eck "was not happy with the [Marketing] Department," that Digital Marketing was not doing what he wanted, and asked the Marketing Department to do a list of things. Exhibit 1 at 86:11-87:3; Exhibit 58.

Plaintiff's Response to Paragraph 135:

Admit in part and deny in part. The deposition testimony Defendants cite (Cardaci Dep. at 86:11-87:3), relates to what Mr. van Eck told Cardaci during their meeting on July 19, 2018, not what Cardaci told Vitalone, Capuano, Jones, and Lopez. Admit that based on her July

19, 2018 conversation with Mr. van Eck, Cardaci prepared a to-do lists for the marketing department. (Cardaci Dep. at 85:25-86:14.)

136. Mr. van Eck did not think Digital would improve "without better senior management guidance." Exhibit 2 at 171:23-172:22.

Plaintiff's Response to Paragraph 136:

Admit that Mr. van Eck, an interested witness, testified that after thinking about perceived performance problems in digital marking throughout 2017 and 2018, he did not think that digital marketing would improve without better senior management. (van Eck Dep. at 169:9-172:14.)

137. Further, Cardaci was not managing projects well (Exhibit 2 at 184:9-185:21), exhibited "low energy," and provided few suggestions for the business. Exhibit 2 at 185:24-186:15; Exhibit 59 (Mr. van Eck stating to Rapple on July 23, 2018, after learning that Cardaci had failed to send a project scoping document to VanEck's head of project management, "This is amazing. Telling me a project was scoped in May but never sent to Will! Help.").

Plaintiff's Response to Paragraph 137:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 59), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

Deposition testimony cited about Cardaci purportedly not managing projects well, (van Eck Dep. at 184:9-185:21), as well as having low energy and providing few suggestions (van Eck Dep. at 185:24-186:15), not only comes from an interested witness but also concerns a 2015 performance review document and Mr. van Eck's views of Cardaci performance in 2015,

not Cardaci's performance in 2018. (van Eck Dep. at 181:4-188:2; Koepp Decl. Ex. 42.) Mr. van Eck admitted that Cardaci was not a poor performer in 2015. (van Eck Dep. at 168:13-21.) The notes do not reflect that Cardaci's projects were not good. Mr. van Eck admitted that the category referred to compliance with a project management process he had implemented, not to the quality of projects generally. (van Eck Dep. at 184:9-21.) With respect to comments about Cardaci's energy, Mr. van Eck clarified that the statements concerned Cardaci having, in his view, an "overall approach" that was "low energy or less intense" than Hirsch and others that Mr. van Eck knew in the ETF marketing. (van Eck Dep. at 185:22-186:12.)

To the extent the Court considers Mr. van Eck's e-mail dated July 23, 2018 (Koepp Decl. 59), admit that Mr. van Eck sent Rapple about Cardaci which states, "This is amazing. Telling me a project was scoped in May but never sent to Will! Help." (Koepp Decl. Ex. 59.) Deny that Cardaci failed to send the project scoping document. (Pl. Decl. ¶ 36.) Consistent with VanEck's project management process, Vitalone was responsible for sending the scoping document. (Pl. Decl. ¶ 36; Cardaci Dep. at 194:5-195:5.) In an e-mail responding to Mr. van Eck's e-mail, Rapple told Mr. van Eck that Vitalone may have been a fault. (Grant Decl. Ex. 23.)

138. In a written midyear review of Cardaci dated July 26, 2018, Mr. van Eck noted that he had "major concerns in the digital marketing area," there had been "no breakthrough [lead generation] initiatives" that he was aware of, there was no "articulated strategy" and "no current direction" for social media, and a lack of ideas on syndication and content distribution. Exhibit 60 at VE001858.

<u>Plaintiff's Response to Paragraph 138</u>:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits in part and denies in part.

The document is not a performance review but notes Mr. van Eck made after the fact about unspecified conversations he had purportedly with Cardaci in July 2018. (Koepp Decl. Ex. 60 ("These notes reflect conversations that I had with Cari in July 2018 about her performance and the department's performance so far this year."; Rapple Dep. at 162:4-164:12.) Cardaci was not given this document, and the document was purportedly made to guide a performance warning discussion that did not occur. (Rapple Dep. at 164:10-21, 166:2-16.) Rapple admitted the document was made to paper the file in an effort to create evidence justifying Cardaci's firing. (Rapple Dep. at 168:10-19, 192:19-194:3.) The document was later edited by Rapple to make it more "individual" and less of a review of the entire Marketing department. (Rapple Dep. at 170:23-173:18; Grant Decl. Exs. 15-16) Rapple admitted that the revised the document, including a revision stating falsely that the document had been given to Cardaci, to create a record justifying Cardaci's firing. (Rapple Dep. at 174:16-175:10.)

Admit that the notes state that the "reason for this note is [Mr. van Eck's] major concerns in the digital marketing area." (Koepp Decl. Ex. 60 at VE001858.) Admit that the notes state that with respect to marketing communications there was "no breakthrough [lead generation] initiatives that [Mr. van Eck was] aware of," but that marketing communication was okay except for the syndication area, which is unrelated to prospecting and lead generation. (Koepp Decl. Ex. 60 at VE001858.) Admit that the notes state that although social media "isn't a top priority," Mr. van Eck did not feel there was "articulated strategy" and that there was "no

current direction" as to LinkedIn best practices. (Koepp Decl. Ex. 60 at VE001858.) Admit that the notes state that there was conversation about distribution content beyond VanEck's website, but Mr. van Eck did not think there was a "mindset to distribute the content we provide." (Koepp Decl. Ex. 60 at VE001858.)

139. The review stated that Mr. van Eck saw little value added in ETF and Active product management. Exhibit 60 at VE001858.

Plaintiff's Response to Paragraph 139:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits that the notes state that although ETF and Active Product Management "may not be broken," Mr. van Eck "still [didn't] perceive value added." (Koepp Decl. Ex. 60 at VE001858.)

140. The review further stated that "digital marketing was in a very bad spot, including poor personnel decisions, nonexistent project management, poor communication with other departments, little visible adherence to procedures in some areas, and lack of vision for improvements." Exhibit 60 at VE001859.

Plaintiff's Response to Paragraph 140:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits that in his notes, Mr. van Eck states "[i]n my March 2018 discussion with

[Cardaci], I made clear that I thought digital marketing was in a very bad spot, including poor personnel decisions, nonexistent project management, poor communication with other departments, little visible adherence to procedures in some areas, and lack of vision for improvements." (Koepp Decl. Ex. 60 at VE001859.) Add that the purported March review meeting did not happen. (See, supra, Pl. Resp. ¶ 124.)

141. The review further stated that the VanEck website "was a major problem area in 2017," noting several specific deficiencies. Exhibit 60 at VE001859.

Plaintiff's Response to Paragraph 141:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits that the notes state that VanEck's website "was a major problem area in 2017" but deny that the notes identify several specific deficiencies in 2017. (Koepp Decl. Ex. 60 at VE001859.) The only specific deficiency identified in the notes for 2017 was a change to the homepage navigation (Koepp Decl. Ex. 60 at VE001859), which was one that happened in 2018 (see, supra, Pl. Resp. ¶ 108).

142. In summary, the review stated that "digital marketing is still broken," "headcount requests are poorly justified," "not one page of documentation" had been provided to the project management department, communication to management was "non-existent," and Mr. van Eck did not "see Cari providing direction, understanding the details, asking the right questions or improving matters." Exhibit 60 at VE001859.

Plaintiff's Response to Paragraph 142:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits that with respect to digital marketing, the document states that "digital marketing is still broken," that Mr. van Eck "find[s] headcount requests are poorly justified," that with respect to project management, "not one page of documentation" had been provided to the department as Mr. van Eck was aware, that communication to the management team/huddle group is non-existent, and that he did not see "see [Cardaci] providing direction, understanding the details, asking the right questions or improving matters." (Koepp Decl. Ex. 60 at VE001859.)

143. The review also noted that in an earlier July 2018 discussion, Cardaci told Mr. van Eck that she had raised concerns about Digital Marketing to Mr. van Eck and to Rapple, an account that Mr. van Eck described as "a complete mischaracterization" and "troubling." Exhibit 60 at VE001859.

<u>Plaintiff's Response to Paragraph 143</u>:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, Plaintiff admits that the document states that during a discussion in July 2018, Cardaci told Mr. van Eck that she had raised concerns about digital marketing to Mr. van Eck and Rapple and that Mr. van Eck described this statement as "a complete mischaracterization" and "troubling" because he had raised the severity of the problems with her. (Koepp Decl. Ex. 60 at VE001859.)

Cardaci did inform Mr. van Eck and Rapple of problems in digital marketing, including those associated with Vitalone's performance in his role managing digital marketing. (Pl. Decl. ¶ 37.)

144. Mr. van Eck concluded that Cardaci "was ineffective" "as a manager" and decided to end her employment. Exhibit 2 at 247:25-249:3.

Plaintiff's Response to Paragraph 144:

Admit that Mr. van Eck, an interested witness, so testified.

145. By August 1, 2018, Mr. van Eck had decided to terminate Cardaci's employment due to her ongoing performance deficiencies. Exhibit 61 (Rapple email with termination talking points); Exhibit 3 at 180:19-23.

Plaintiff's Response to Paragraph 145:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 61), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff denies. Although Rapple, an interested witness, testified that the decision to fire Cardaci was made by August 1, 2018, after Rapple met with Mr. van Eck on July 31, 2018 (Rapple Dep. at 180:19-23), Mr. van Eck did not recall having any meeting with Rapple to discuss possibly firing Cardaci after he raised the possibility of firing Cardaci with Rapple in early 2018 (van Eck Dep. at 255:7-256:20.) Rapple admitted that at the same time VanEck was considering measures for potentially terminating Cardaci, VanEck was also considering whether, instead, to pursue a performance improvement path with Cardaci, a conversation that started at the end of July. (Rapple Dep. at 147:22-149:14.) Although potential termination documents were made (Koepp Decl. Ex. 61), at around the same time documents for

a potential performance discussion were being made for a potential performance discussion (Rapple Dep. at 164:13-21; Koepp Decl. Ex. 60). Concerning a meeting he had with Cardaci two days later, on August 3, 2018, Mr. van Eck said that at the time he was "preparing to terminate [Cardaci]" but that he did not know "when it was going to be exactly." (van Eck Dep. at 239:16-240:9.)

146. Mr. van Eck advised Rapple of his decision. Exhibit 61; Exhibit 3 at 180:19-23.

Plaintiff's Response to Paragraph 146:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 61), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff denies. Although Rapple, an interested witness, testified that the decision to fire Cardaci was made by August 1, 2018, after Rapple met with Mr. van Eck on July 31, 2018 (Rapple Dep. at 180:19-23), Mr. van Eck did not recall having any meeting with Rapple to discuss possibly firing Cardaci after he raised the possibility of firing Cardaci with Rapple in early 2018 (van Eck Dep. at 255:7-256:20.)

147. Rapple then contacted outside counsel about Cardaci's imminent exit from VanEck. Exhibit 61; Exhibit 1 at 259:22-25, 260:18-19; Exhibit 3 at 181:6-10, 182:5-23.

Plaintiff's Response to Paragraph 147:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 61), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this

statement of fact, in whole or in part, Plaintiff denies. Although Rapple, an interested witness, testified that the decision to fire Cardaci was finalized by August 1, 2016 (Rapple Dep. at 180:19-23), Rapple admitted that at the same time VanEck was considering measures for potentially terminating Cardaci, VanEck was also considering whether, instead, to pursue a performance improvement path with Cardaci, a conversation that started at the end of July. (Rapple Dep. at 147:22-149:14.) Although potential termination documents were made (Koepp Decl. Ex. 61), at around the same time documents for a potential performance discussion were being made for a potential performance discussion (Rapple Dep. at 164:13-21; Koepp Decl. Ex. 60). Mr. van Eck did not recall any meeting with Rapple to discuss possibly firing Cardaci after he raised the possibility of firing Cardaci with Rapple in early 2018 (van Eck Dep. at 255:7-256:20), inconsistent with Rapple's testimony that Mr. van Eck informed her of the decision to end Cardaci employment on July 31, 2018 (Rapple Dep. at 180:19-23). Concerning a meeting he had with Cardaci two days later, on August 3, 2018, Mr. van Eck said that at the time he was "preparing to terminate [Cardaci]" but that he did not know "when it was going to be exactly." Cardaci did not admit that the decision to terminate her employment was finalized by August 1, 2018. (Cardaci Dep. at 260:2-262:22.)

148. Rapple's email to counsel contained the subject line "Follow Up to Conversation Last Week" and attached "Talking Points for Jan_CC Conversation." Exhibit 61.

Plaintiff's Response to Paragraph 148:

Plaintiff objects to this paragraph because the only evidence cited by Defendants, is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that in an

e-mail Rapple sent to Defendants' counsel dated August 1, 2018, the subject line reads "Follow Up to Conversation Last Week" and attached "Talking Points for Jan_CC Conversation." (Koepp Decl. Ex. 61.)

149. Rapple prepared a separation agreement for Cardaci dated August 1, 2018. Exhibit 62.

Plaintiff's Response to Paragraph 149:

Plaintiff objects to this paragraph because the only evidence cited by Defendants, is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that Rapple prepared a draft separation agreement that is dated August 1, 2018. (Koepp Decl. Ex. 62.)

150. On August 3, 2018, Mr. van Eck met with Cardaci and Vitalone and expressed his unhappiness with Digital Marketing. Exhibit 1 at 88:22-89:7; Exhibit 63; Exhibit 10 at ¶ 94.

Plaintiff's Response to Paragraph 150:

Admit.

151. Mr. van Eck wanted Cardaci to understand that the responses to his requests were "woefully inadequate." Exhibit 2 at 237:15-240:9.

Plaintiff's Response to Paragraph 151:

Admit that Mr. van Eck, an interested witness, so testified. (van Eck Dep. at 237:15-240:9.)

152. Mr. van Eck concluded it was not a "fixable situation." Accordingly, he was "preparing to terminate" Cardaci's employment. Exhibit 2 at 237:15-240:9.

Plaintiff's Response to Paragraph 152:

Admit that Mr. van Eck, an interested witness, so testified. (van Eck Dep. at 237:15-240:9.)

153. Based on the August 3 meeting, Vitalone thought they both "were going to be fired almost immediately." Exhibit 7 at 276:24-278:4.

Plaintiff's Response to Paragraph 153:

Admit that Vitalone, an interested witness, so testified. (Vitalone Dep. at 276:24-278:4.) Add that Vitalone, the head of digital marketing, has not been fired and was not disciplined in any way for performance deficiencies in digital marketing. (van Eck Dep. at 169:9-170:25.)

154. After the decision was made to terminate Cardaci's employment, on August 7, 2018, Cardaci advised Rapple and Mr. van Eck that her grand jury service was extended to February 16, 2019. Exhibit 64.

Plaintiff's Response to Paragraph 154:

Admit in party and deny in part. Admit that on August 7, 2018, Cardaci informed Rapple and Mr. Van Eck that her grand jury service had been extended to February 16, 2019. Deny that decision to fire Cardaci was made before August 7, 2018. (See, supra, Pl. Resp. ¶ 145.)

155. When Cardaci's grand jury service was extended, Mr. van Eck replied, "Noted." Exhibit 65.

Plaintiff's Response to Paragraph 155:

Admit.

156. As Rapple and Mr. van Eck were scheduled to be out of the office at different times on vacation between August 2 and August 14, 2018, the termination discussion with Cardaci was postponed. Exhibit 61; Exhibit 66.

Plaintiff's Response to Paragraph 156:

Plaintiff objects to this paragraph because the only evidence cited by Defendants, is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, deny. There is no reference to termination being the subject of discussion in the e-mail Rapple sent an e-mail to Mr. van Eck dated August 1, 2018 with the subject line "next steps with Mktg," asking whether an unspecified conversation with Cardaci could be delayed after Mr. van Eck's return from vacation. (Koepp Decl. Ex. 66.) Deny that Cardaci's termination was finalized on August 1, 2018 and that discussion of that termination was, therefore, delayed until August 14, 2018 when both Rapple and Mr. van Eck were not on vacation. (See, supra, Pl. Resp. ¶ 145.)

157. On August 16, 2018, Mr. van Eck and Rapple met with Cardaci and advised Cardaci of her termination. Exhibit 1 at 258:14-17; Exhibit 67 at Pl. 000149; Exhibit 3 at 194:9-195:10.

Plaintiff's Response to Paragraph 157:

Admit.

158. Mr. van Eck and Rapple presented Cardaci with a Separation Agreement that offered substantial payments and arrangements. Exhibit 68; Exhibit 3 at 196:13-17.

Plaintiff's Response to Paragraph 158:

Admit in part and deny in part. Admit that Cardaci was given a Separation Agreement dated August 16, 2018 (the "August Separation Agreement"). (Koepp Decl. Ex. 68; Cardaci Dep. at 267:24-268:5.) Deny that August Separation Agreement offered "substantial payments and arrangements" given that, inter alia, Cardaci would have had to release all potential claims against VanEck, work through the end of the year, December 31, 2018, assist in the transitioning of her duties, agree not to criticize the company in perpetuity, and pay back all severance received, including money earned while working for VanEck, in the event she breached any provision. (Koepp Decl. Ex. 68 at Pl.000132-34, Pl.000136-37; Koepp Decl. Ex. 61 at VE000270; Cardaci Dep. at 268:6-22; Rapple Dep. at 203:10-208:9.)

159. Subject to Cardaci's acceptance, the Separation Agreement included (1) a "Working Notice Period" until December 31, 2018, during which Cardaci would remain on the payroll while she looked for a new job, and could represent to potential employers that she was still employed, (2) a lump sum payment of $435,835, (3) payment of COBRA premiums from January 1 through March 31, 2019, (4) payment for outplacement services, and (5) waiver of Cardaci's three-month non-compete clause, all in exchange for a standard release. Exhibit 68 at Pl. 000131-134; Exhibit 1 at 268:3-269:13.

Plaintiff's Response to Paragraph 159:

Admit in part and deny in part. Deny that the "Working Notice Period" was for Cardaci to "look[ ] for a new job"; during the "Working Notice Period" Cardaci was expected to "continue to report to work and assist [VanEck] with transitioning [of her] duties." (Koepp Decl. Ex. 68 at Pl.000131; see Koepp Decl. Ex. 61 at VE000270; Cardaci Dep. at 268:13-19.) Admit that Cardaci would receive a lump sum payment, but add that this payment reflected, inter alia,

bonus she would have earned for working the reminder of the year, as the August Separation Agreement required her to do. (Koepp Decl. Ex. 68 at Pl.000131; Koepp Decl. Ex. 61 at VE000270; Rapple Dep. at 189:21-191:2.) Admit that the August Separation Agreement provided that Cardaci would receive COBRA premiums from January 1, 2019 through March 31, 2019, payment for certain outplacement services, and a waiver of the three-month non-compete clause in her Offer Letter. (Koepp Decl. Ex. 68 at Pl.000131-32.)

160. Mr. van Eck testified that his intention was that Cardaci would not have to work during the working notice period. Exhibit 2 at 258:16-259:6, 259:25-260:8.

Plaintiff's Response to Paragraph 160:

Admit that Mr. van Eck, an interested witness, so testified but deny that that was VanEck's intention. The August Separation Agreement outlines a "Working Notice Period" during which Cardaci was expected to "continue to report to work and assist [VanEck] with transitioning [of her] duties." (Koepp Decl. Ex. 68 at Pl.000131; see Koepp Decl. Ex. 61 at VE000270; Cardaci Dep. at 268:13-19.) Rapple confirmed that this was VanEck's offer (Rapple Dep. at 203:17-204:3), and Rapple admitted that the VanEck wanted to have Cardaci around for another four or five months (Rapple Dep. at 198:7-10.) The August Separation Agreement provided that the VanEck could later "determine . . . during the Working Notice Period that [VanEck] no longer requires the benefit of [Cardaci's] services" and end Cardaci's active employment, but the agreement did not give Cardaci unilateral authority to terminate the "Working Notice Period." (Koepp Decl. Ex. 68 at Pl.000132.) Although Mr. van Eck had authority over the offer extended to Cardaci, he did not read or review August Separation Agreement. (van Eck Dep. at 258:16-263:21.)

161. Cardaci had until September 6, 2018 to sign the Separation Agreement. Exhibit 68 at Pl. 000135.

Plaintiff's Response to Paragraph 161:

Admit. Add that nothing in the August Separation Agreement provided that Cardaci would be terminated immediately if she did not sign the agreement. (Koepp Decl. Ex. 68; see id. at Pl.000135 (advising Cardaci that she had 21 days to decide whether to sign the agreement), Pl.000137 (providing that if a signed agreement is not received by September 6, 2018, it will expire). At that time Cardaci was presented the August Separation Agreement, she was not told that her failure to sign the August 16, 2018 Separation Agreement would lead to immediate termination. (Pl. Decl. ¶ 38). At the time Cardaci was presented the August 16, 2018 Separation Agreement, she was told that the company intended for her to work through the end of the year. (Pl. Decl. ¶ 38). The August Separation Agreement states that "[a]s discussed, [Cardaci's] active employment will end of December 31, 2018." (Koepp Decl. Ex. 68 at Pl.000131.)

162. Meanwhile, VanEck allowed Cardaci to remain on the payroll while she considered the package. Exhibit 69 (separation package emails) at VE000312.

Plaintiff's Response to Paragraph 162:

Admit. Add that Cardaci remaining on the payroll was consistent with terms of the August Separation Agreement, which provided that her employment would end of December 31, 2018. (See, supra, Pl. Resp. ¶ 161.)

163. On August 30, 2018, Cardaci's counsel sent a letter alleging discrimination. Exhibit 70.

Plaintiff's Response to Paragraph 163:

Admit. Add that Plaintiff's letter asserted retaliation claims. (Koepp Decl. Ex. 70.)

164. VanEck's counsel replied, denying any discrimination. Exhibit 71.

Plaintiff's Response to Paragraph 164:

Admit.

165. On September 11, 2018, VanEck gave Cardaci a revised separation agreement which included COBRA reimbursements through June 30, 2019, and clarified that the Working Notice Period would be a Non-Working Notice Period whereby Cardaci would not have to come into the office as she looked for a new job. Exhibit 72 at Pl. 000139; Exhibit 1 at 273:20-274:7.

Plaintiff's Response to Paragraph 165:

Admit in part and deny in part. Admit that on September 11, 2018, VanEck gave Cardaci a new separation agreement (the "September Separation Agreement"), which had terms substantially similar to those in the August Separation Agreement (Koepp Decl. Ex. 72; Cardaci Dep. at 273:2-7; see Koepp Decl. Ex. 68.) Admit that the September Separation Agreement included COBRA reimbursement through June 30, 2019.

Deny that the September Separation Agreement clarified that the Working Notice Period would be a Non-Working Notice Period. The August Separation Agreement did not contain any provision for a Non-Working Notice Period. (Koepp Decl. Ex. 68.) The August Separation Agreement provided that the VanEck could later "determine . . . during the Working Notice Period that [VanEck] no longer requires the benefit of [Cardaci's] services" and end Cardaci's active employment (Koepp Decl. Ex. 68 at Pl.000132), but the agreement did not give

Cardaci any option to select a Non-Working Notice Period. (Koepp Decl. Ex. 68.) When she was presented the August Separation Agreement, Cardaci was not told she could elect a Non-Working Notice Period in lieu of a Working Notice Period. (Pl. Decl. ¶ 39.)

166. Cardaci's time to accept the separation offer was ultimately extended to September 18, 2018. Exhibit 73 (emails regarding end of Cardaci's employment) at VE000301.

Plaintiff's Response to Paragraph 166:

Deny. Cardaci was given until September 11, 2018 to consider the August Separation Agreement (Pl. Decl. ¶ 40; Koepp Decl. Ex. 71 at VE000309; Cardaci Dep. at 272:13-20.) Then, on September 11, 2018, Cardaci was given the September Separation Agreement. (Koepp Decl. Ex. 72.) The September Separation provided that Cardaci had until September 14, 2018, three days after receiving the agreement, to accept the agreement and that Cardaci voluntarily waived any longer consideration period as may be required by law. (Koepp Decl. Ex. 72 at Pl.000143.) The time for Cardaci to accept the September Separation Agreement was extended until September 18, 2018. (Koepp Decl. Ex. 73.)

167. Cardaci's employment would end if she did not sign the Separation Agreement. Exhibit 69 at VE000312*;* Exhibit 1 at 277:11-14, 278:17-21 (admitting she understood that if she did not sign the Separation Agreement, she would not receive a notice period).

Plaintiff's Response to Paragraph 167:

Admit in part and deny in part. Nothing in the August Separation Agreement provided that Cardaci would be terminated immediately if she did not sign the agreement. (Koepp Decl. Ex. 68; see id. at Pl.000135 (advising Cardaci that she had 21 days to decide whether to sign the

agreement), Pl.000137 (providing that if a signed agreement is not received by September 6, 2018, it will expire). The August Separation Agreement states that "[a]s discussed, [Cardaci's] active employment will end on December 31, 2018." (Koepp Decl. Ex. 68 at Pl.000131.) At the time Cardaci was presented the August Separation Agreement, she was not told that her failure to sign the August Separation Agreement would lead to immediate termination. (Pl. Decl. ¶ 38.) Rather, at the time Cardaci was presented the August Separation Agreement, she was told that the company intended for her to work through the end of the year. (Pl. Decl. ¶ 38.)

After receiving a demand letter from Cardaci's counsel asserting discrimination and retaliation claims on August 30, 2018 (Koepp Decl. Ex. 70), Cardaci was given the September Separation Agreement which provided that her active employment would now end on September 14, 2018 (Grant Decl. Ex. 12; Koepp Decl. Ex. 72.) The deposition testimony cited by Defendants (Cardaci Dep. at 277:11-14, 278:17-21), concerns Cardaci's understanding whether she would receive the non-working period set forth in the revised September Separation Agreement, not a notice period generally, including the working notice period set forth in the original but then withdrawn August Separation Agreement. (Cardaci Dep. at 277:11-14, 278:17-21.)

168. After taking approximately 30 days to consider it, Cardaci rejected the Separation Agreement. Exhibit 69; Exhibit 74; Exhibit 1 at 276:8-14.

<u>Plaintiff's Response to Paragraph 168</u>:

Admit in part and deny in part. Cardaci did not have 30 days to consider either the August Separation Agreement or the September Separation Agreement. Cardaci was given until September 11, 2018 (26 days) to consider the August Separation Agreement. (Pl. Decl. ¶ 40;

Koepp Decl. Ex. 71 at VE000309; Cardaci Dep. at 272:13-20.) Cardaci was given until September 18, 2018 (7 days) to consider the September Separation Agreement. (Koepp Decl. Ex. 73.) Admit that Cardaci did not accept the September Separation Agreement. (Cardaci Dep. at 274:23-275:3.)

169. On September 12, 2018, Cardaci's counsel stated: "Ms. Cardaci does not accept the Firm's severance offer." Exhibit 69 at VE000312 (emphasis added); Exhibit 1 at 276:8-9.

Plaintiff's Response to Paragraph 169:

Admit.

170. On September 18, 2018, Cardaci was taken off the payroll. Exhibit 1 at 12:16-19; Exhibit 75; Exhibit 76 (letter with Form U5) at Pl. 001225; Exhibit 77.

Plaintiff's Response to Paragraph 170:

Admit.

171. In May 2013, Capuano was promoted to head of product management for the mutual fund business. Exhibit 8 at 86:20-24.

Plaintiff's Response to Paragraph 171:

Admit.

172. Capuano testified that at a lunch in 2013 with Mr. van Eck and Hirsch, Mr. van Eck stated that they would need a plan if she became pregnant. Exhibit 8 at 42:8-19.

Plaintiff's Response to Paragraph 172:

Admit. Mr. van Eck told Capuano, in the context of a potential promotion for Capuano, "You can get pregnant. We just have to plan for it." (Capuano Dep. at 40:3-43:9.)

173. Capuano testified that she did not believe Mr. van Eck meant anything by the comment and that "[h]e didn't mean it in a discriminatory fashion." Exhibit 8 at 142:17-19, 170:20-21, 173:2.

Plaintiff's Response to Paragraph 173:

Admit in part and deny in part. Admit that Capuano, an interested witness, testified concerning the pregnancy comment that Mr. van Eck made to her that Mr. van Eck "didn't mean it" and that he "didn't mean it in a discriminatory fashion." (Capuano Dep. at 170:17-21; 171:15-23.) Deny the implication that she believed the comment was benign. Mr. van Eck's comment stood out to Capuano, and Capuano believed the comment was "careless," "unnecessary," and "weird." (Capuano Dep. at 43:17-44:11; 171:15-23.) Capuano did not recall raising the prospect of pregnant with Mr. van Eck at the time he made the comment. (Capuano Dep. at 44:7-11.) Capuano admitted that it was unnecessary to discuss her family planning in connection with a discussion about promotion (Capuano Dep. at 44:23-45:5), and that she never heard Mr. van Eck make a comment about the prospect a man having a family during discussions she has had with Mr. van Eck concerning potential promotions of other employees (Capuano Dep. at 47:5-15.) Capuano acknowledged that pregnancy should not be a factor considered in the hiring process. (Capuano Dep. at 173:15-174:9.) Mr. van Eck is aware that one is not supposed to consider the prospect of pregnancy in making an employment decision. (van Eck Dep. at 280:6-282:8.)

174. Neither Mr. van Eck nor Hirsch recalls such a comment. Exhibit 2 at 280:6-9; Exhibit 4 at 117:14-18.

Plaintiff's Response to Paragraph 174:

Admit that Mr. van Eck and Hirsch so testified. Add that Mr. van Eck considers Capuano to be an honest and credible person. (van Eck Dep. at 264:19-23, 280:6-16.)

175. Subsequent to May 2013, Capuano took over responsibility for VanEck's hedge fund business (which is no longer operating) and Requests for Proposals ("RFP") and Due Diligence Questionnaires ("DDQ"). Exhibit 8 at 87:11-14.

Plaintiff's Response to Paragraph 175:

Admit in part and deny in part. Admit that Capuano took over responsibility for managing marketing for VanEck's hedge fund business (which no longer exists) and the RFP and DDQ functions. (Capuano Dep. at 86:20-87:21.)

176. Subsequent to May 2013, Capuano took on additional responsibilities until she became head of Active marketing. Exhibit 8 at 88:12-18.

Plaintiff's Response to Paragraph 176:

Deny. Capuano took on additional, unspecified responsibilities until she was promoted to Cardaci's former job in December 2018. (Capuano Dep. at 88:10-89:8, 145:19-23, 146:3-147:15, 148:4-17.)

177. Beginning in September 2018, Capuano took more of a senior role and reported directly to Mr. van Eck. Exhibit 3 at 229:19-25.

Plaintiff's Response to Paragraph 177:

Deny. After Cardaci was fired, Capuano was given an interim role assisting Mr. van Eck in managing the day-to-day operations of the marketing department by overseeing the 2019 marketing budget and reviewing existing marketing vendor relationships. (Grant Decl. Ex. 18; Grant Decl. Ex. 22; Grant Decl. Ex. 25; Jones Dep. at 107:18-108:3) All of Cardaci's former direct reports, including Capuano, began to report to Mr. van Eck directly. (Grant Decl. Ex. 25; Grant Decl. Ex. 22; Vitalone Dep. at 162:23-163:8.) Capuano was not given a new title during the interim period (Grant Decl. Ex. 18), and all of Cardaci's former direct reports maintained their responsibilities in their respective roles (Rapple Dep. at 229:11-25).

178. Before heading the Marketing Department, Capuano gained extensive experience working with ETFs in her 11 years at VanEck, including her work on RFPs. Exhibit 8 at 224:18-22.

Plaintiff's Response to Paragraph 178:

Deny. Capuano did not gain extensive experience in ETFs during her 11 years at VanEck. (Cardaci Dep. at 292:3-293:10.) Capuano admitted that she only recently began supporting VanEck's ETF business. (Capuano Dep. at 75:16-77:14.) Before assuming Cardaci's former job heading the marketing department in December 2018, Capuano positions at VanEck were in marketing for the Active business. (Capuano Dep. at 85:6-16, 86:16-89:8; Koepp Decl. Ex. 81 (stating that Capuano was responsible for active product management and institutional marketing)). The fact that Capuano's roles, duties, and contributions were unrelated to the ETF business for much of her employment at VanEck is confirmed by her lack of participation in the ETF profit pool until in or about 2017. (Capuano Dep. at 75:7-77:14, 90:8-18, 216:4-19; Rapple Dep. at 241:24-242:13; Phillips Dep. at 70:23-71:23, 74:3-20 (explaining that participation in bonus pools depends on employee's role)). VanEck's RFPs are probably related to the Active

business. (Smith Dep. at 52:9-53:9.) Capuano admitted that she did not have any experience in ETFs based on work for a competing ETF firm. (Capuano Dep. at 195:18-24; Koepp Decl. Ex. 79 at VE004821; see also Capuano Dep. at 82:5-84:3 (recounting pre-VanEck job history))

179. Capuano has repeatedly demonstrated her ability to complete projects. Exhibit 78; Exhibit 79 (email regarding Capuano's strengths) at VE004820-4821.

Plaintiff's Response to Paragraph 179:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part. Admit that Hirsch, the author of one of the e-mails Defendants cite (Koepp Decl. Ex. 78), testified that during his tenure as Head of Marketing Capuano was "great at project work and communication" but "not so great" at "other aspects of product management." (Hirsch Dep. at 106:6-19.) Admit that Capuano stated in an e-mail that one of her strengths is "project management, including project development." (Koepp Decl. Ex. 79.)

180. Capuano was deeply knowledgeable about VanEck's story and the firm's brand. Exhibit 79 at VE004821.

Plaintiff's Response to Paragraph 180:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that Capuano stated in an e-mail that one of her strengths is "messaging," including

VanEck's "story/brand," and noted that she could "can tell the VanEck story word for word." (Koepp Decl. Ex. 79 at VE004821.)

181. On September 18, 2018, Cardaci sent a text message to Capuano, stating in part, "I wanted to again wish you the best of luck and think you are doing an amazing job for the firm! I know you will continue to shine as your contributions are constant and obvious!!!" Exhibit 80.

Plaintiff's Response to Paragraph 181:

Admit. Add that during the same text message exchange, Capuano said in response to the message cited by Defendants that she was "sick over how this has all transpired." (Grant Decl. Ex. 11 at Pl.001411). In response to a separate message from Cardaci thanking Capuano for Capuano's "support, amazing work[,] and friendship," Capuano said, "the feeling is mutual." (Grant Decl. Ex. 11 at Pl.001409; Capuano Dep. at 177:17-179:16.)

182. In December 2018, Capuano was promoted to head of marketing and product strategy. Exhibit 81 (promotion announcement); Exhibit 8 at 88:19-24; Exhibit 3 at 235:4-11.

Plaintiff's Response to Paragraph 182:

Admit. Add that notwithstanding differences in title Cardaci had at the time she was fired, and the title given to Capuano after Capuano was promoted to Cardaci's former job, Managing Director, Head of Marketing and Product Strategy, Capuano was Cardaci's replacement. (Capuano Dep. at 88:10-89:8, 145:19-23, 146:3-147:15, 148:4-17; van Eck Dep. at 264:4-8; Philips Dep. at 207:4-21; Rapple Dep. at 226:23-229:16; Smith Dep. at 58:24-59:5; Koepp Decl. Ex. 81.) Mr. van Eck decided that Capuano promotion should not come with the CMO title. (Capuano Dep. at 145:19-23, 146:3-147:15, 148:4-17; Rapple Dep. at 235:4-237:21.)

183. Shortly after Cardaci joined VanEck, a "Ladies of 25 Lunch" was held on December 11, 2014 for the women who worked on the 25th floor at VanEck. Exhibit 82 (lunch invitation).

Plaintiff's Response to Paragraph 183:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that Cardaci attended a luncheon meeting called the "Ladies of 25 Lunch" by the event's organizer, Amrita Nandakumar, which was attended by female VanEck employees. (Cardaci Dep. at 108:15-109:23; Pl. Decl. ¶ 41.)

184. The lunch was organized by Amrita Nandakumar. Exhibit 82.

Plaintiff's Response to Paragraph 184:

Admit.

185. Cardaci alleges that the lunch was a "meeting" at which several women were vocal about VanEck's maternity leave and no-work-from-home policies. Exhibit 10 at ¶¶ 31-37.

Plaintiff's Response to Paragraph 185:

Admit. Add that it was a "luncheon meeting" (Cardaci Dep. at 109:15-17), and women in attendance raised concerns they had at VanEck about pay, promotion, maternity leave, work-from-home procedure, and VanEck's inequitable application of these policies to women compared to men. (Cardaci Dep. at 110:24-117:4.)

186. None of the attendees at the lunch complained to HR about VanEck's maternity leave or no-work-from-home policies or asserted they were discriminatory, or that they had received discriminatory compensation. Exhibit 3 at 97:5-22; Exhibit 6 at 63:5-9, 67:7-11.

Plaintiff's Response to Paragraph 186:

Deny. After the meeting, Cardaci went to Smith, who supervised VanEck's Human Resources Department at the time (Koepp Decl. Ex. 18; Cardaci Dep. at 125:13-126:12, 168:20-23; Smith Dep. at 16:14-17:15), and told Smith about the Ladies of 25 meeting and that, based on what she heard at the meeting, that there was a morale issue among VanEck's female employees who believed they were being paid less, treated unfairly with respect to certain policies, and subjected to policies that had an detrimental impact on them based on their sex. (Cardaci Dep. at 125:13-126:7.)

187. On February 3, 2015, Cardaci met with Smith. Exhibit 83 (emails regarding meeting to discuss Active Marketing staffing).

Plaintiff's Response to Paragraph 187:

Admit.

188. The purpose of the February 3, 2015 meeting was to discuss Active Marketing staffing. Exhibits 83-85.

Plaintiff's Response to Paragraph 188:

Admit. Add that at this meeting concerning staffing, Cardaci told Smith, based on what she heard at the Ladies of 25 luncheon meeting, that there was a morale issue among VanEck's female employees who believed they were being paid less, treated unfairly with

respect to certain policies, and subjected to policies that had an detrimental impact on them based on their sex. (Cardaci Dep. at 125:13-126:7, 314:12-315:6; Grant Decl. Ex. 10.)

189. Cardaci never filed any written complaint with HR or Smith regarding leave policies or any other allegedly discriminatory practice at VanEck. Exhibit 11 at Response 12.

Plaintiff's Response to Paragraph 189:

Admit. Cardaci complained to Smith in person. (Cardaci Dep. at 123:10-12.) VanEck's complaint procedure does not require that complaints be in writing. (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; Cardaci Dep. at 213:15-21; Rapple Dep. at 29:12-18.) VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

190. Cardaci did not report any complaint, in writing or verbally, to Smith, McLaughlin (then Director of HR, reporting to Smith) or to Mr. van Eck regarding the Ladies of 25 Lunch. Exhibit 1 at 123:10-22; Exhibit 2 at 323:13-17; Exhibit 6 at 17:9-11 (explaining that prior to Rapple, McLaughlin was HR Director); Exhibit 18 (November 2014 organizational chart).

Plaintiff's Response to Paragraph 190:

Deny. Cardaci told Smith about the Ladies of 25 meeting and that, based on what she heard at the meeting, there was a morale issue among VanEck's female employees who believed they were being paid less, treated unfairly with respect to certain policies, and subjected to policies that had an detrimental impact on them based on their sex. (Cardaci Dep. at 125:13-126:7.) When Cardaci told Smith about the Ladies of 25 meeting, Smith said this is the way it has always been and warned Cardaci not to talk to Mr. van Eck about Ladies of 25 meeting and

the issue raised there as it would anger Mr. van Eck. (Cardaci Dep.126:13-17.) As Cardaci had complained to Smith, McLaughlin's supervisor, Cardaci did not see the need to raise the issue with McLaughlin. (Cardaci Dep. at 126:10-24.)

191. In 2017, Cardaci proposed to Mr. van Eck to reorganize the Marketing Communications division. Exhibit 1 at 222:4-16; Exhibit 2 at 274:6-16.

Plaintiff's Response to Paragraph 191:

Deny. In March 2017, Cardaci asked Mr. van Eck for approval to promote Laura Jones. (Cardaci Dep. at 165:20-167:3, 222:4-10.) Cardaci's request to promote Jones and subsequent discussions with Mr. van Eck about promoting Jones were unrelated to conversations about larger organizational staffing in marketing. (Pl. Decl. ¶¶ 42-43.) Jones promotion was to replace Heather MacLeod (Jones Dep. at 41:24-42:4), who was Director of Communications (Cardaci Dep. at 101:14-19; Phillips Dep. at 146:17-148:12; Grant Decl. Ex. 19 (organizational chart showing MacLeod's position as of December 2016)).

192. Mr. van Eck took Cardaci's proposal to reorganize the Marketing Communications division under consideration. Exhibit 2 at 274:17-24.

Plaintiff's Response to Paragraph 192:

Deny. Cardaci's proposal to Mr. van Eck in March 2017 was to promote Jones to replace MacLeod, the then Director of Communications, not a proposal concerning reorganization of the Marketing department. (See, supra, Pl. Resp. ¶ 191.) Mr. van Eck told Cardaci that he would take Cardaci's request to promote Jones under advisement. (Cardaci Dep. at 165:20-166:6.)

193. In 2017, Jones was associate product manager in the ETF Product Development division, reporting to Lopez. Exhibit 21.

Plaintiff's Response to Paragraph 193:

Admit. (Jones Dep. at 35:8-19, 46:6-10.)

194. In 2017, Cardaci proposed to Mr. van Eck that Jones be promoted to head a reorganized Marketing Communications division. Exhibit 2 at 275:4-16.

Plaintiff's Response to Paragraph 194:

Deny. Cardaci's proposal to Mr. van Eck was to promote Jones to replace MacLeod, the then Director of Communications, not a proposal concerning reorganization of the Marketing department. (See, supra, Pl. Resp. ¶ 191.)

195. The proposed reorganization of the Marketing Communications division involved moving Jones from ETF Product Development to Marketing Communications, reporting directly to Cardaci. Exhibit 9 at 42:19-43:2, 43:13-15; Exhibit 2 at 275:23-276:20.

Plaintiff's Response to Paragraph 195:

Deny. There was no proposed reorganization of Marketing at the time; the proposal was to have Jones replace MacLeod, who was already Director of Communications. (See, supra, Pl. Resp. ¶ 191.) The promotion would require Jones to leave her position in the ETF Product Development division, reporting to Lopez (Jones Dep. at 35:8-19, 46:6-10), and take McLeod's role, one reporting to Cardaci directly (Grant Decl. Ex. 19).

196. Jessica Malino, Vicki Chan, Thomas Butcher and Amy Ashkenas also eventually joined the reorganized Marketing Communications division. Exhibit 23.

Plaintiff's Response to Paragraph 196:

Admit in part and deny in part. Butcher was already reporting to MacLeod (Pl. Decl. ¶ 44), and Butcher began reporting Jones as soon as Jones's promotion was approved (Grant Decl. Ex. 21; Koepp Decl. Ex. 22). The Marketing Communications department already existed. (Cardaci Dep. at 101:14-19; Phillips Dep. at 146:17-148:12.) Admit that over the course of the year following Mr. van Eck's approval of Jones's promotion (Cardaci Dep. at 224:2-10; van Eck Dep. at 278:20-25; Jones Dep. at 35:2-5), Chan, Ashkenas, and Malino began reporting to Jones (Koepp Decl. Ex. 22). Add that decisions concerning Chan's, Ashkenas's, and Malino's transitions to roles reporting to Jones were made after the decision to promote Jones and were unrelated to the decision to promote Jones to MacLeod's former role. (Pl. Decl. ¶ 45.)

197. Once Mr. van Eck approved the reorganization of the Marketing Communications function in or about September 2017, his approval of Cardaci's proposal to promote Jones to head the reorganized Marketing Communications division was "instantaneous." Exhibit 2 at 277:8-19; Exhibit 86.

Plaintiff's Response to Paragraph 197:

Deny. Cardaci's request to promote Jones to replace MacLeod, the then Director of Communications, was not one related to reorganization of the Marketing department. (See, supra, Pl. Resp. ¶ 191.) Mr. van Eck's approval of Jones's promotion did not follow any related approval for reorganizing the Marketing department. (Pl. Decl. ¶ 46.) MacLeod's position already existed at the time Jones was promoted. (See, supra, Pl. Resp. ¶ 191.)

198. Cardaci alleges that, in the context of considering Jones's promotion, Mr. van Eck stated, "What if she gets pregnant." Exhibit 1 at 166:9-13, 208:19-23; Exhibit 10 at ¶ 62.

Plaintiff's Response to Paragraph 198:

Admit. After Cardaci recommended Jones for promotion in March 2017, Cardaci followed up with Mr. van Eck several times; on Cardaci's third or fourth attempt, which occurred sometime in the summer of 2017, Mr. van Eck said, "What if she gets pregnant." (Cardaci Dep. at 165:20-166:13, 222:17-223:9) Cardaci immediately opposed Mr. van Eck's statement by telling him, "Well, I assume she'll have the baby. She'll go on maternity leave, and she'll either come back or she won't come back to work." (Cardaci Dep. at 166:14-18.) Mr. van Eck did not respond. (Cardaci Dep. at 166:19.)

199. Cardaci never put into writing any complaint she allegedly made to Rapple regarding any comment Mr. van Eck allegedly made in the context of Jones' promotion about Jones becoming pregnant. Exhibit 11 at Response 12.

Plaintiff's Response to Paragraph 199:

Admit. Cardaci complained to Rapple in person. (Cardaci Dep. at 208:10-209:8.) Add that VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

200. VanEck's Employee Handbook, which contained an anti-discrimination policy and complaint procedure, was referenced in the Offer Letter and available to Cardaci. Exhibit 31 at Pl. 000129; Exhibit 17 at VE000407-410; Exhibit 1 at 22:11-19, 26:9-28:25.

Plaintiff's Response to Paragraph 200:

Admit. VanEck's complaint procedure does not require that complaints be in writing. (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; Cardaci Dep. at 213:15-21; Rapple Dep. at 29:12-18.)

201. Cardaci understood that VanEck's policies and procedures were applicable to the terms and conditions of her employment. Exhibit 31 at Pl. 000129; Exhibit 11 at Response 8.

Plaintiff's Response to Paragraph 201:

Admit.

202. Cardaci did not make a note to the file that she, or anyone else, was subjected to discrimination of any kind, except purportedly for the pregnancy comment that Mr. van Eck allegedly made. Exhibit 11 at Response 13; Exhibit 1 at 219:23-220:15, 250:2-7, 253:15-21.

Plaintiff's Response to Paragraph 202:

Admit in part and deny in part. Except for a note she made about Mr. van Eck's pregnancy comment, Cardaci did not make a written note to the file about her, or any other VanEck employee, being subjected to discrimination by VanEck. (Cardaci Dep. at 219:23-220:15, 250:2-7, 253:15-21.) Deny the remainder, because the evidence cited by Defendants does not support the statement of fact made. (Koepp Decl. Ex. 11; Cardaci Dep. at 219:23-220:15, 250:2-7, 253:15-21.)

203. Cardaci said she lost a purported file note about the alleged pregnancy comment and cannot locate it. Exhibit 1 at 212:9-213:9.

Plaintiff's Response to Paragraph 203:

Admit. Cardaci lost the note she made concerning the pregnancy comment. (Cardaci Dep. at 212:9-213:9.)

204. Except for Cardaci's alleged complaints, no other female employee has ever filed any complaint of discrimination with HR. Exhibit 3 at 28:8-17, 252:4-21; Exhibit 2 at 282:23-283:8; Exhibit 6 at 21:18-19, 67:12-24.

Plaintiff's Response to Paragraph 204:

Deny. Cardaci's complaints are not merely alleged. Rapple admitted that Cardaci complained to her about pay and that she understood Cardaci's complaint to be about her pay in relation to men. (Rapple Dep. at 110:13-111:23.) Rapple informed Mr. van Eck about Cardaci's complaint. (Rapple Dep. at 123:8-124:24.) Rapple confirmed that Cardaci complained about her pay in an e-mail to Mr. van Eck, who responded angrily, stating "cares more about comp than performance." (Rapple Dep. at 125:15-126:25; Grant Decl. Ex. 13.) Rapple also admitted that she received a complaint about pay that had been lodged by Imaru Casanova to her manager about her pay compared to her peers. (Rapple Dep. at 73:11-74:11.) VanEck's complaint procedures provides that complaints may be directed to a manager rather than to Human Resources and that all complaints will be investigated. (See, supra, Pl. Resp. ¶ 6.) Casanova told Cardaci that she believed she was being paid less than her male peers. (Cardaci Dep. at 118:22-119:15; see Capuano Dep. at 64:6-15.) Likewise, Jones complained to Capuano, who had become Jones's manager, that she believed she was being underpaid compared to a male peer, and Capuano told Rapple about the issue with Jones's pay. (Capuano Dep. at 65:22-69:25.)

205. There is no evidence that Cardaci complained to company representatives about discrimination or retaliation except for her testimony, which is not supported by any contemporaneous document. *Compare* Exhibit 3 at 28:8-17, 34:14-36:25, 252:4-21, 255:7-

256:22; Exhibit 6 at 67:12-24 *with* Exhibit 1 at 123:10-12, 212:9-213:21, 227:20-228:23, 248:10-250:7, 252:7-253:21, 305:22-306:11.

Plaintiff's Response to Paragraph 205:

Deny. Rapple admitted that Cardaci complained to her about pay and that she understood Cardaci's complaint to be about Cardaci's pay in relation to men. (Rapple Dep. at 110:13-111:23.) Rapple informed Mr. van Eck about Cardaci's complaint. (Rapple Dep. at 123:8-124:24.) Rapple confirmed that Cardaci complained about her pay in an e-mail to which Mr. van Eck responded angrily, stating Cardaci "cares more about comp than performance." (Rapple Dep. at 125:15-126:25; Grant Decl. Ex. 13.) Phillips also admitted that Cardaci spoke to him concerning her pay in comparison to Lopez (Phillips Dep. at 155:17-156:17), consistent with Cardaci's testimony that Mr. van Eck told her to talk to Phillips if she disagreed with her compensation (Cardaci Dep. at 36:11-37:9). Likewise, Mr. van Eck e-mailed Rapple and Phillips about his agreement to revisit her compensation, as the disconnect between her pay and her direct reports' pay "[was not] well received" (Grant Decl. Ex. 14), consistent with Cardaci's testimony that she complained about her pay during the February 9, 2018 meeting (Cardaci Dep. at 36:11-37:9). Jones admitted that Cardaci told her that Cardaci had complained to Rapple about Mr. van Eck's pregnancy comment. (Jones Dep. at 78:18-79:2.) Rapple also admitted that Cardaci came to her to complain about not having access to Mr. van Eck. (103:10-104:16.)

Jones and Vitalone admitted that Cardaci complained to them and others about conduct Cardaci believed was discriminatory or retaliatory, including Mr. van Eck's pregnancy comment, unfair pay, and VanEck being a boys club. (Jones Dep. at 62:6-65:7, 74:15-78:17; Vitalone Dep. at 198:17-199:25). Notes Vitalone kept about Cardaci concerning Cardaci's actions that Vitalone believed were negative (see Vitalone Dep. at 178:19-195:25, 221:15-20; see

Capuano Dep. at 186:20-188:13), reflect that Cardaci made these complaints. (Koepp Decl. Ex. 51 at 5-6.) Add that VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

206. Rapple testified that Cardaci never told her about the alleged pregnancy comment. Exhibit 3 at 249:7-24.

Plaintiff's Response to Paragraph 206:

Admit that Rapple, an interested witness, so testified but deny the truth of that testimony; Cardaci complained to Rapple about Mr. van Eck's pregnancy comment shortly after Mr. van Eck made the comment and before Mr. van Eck gave approval for Jones's promotion. (Cardaci Dep. at 165:20-167:13.)

207. Rapple never told Mr. van Eck about an alleged complaint Cardaci allegedly made to her about an alleged pregnancy comment. Exhibit 3 at 249:7-24.

Plaintiff's Response to Paragraph 207:

Admit that Rapple, an interested witness, so testified but deny the truth of that testimony. Although Rapple denies that Cardaci complained to her about Mr. van Eck's pregnancy comment (Rapple Dep. at 249:7-24), Cardaci complained to Rapple about Mr. van Eck's pregnancy comment (Cardaci Dep. at 165:20-167:13). Rapple admitted that when she receives a complaint, she conducts an investigation that includes discussing the complaint with the person who engaged in the bad act. (Rapple Dep. at 24:12-25:17). For instance, Rapple admitted that she took Cardaci's complaint about 2017 compensation to Mr. van Eck. (Cardaci Dep. at 54:2-55:19; Rapple Dep. at 100:5-103:9.) Likewise, Rapple reported Cardaci's complaint about not having one-on-one meetings with Mr. van Eck to Mr. van Eck. (Rapple Dep. at

103:10-104:10.) In Cardaci's experience, Rapple forwarded complaints to Mr. van Eck (Cardaci Dep. at 167:5-168:4; see Rapple Dep. at 103:10-104:16.)

208. Mr. van Eck was unaware that Cardaci allegedly had made a complaint about a pregnancy comment he allegedly made. Exhibit 1 at 168:5-8 (stating that she did not know if Rapple went to Mr. van Eck about an alleged pregnancy comment); Exhibit 2 at 282:9-18.

Plaintiff's Response to Paragraph 208:

Admit Mr. van Eck, an interested witness, so testified by deny the truth of that testimony. Although Rapple denies that Cardaci complained to her about Mr. van Eck's pregnancy comment (van Eck Dep. at 282:9-18), Cardaci complained to Rapple about Mr. van Eck's pregnancy comment (Cardaci Dep. at 165:20-167:13), and Rapple admitted that when she receives a complaint she conducts an investigation that includes discussing the complaint with the person who engaged in the bad act. (Rapple Dep. at 24:12-25:17). For instance, Rapple admitted that she took Cardaci's complaint about 2017 compensation to Mr. van Eck. (Cardaci Dep. at 54:2-55:19; Rapple Dep. at 100:5-103:9.) Likewise, Rapple reported Cardaci's complaint about not having one-on-one meetings with Mr. van Eck to Mr. van Eck. (Rapple Dep. at 103:10-104:10.) In Cardaci's experience, Rapple forwarded complaints to Mr. van Eck (167:5-168:4; see Rapple Dep. at 103:10-104:16.)

209. Cardaci testified that she told Jones about an alleged pregnancy comment in September 2017. Exhibit 1 at 215:23-216:5.

Plaintiff's Response to Paragraph 209:

Admit; Cardaci told Jones when Mr. van Eck finally approved Jones's promotion. (Cardaci Dep. at 215:23-216:5.)

210. Jones never heard about an alleged pregnancy comment until a dinner on February 15, 2018. Exhibit 9 at 46:7-22.

Plaintiff's Response to Paragraph 210:

Deny. Cardaci told Jones about the pregnancy comment in September 2017, after Mr. van Eck had approved of Jones's promotion. (Cardaci Dep. at 215:23-216:5.) Cardaci told Jones because she wanted Jones to know the environment in which Jones was working. (Cardaci Dep. at 218:15-21.) When Cardaci told Jones about the Mr. van Eck's pregnancy comment, Jones was upset and asked, in sum and substance, "Is this real?" and "Am I alright?" (Cardaci Dep. at 218:17-25.)

211. Jones testified that she never felt discriminated against. Exhibit 9 at 77:18-20, 77:25-78:3, 81:16-18.

Plaintiff's Response to Paragraph 211:

Admit that Jones, an interested witness, so testified but deny the truth of that testimony; Jones admitted that she considered reporting the pregnancy comment to Rapple. (Jones Dep. at 81:6-18.) When Cardaci told Jones about the pregnancy comment in September 2017, Jones was upset. (Cardaci Dep. at 215:23-216:5, 218:17-25.) During a subsequent dinner in or about February 2018 celebrating the promotion Vicki Chan, an employee in the Marketing department who had been promoted to a position reporting to Jones, Mr. van Eck's pregnancy comment and the subject of VanEck's being an old boys club were raised, and Jones agreed that VanEck is an old boys club. (Cardaci Dep. at 216:23-217:12; Pl. Decl. ¶ 47.) Jones's agreement

is reflected in notes Vitalone kept about Cardaci concerning Cardaci's actions that Vitalone believed were negative (see Vitalone Dep. at 178:19-195:25, 221:15-20; Capuano Dep. at 186:20-188:13); (Koepp Decl. Ex. 51 at 6). Jones discussed with Vitalone the possibility of taking legal action against VanEck for the pregnancy comment. (Koepp Decl. Ex. 51 at 6). Jones complained to Capuano, who had become Jones's manager, about being underpaid compared to a male peer, and Capuano forwarded that complaint to Rapple. (Capuano Dep. at 65:22-69:25.)

212. Jones testified that she felt valued and supported by Mr. van Eck. Exhibit 9 at 77:16-78:3.

Plaintiff's Response to Paragraph 212:

Admit that Jones, an interested witness, so testified but deny the truth of that testimony. (See, supra, Pl. Resp. 211.)

213. Mr. van Eck emailed his wife, Cynthia van Eck, about Jones's promotion, stating that "It's nice to have an internal success story." Exhibit 87 at VE003292.

Plaintiff's Response to Paragraph 213:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit.

214. Cardaci hired Vitalone to head digital marketing. Exhibit 1 at 77:12-14.

Plaintiff's Response to Paragraph 214:

Admit. Add that Mr. van Eck participated in the process for hiring Vitalone and approved Vitalone's hiring. (Pl. Decl. ¶ 48.)

215. Cardaci testified that Vitalone was "a suspect performer." Exhibit 1 at 53:18-19.

Plaintiff's Response to Paragraph 215:

Admit. Add that Cardaci shared her concerns about Vitalone with Capuano and that Capuano upon taking over management of the Marketing department has had to take measures because of her concerns about Vitalone's performance. (Capuano Dep. at 188:17-190:17). Mr. van Eck admitted that Vitalone has weaknesses, including lack of knowledge about ETFs or individual investment at VanEck, deficient business sense and prioritization skills, (van Eck Dep. at 175:24-180:23), and criticized Cardaci for, among other things, not recognizing Vitalone's weaknesses. (Rapple Dep. at 178:19-179:17; Koepp Decl. Ex. 53.).

216. Cardaci never recommended firing Vitalone. Exhibit 1 at 77:15-17.

Plaintiff's Response to Paragraph 216:

Admit.

217. For each of 2015 through 2017, Cardaci received more compensation than Lopez. Exhibit 88 (Cardaci 2017 bonus statement); Exhibit 90 (Rapple affidavit) at ¶ 16.

Plaintiff's Response to Paragraph 217:

Admit. Add that Lopez received more in ETF profit sharing for each of those years. (Pl. Decl. ¶ 49.)

218. Cardaci received a lower percentage increase and a lower share of the ETF bonus pool than Lopez for 2017. Exhibit 88.

Plaintiff's Response to Paragraph 218:

Admit. For the 2017 year, Lopez received $251,000 in ETF profit sharing and, Lopez's total 2017 compensation was $566,000, an increase of 28.6% from his compensation for the previous year. (Pl. Decl. ¶ 50; Koepp Decl. Ex. 88.)

219. Lopez made significant contributions to the ETF business, including leading the creation of the ANGL ETF, which became the top performing ETF for 2017. Exhibit 5 at 137:7-10; Exhibit 1 at 67:18-24; Exhibit 89 (MarketWatch article).

Plaintiff's Response to Paragraph 219:

To the extent facts asserted in this statement of fact rely on inadmissible hearsay (Koepp Decl. Ex. 89), Plaintiff objects to those facts as Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers this statement of fact, in whole or in part, Plaintiff admits in part and denies in part.

Admit that Lopez conceived of the idea for the ANGL ETF and that the ANGL ETF was the 2017 ETF of the year. (Cardaci Dep. at 67:18-24.) Lopez conceived of the ANGL ETF four years earlier, and the ETF underperformed in terms of AUM and trading volume until growing in popularity in or about 2017. (Pl. Decl. ¶ 51.) Cardaci led a revamped marketing plan for ANGL across multiple divisions of the Marketing department. (See, infra, ¶ 329.) Deny that Lopez made significant contributions to the ETF business beyond ANGL, as none of the evidence cited by Defendants supports the proposition. (Cardaci Dep. at 67:18-24; Phillips Dep. at 137:7-10; Koepp Decl. Ex. 89.)

220. Phillips testified that Lopez's division is "a very, very important part of our ETF business," with responsibility for product development, competitive analysis, ETF launches, positioning ETFs to raise money and updating ETF marketing materials. Exhibit 5 at 96:16-97:9.

Plaintiff's Response to Paragraph 220:

Admit that Phillips, an interested witness, so testified. Add that this division is in the Marketing department, which Cardaci oversaw and managed. (Pl. Decl. ¶ 52; see, supra, Pl. Resp. ¶ 10.) Phillips admitted that the importance of this division as well as other divisions in Marketing department overseen by Cardaci contributed to VanEck's ETF business. (Phillips Dep. at 96:11-98:19.)

221. Phillips testified that Lopez is "the key member of the marketing department with ETF expertise" and that Lopez and his team have had "a proven strong track record" going back to 2006. Exhibit 5 at 212:6-8, 212:22-213:8.

Plaintiff's Response to Paragraph 221:

Admit that Phillips, an interested witness, so testified. Phillips testified that he did not have any concerns about Capuano's lack of direct ETF experience when Capuano replaced Cardaci as CMO because "the key member of the marketing department with ETF expertise, Ed Lopez, along with his team had a proven strong track record that [Phillips] viewed could make up for" the gap in Capuano's experience. (Phillips Dep. at 211:24-213:8.) Phillips admitted that the ETF product team had a strong track record throughout Cardaci's employment when she was managing Lopez and that department. (Phillips Dep. at 213:19-214:4.)

222. Cardaci never recommended to HR that Lopez be fired. Exhibit 3 at 114:24-115:4.

Plaintiff's Response to Paragraph 222:

Admit.

223. No female employee at VanEck has complained to HR during Rapple's tenure as Global Head of HR (since August 2015) about pay disparities with men. Exhibit 3 at 28:12-14.

Plaintiff's Response to Paragraph 223:

Deny. In February 2018, Cardaci complained to Rapple about Cardaci's 2017 compensation. (Cardaci Dep. at 54:2-55:19; Rapple Dep. at 100:5-103:9.) Rapple admitted that she understood Cardaci to be complaining about being paid less comparatively than men. (Rapple Dep. at 110:13-111:2.) Add that Imaru Casanova complained to her manager about her pay compared to her peer, a complaint which was forwarded to Human Resources. (See, infra, Pl. Resp. ¶¶ 224-25.) VanEck's complaint procedure, as set forth in its Employee Handbook, does not require complaint be given directly to Human Resources, but rather provides that an employee may complain to a manager. (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408.)

224. In early 2018, Rapple met with Imaru Casanova ("Casanova"), a VanEck employee, because Casanova had asked her manager whether she was compensated comparably to her peers for 2017. Exhibit 3 at 73:11-74:5; Exhibit 90 at ¶¶ 4-8; Exhibit 91 (Casanova affidavit) at ¶¶ 1-4.

Plaintiff's Response to Paragraph 224:

Admit.

225. Rapple and Mr. van Eck reviewed Casanova's compensation, the McLagan data and the compensation of her peers to make a determination. Exhibit 3 at 77:4-15; Exhibit 90 at ¶ 9.

Plaintiff's Response to Paragraph 225:

Deny. Although Rapple, an interested witness, so testified an averred, Mr. van Eck did not recall reviewing Casanova's pay outside of the annual process for setting compensation, and he did not know Casanova had complained about being less than male peers. (van Eck Dep. at 283:23-284:24.) Mr. van Eck testified that there had been no other complaint by a woman at VanEck about pay. (van Eck Dep. at 215:9-15.) The process described by Rapple was one for determining whether to adjust the decision that had been made concerning Casanova's 2017 compensation, not one about setting Casanova's 2017 compensation. (Rapple Dep. at 72:2-78:25.)

226. After reviewing Casanova's compensation as compared to her peers, Rapple recommended that Casanova's compensation not be changed, and Mr. van Eck agreed. Exhibit 3 at 78:6-25; Exhibit 90 at ¶ 10.

Plaintiff's Response to Paragraph 226:

Admit in part and deny in part. Although Rapple, an interested witness, so testified and averred, deny that Mr. van Eck participated in the decision-making as to whether to adjust Casanova's 2017 compensation. (See, supra, Pl. Resp. ¶ 225).

227. Casanova was satisfied with how her compensation inquiry was handled. Exhibit 90 at ¶ 10; Exhibit 91 at ¶ 5.

Plaintiff's Response to Paragraph 227:

Deny. Casanova's affidavit states only that she was satisfied with "the fact [her] manager took [her] inquiry seriously." (Koepp Decl. Ex. 91 ¶ 5.)

228. In July 2018, VanEck's sales department held its annual global sales meeting, with sales employees coming to New York from the firm's offices in Europe, Australia and China. Exhibit 92.

Plaintiff's Response to Paragraph 228:

Admit.

229. Men and women were invited to the annual global sales meeting in July 2018. Exhibit 93 at VE003150-3151.

Plaintiff's Response to Paragraph 229:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit in part and deny in part. Admit that five of the more than 50 VanEck employees invited to certain events organized in connection with VanEck's 2018 annual global sales meeting—a barbeque at Mr. van Eck's home, a tennis outing, and a golf outing—were women. (Koepp Decl. Ex. 93; van Eck Dep. at 318:25-321:16.)

230. Women attended the annual global sales meeting in July 2018. Exhibit 93 at VE003150-3151.

Plaintiff's Response to Paragraph 230:

Plaintiff objects this statement of fact because the only evidence cited by Defendants is inadmissible hearsay, and Defendants have not established foundation for admission of the hearsay evidence cited. To the extent the Court considers the statement of fact, admit that five of the more than 50 VanEck employees invited to certain events organized in connection with VanEck's 2018 annual global sales meeting—a barbeque at Mr. van Eck's home, a tennis outing, and a golf outing—were women. (Koepp Decl. Ex. 93; van Eck Dep. at 318:25-321:16.)

231. As part of the 2018 global sales meeting, there was a barbecue at Mr. van Eck's home, which was the only company event ever at his home. Exhibit 2 at 313:20-24; Exhibit 92.

Plaintiff's Response to Paragraph 231:

Admit in part and deny in part. Deny that the barbeque was the only company event ever at Mr. van Eck's home. (Cardaci Dep. at 244:17-245:3, 246:5-19.) Admit that in connection with VanEck's 2018 global sales meeting certain events, including a barbeque at Mr. van Eck's home, were organized. (Koepp Decl. Ex. 93; van Eck Dep. at 318:25-321:16.)

232. Mr. van Eck sent an email on July 5, 2018 to VanEck's New York-based employees to explain why only certain employees would be invited to social events – a golf outing, a tennis outing and a barbecue at Mr. van Eck's home – related to the global sales meeting. Exhibit 92.

Plaintiff's Response to Paragraph 232:

Admit.

233. Women were invited to and attended tennis outings and VanEck's annual holiday party. Exhibit 1 at 249:3-8; Exhibit 2 at 312:19-24.

Plaintiff's Response to Paragraph 233:

Admit in part and deny in part. Admit that women were invited to VanEck's annual holiday party and that women have been invited to tennis outings. (Cardaci Dep. at 245:4-13, 249:3-8, 315:20-316:10.) Deny that women were always invited and attended VanEck tennis outings; in 2018, for example, none of the employee invited to the tennis outing organized in connection with VanEck 2018 global sales meeting, were women. (Koepp Decl. Ex. 93; van Eck Dep. at 318:25-321:16 (identifying female employees on list)).

234. Prior to Cardaci's lawsuit, no one complained to HR about who was invited to the social events related to the global sales meeting or tennis outings. Exhibit 3 at 260:22-261:2; Exhibit 2 at 312:19-24.

Plaintiff's Response to Paragraph 234:

Deny. Cardaci complained to Rapple about the composition of attendees to these social events and feeling among women about the issue. (Cardaci Dep. at 248:9-249:25.)

235. Employees who attended the ETF.com and precious metals conferences were those who were closest to the product. Exhibit 1 at 244:2-4.

Plaintiff's Response to Paragraph 235:

Admit.

236. Conferences were expensive. Exhibit 1 at 241:15-16.

Plaintiff's Response to Paragraph 236:

Deny. The evidence cited (Cardaci Dep. at 241:15-16), does not support the statement of fact made. Mr. van Eck told Cardaci she could not attend certain conferences because they are expensive and spots for those conferences had been filled already. (Cardaci Dep. at 241:7-16.)

237. Cardaci made no notes of any complaints about VanEck's conferences or social events. Exhibit 1 at 250:2-4.

Plaintiff's Response to Paragraph 237:

Admit.

238. Cardaci never filed a complaint in writing about VanEck's conferences or social events. Exhibit 11 at Response 12; Exhibit 1 at 250:5-7.

Plaintiff's Response to Paragraph 238:

Admit. Cardaci complained about the social events to Rapple in person. (Cardaci Dep. at 248:9-249:25.) VanEck's complaint procedure does not require that complaints be in writing. (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; Cardaci Dep. at 213:15-21; Rapple Dep. at 29:12-18.) VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

239. Lars Hamich ("Hamich") and Uwe Eberle ("Eberle") worked in VanEck's European offices. Exhibit 1 at 250:15-17; Exhibit 90 at ¶¶ 12, 14.

Plaintiff's Response to Paragraph 239:

Admit.

240. Hamich oversaw VanEck's European index business as CEO of Van Eck Global (Europe) GmbH in Frankfurt, Germany until May 2016, when he left VanEck. Exhibit 3 at 254:13-15; Exhibit 90 at ¶¶ 12-13.

Plaintiff's Response to Paragraph 240:

Admit that Rapple, an interested witness, so testified and averred.

241. Eberle was Head of International Business Development and Distribution for Van Eck Switzerland AG in Zurich, Switzerland until August 2017, when he left VanEck. Exhibit 3 at 254:16-19; Exhibit 90 at ¶¶ 14-15.

Plaintiff's Response to Paragraph 241:

Admit that Rapple, an interested witness, so testified and averred.

242. Cardaci interacted with Hamich and Eberle because the New York office provided marketing support to the European offices. Exhibit 3 at 254:20-255:6.

Plaintiff's Response to Paragraph 242:

Admit that Rapple, an interested witness, so testified.

243. Hamich and Eberle were demanding and had high expectations. Exhibit 3 at 257:16-18.

Plaintiff's Response to Paragraph 243:

Admit that Rapple, an interested witness, so testified.

244. Hamich and Eberle were demanding of all employees, not just Cardaci. Exhibit 3 at 257:24-258:17.

Plaintiff's Response to Paragraph 244:

Admit in part and deny in part. Although Rapple, an interested witness, testified that Hamich and Eberle were demanding of all employees, they were, in Cardaci's observations, more demanding, belittling, unresponsive, and abusive to female employees. (Pl. Decl. ¶ 53; Cardaci Dep. at 250:15-254:7.) Although Cardaci received complaints from female subordinates about Hamich's and Eberle's conduct, she did not get complaints from her male subordinates. (Cardaci Dep. at 251:5-254:7.) Furthermore, in Cardaci's observations, Hamich and Eberle treated her more dismissively than they treated male counterparts at her level. (Pl. Decl. ¶ 54.)

245. Cardaci never made a written complaint to HR about any calls with Hamich or Eberle. Exhibit 11 at Response 12.

Plaintiff's Response to Paragraph 245:

Admit. Cardaci complained to Rapple and Jan van Eck in person. (Cardaci Dep. at 252:3-253:17.) VanEck's complaint procedure does not require that complaints be in writing. (Koepp Decl. Ex. 15 at VE000560; Koepp Decl. Ex. 16 at VE000324; Koepp Decl. Ex. 17 at VE000408; Cardaci Dep. at 213:15-21; Rapple Dep. at 29:12-18.) VanEck did not have a policy for recording or logging Human Resources complaints until "sometime in 2018." (Rapple Dep. at 267:18-268:8.)

## Plaintiff's Statement of Additional Material Facts

### I. Cardaci's Background and Hiring at VanEck

246. Cardaci was employed as VanEck's CMO from November 10, 2014 until September 18, 2018. (See, supra, Pl. Resp. ¶¶ 7-8, 160, 170.)

247. Cardaci holds a B.S. in Business Administration with a concentration in Finance from Bucknell University. (Pl. Decl. ¶ 3; Koepp Decl. Ex. 28 at VE001375)

248. Before joining VanEck in 2014, Cardaci already had amassed 30 years of experience in financial services marketing, which including holding positions at Bankers Trust Company, where Cardaci was Vice President of Sales and Marketing for Global Investment Management, AIG Global Investment Corporation, where Cardaci was Vice President and Director of Institutional Marketing, Diversified Investment Advisors, where Cardaci was Vice President of Investment Communications, Zurich Scudder Investments, where Cardaci was Senior Vice President and Director of Global Institutional Marketing, BlackRock Investments, where Cardaci was Senior Vice President and Director of Marketing for the Private Client Group, Citigroup Asset Management, where Cardaci was Director of Institutional Marketing, Western Asset Management, where Cardaci was Senior Vice President and Head of Client Service and Marketing, and HSBC Global Asset Management, where Cardaci was Managing Director and Global Head of Institutional Marketing, as well as work as an independent marketing consulting for companies including Morgan Stanley Investment Management. (Pl. Decl. ¶ 4; Koepp Decl. Ex. 28 at Pl.001374-75.)

249. In these roles, Cardaci garnered extensive experience in institutional marketing (RFPs, consultant relations, active product development and positioning), marketing communications, global marketing management, strategic branding and value proposition development, and digital and print content development. (See, supra, Pl. Resp. ¶ 46.)

250. Cardaci also holds Series 24, Series 7, and Series 63 registrations with the Financial Industry Regulatory Authority. (Koepp Decl. Ex. 28 at Pl.001374; Cardaci Dep. at 307:5-11.)

251. During her employment at VanEck, Cardaci was the only woman on VanEck's ETF Management Committee and was one of only two women on VanEck's Active Management Committee, VanEck's primary management committees. (Pl. Decl. ¶ 5; Grant Decl. Ex. 37; van Eck Dep. at 69:25-75:18.)

II. Cardaci's Predecessor

252. Cardaci replaced Hirsch, VanEck's former CMO, who retired from VanEck in 2014. (See, supra, Pl. Resp. ¶ 11; Hirsch Dep. at 133:3-135:7; van Eck Dep. at 154:5-13; Phillips Dep. at 174:3-15; Grant Decl. Ex. 35.)

253. Hirsch's duties as VanEck's CMO included: serving on VanEck's ETF Management Committee and VanEck's Active Management Committee; developing branding strategy and marketing positioning; creating and managing VanEck's digital presence; performing market research; managing communications and public relations efforts, including managing VanEck's relationships with outside public relations and branding agencies; overseeing communications between different parts of the marketing team; developing performance metrics for marketing; supporting the sales team; coordination with human resources; managing marketing strategy and communications among VanEck's business lines; and staffing and resource development for the marketing department. (Hirsch Dep. at 43:4-50:14, 51:10-52:9, 55:4-65:9, 66:20-25).

254. Hirsch's duties were consistent with those outlined in the job description for his replacement, Cardaci. (Hirsch Dep. at 43:4-50:14, 51:10-52:9, 55:4-65:9, 66:20-25; Grant Decl. Ex. 33.)

255. Cardaci assumed the all of Hirsch's responsibilities when she took the job as VanEck's CMO. (Hirsch Dep. at 134:9-17, 135:4-7, 136:16-137:3; Grant Decl. Ex. 34 (Hirsch asking Mr. van Eck what he could do to help with integrating Cardaci, as he had promised a "seamless transition")).

256. As CMO, Cardaci also served on VanEck's ETF Management Committee and VanEck's Active Management Committee; developed branding strategy and marketing positioning; created and managed VanEck's digital presence; performed market research; managed communications and public relations efforts, including managing VanEck's relationships with outside public relations and branding agencies; oversaw communications between different parts of the marketing team; developed performance metrics for marketing; supported the sales team; coordinated with human resources; managed marketing strategy and communications among VanEck's business lines; and performed staffing and resource development for the marketing department. (Pl. Decl. ¶ 6.)

257. VanEck admitted that Cardaci had the same general responsibilities as Hirsch. (Am. Answer ¶ 52, ECF No. 23.)

258. During Cardaci's tenure as CMO, VanEck's AUM grew from $32 billion in 2014 to more than $43 billion in 2018. (Form ADV at 15; Smith Dep. at 46:20-24; see, supra, Pl. Resp. ¶ 39.)

259. VanEck's AUM grew at a higher rate during Cardaci's approximately 4-year long tenure as CMO than it did during the twelve-year period before Hirsch's retirement; during Cardaci approximately 4-year tenure as CMO, VanEck's AUM grew approximately $11 billion, about $2.75 billion per year, and during the twelve-year period prior to Hirsch's

retirement, VanEck's AUM grew approximately $31 billion, about $2.58 billion per year. (Form ADV at 15; Smith Dep at 46:20-24; see, supra, Pl. Resp. ¶ 39.)

260. Although the opportunities for launching new ETFs has narrowed with time as the industry was filled (van Eck Dep. at 124:18-125:17), during Cardaci's tenure as CMO, VanEck continued to expand its presence in the ETF industry, growing from having about 35 ETFs in 2014 to having approximately 50 ETFs in 2018. (van Eck Dep. at 116:10-15, 117:22-25.)

261. During her tenure as CMO, Cardaci managed the marketing for the launches of new ETFs. (Pl. Decl. ¶ 55.)

262. VanEck continued to grow both in terms of AUM and ETFs during Cardaci's tenure as CMO. (van Eck Dep. at 118:16-119:18.)

263. During Cardaci's tenure as CMO, VanEck's marketing department continued to grow in size, expanding from 28 domestic positions in 2014 when Cardaci started to 32 positions domestic in 2018. (Pl. Decl. ¶ 56; Grant Decl. Ex. 39 (showing 28 total positions in marketing); Grant Decl. Ex. 38 (showing 32 positions, including 3 to be filled, in marketing)).

264. During Cardaci's tenure as CMO, the marketing department also grew because Cardaci began to oversee VanEck's European marketing employees, a group of approximately three to four employees. (Pl. Decl. ¶ 57; Cardaci Dep. at 159:18-160:13.)

265. Cardaci was actively involved in hiring for roles within the marketing department and reorganization within the marketing department. (Pl. Decl. ¶ 58.)

266. Possessing an MBA was not a requirement for the CMO position. (Grant Decl. Ex. 33.)

267. Mr. van Eck hired Hirsch and Cardaci for the CMO job because of their experience in marketing. (van Eck Dep. at 121:23-122:6, 154:11-155:5.)

## III. Hirsch's Performance

268. During Hirsch's tenure as CMO, there were weaknesses in digital marketing, including performance issues with the then head of digital marketing, MacLeod. (van Eck Dep. at 126:19-129:8, 131:21-132:12; Hirsch Dep. at 79:3-25)

269. VanEck hired a consultant to examine the issues in digital marketing at the time. (van Eck Dep. at 129:9-131:20.)

270. Shortly after hiring Cardaci, Mr. van Eck asked Cardaci to help him fix preexisting problems in digital marketing. (van Eck Dep. at 136:25-137:24; Cardaci Dep. at 101:7-19; Grant Decl. Ex. 41)

271. Cardaci resolved these problems by moving MacLeod into a role performing marketing communications, and no longer overseeing digital marketing. (Cardaci Dep. at 101:7-102:2; van Eck Dep. at 133:5-134:14.)

272. VanEck's AUM was lower during Hirsch's final two years as CMO than it had been in 2012. (Grant Decl. Ex. 36 at VE000905; see also Grant Decl. Ex. 29 (e-mail from Mr. van Eck to Hirsch and others about significant fall (25%-30%) in level of ETF profit pool in first quarter of 2014 compared to previous year)).

273. Excluding a jump in VanEck's AUM in 2012, VanEck's AUM was relatively flat (between $31 billion and $33 billion) during Hirsch's final four years of at VanEck. (Grant Decl. Ex. 36 at VE000905.)

IV. Compensation at VanEck

274. Compensation at VanEck is comprised of four components: base salary, merit bonus, Active profit sharing, and ETF profit sharing. (Phillips Dep. at 69:10-74:2; van Eck Dep. at 86:2-88:4.)

275. In determining employees' salaries and merit bonuses, VanEck considers, but does not always use, McLagan survey data, which outlines average industry compensation. (See, supra, Pl. Resp. ¶ 59; Phillips Dep. at 114:11-115:16, van Eck Dep. at 94:4-9.)

276. Performance is not always considered in merit bonus determinations. (van Eck Dep. at 95:5-17; Smith Dep. at 38:8-39:6), and McLagan survey data can be ignored (Phillips Dep. at 115:4-117:23, 121:20-122:4; Rapple Dep. at 71:7-72:22).

277. McLagan survey data is not considered in determining VanEck employees' Active profit sharing or ETF profit sharing compensation. (Rapple Dep. at 52:12-24.)

278. The size of the overall ETF profit pool is calculated using a formula: a percentage of the profits of VanEck's ETF business excluding the revenues and losses of two of VanEck's gold ETFs. (van Eck Dep. at 88:5-19; Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25.)

279. Mr. van Eck decides on the percentage used for calculating the ETF profit pool for a particular year. (Capuano Dep. at 202:2-16.)

280. The size of the overall Active profit pool is discretionary and not calculated using a formula. (van Eck Dep. at 87:5-88:4; Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25, 202:19-203:4.)

281. The factors considered in determining the amount of an individual employee's ETF profit share allocation are the employee's time spent working within the ETF business and contribution to the success of the ETF business. (Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25.)

282. The factors considered in determining the amount of an individual employee's Active profit share allocation are the employee's contribution to the strategy's investment performance and overall job performance. (Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25.)

283. An employee's level of educational attainment is not a factor considered in determining that employee's ETF profit share allocation or Active profit share allocation. (Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25.)

284. An employee's longevity or tenure is not a factor considered in determining that employee's ETF profit share allocation or Active profit share allocation. (Koepp Decl. Ex. 35; Capuano Dep. at 200:13-201:25.)

285. Ultimately, the amount of each employee's ETF profit sharing allocation or Active profit sharing allocation is discretionary. (Grant Decl. Ex. 30; Grant Decl. Ex. 32 at VE001834.)

286. Mr. van Eck determines the size of the profit pool allocations of his direct reports. (Smith Dep. at 43:4-12, 45:15-25; van Eck Dep. at 103:8-104:15.)

287. Generally, an employee must have been employed at VanEck for 2 years before the end of an applicable calendar year in order to participate in ETF profit sharing or Active profit sharing. (Koepp Decl. Ex. 35; Capuano Dep. at 203:10-24; Rapple Dep. at 121:7-

21; van Eck Dep. at 98:14-24; see Phillips Dep. at 83:23-86:4, 90:10-91:13; Grant Decl. Ex. 32 at VE001834.)

288. Exceptions to the 2-year requirement for profit sharing, allowing for early participation, are made for employees who are exceptional performers and contributing to the business. (Rapple Dep. at 121:15-122:11; van Eck Dep. at 93:14-19, 98:14-24, 163:4-164:9.)

289. Generally, the head of VanEck's marketing department participates in both ETF profit sharing and Active profit sharing. (Phillips Dep. at 74:3-75:9.)

290. The marketing department, which Cardaci oversaw, contributes to VanEck's ETF business, and the head of the marketing department is a "big part" of VanEck's ETF business. (Phillips Dep. at 96:11-98:19, 200:8-17.)

V. Cardaci Paid Less Than Hirsch and the Inequitable Pay of Other Women

291. During Hirsch's final four full years of employment, Hirsch was paid at least $710,000 annually. (See, supra, Pl. Resp. ¶ 68 (showing that Hirsch earned $750,000 for 2010, $1,000,000 for 2011, $750,000 for 2012, and $710,000 for 2013)).

292. In no year of Cardaci's employment at VanEck, including years during which is she participated in profit sharing, did Cardaci earn more than $629,750. (See, supra, Pl. Resp. ¶ 68 (showing that Cardaci earned $400,000 in 2014, $565,000 in 2015, $600,000 for 2016, and $629,750 for 2017)).

293. In no year was Cardaci paid as much in profit sharing as Hirsch was paid in profit sharing. (See, supra, Pl. Resp. ¶ 68.)

294. With respect to ETF profit sharing, even accounting for the size of the ETF profit pool and the number of ETF profit pool participants in a given year, Hirsch was

always paid an amount that was at least 2.78 times and up to 5.019 times the size of the average share, whereas Cardaci was always paid less than the average share. (See, supra, Pl. Resp. ¶ 69.)

295. Originally, Defendants contended that Cardaci was not underpaid compared to Hirsch because, inter alia, "VanEck uses the annual McLagan market data surveys in determining overall compensation." (Joint Pretrial Conference Ltr. dated March 7, 2019 at 3, ECF No. 15.)

296. McLagan data, however, is not used to determine overall compensation, for that data does not factor into determining ETF profit sharing or Active profit sharing. (Rapple Dep. at 52:12-24.)

297. During a lunch in 2017, Casanova, a female VanEck deputy portfolio manager for the gold and precious metals strategy, told Cardaci that Casanova believed she was being paid less than certain male counterparts and that two other female VanEck employees had expressed similar concerns to Casanova. (Cardaci Dep. at 163:12-165:4; Koepp Decl. Ex. 91 ¶ 2.)

298. Casanova ultimately raised concerns about her compensation to her manager who then forwarded the issue to Mr. van Eck and Rapple. (Koepp Decl. Ex. 91 ¶ 3; Rapple Dep. at 73:25-74:5.)

299. For the 2017 compensation year, Casanova was paid less than three male colleagues, Angus Shillington, David Austerweil, and Charl Malan. (Rapple Dep. at 75:12-20, 79:2-81:25.)

300. Casanova joined VanEck in December 2011 as Senior Analyst. (Koepp Decl. Ex. 91 ¶ 1.)

301. In 2014, Casanova became a Deputy Portfolio Manager, meaning she has responsibilities for managing part of a portfolio in addition to her Senior Analyst duties. (Koepp Decl. Ex. 91 ¶ 2; Pl. Decl. ¶ 59.)

302. Shillington and Austerweil, like Casanova, are Deputy Portfolio Managers that manage part of a portfolio. (Rapple Dep. at 79:2-81:2.) Casanova is paid less than both. (Rapple Dep. at 79:25-81:15.)

303. Malan, however, is a Senior Analyst, not a Deputy Portfolio Manager, and he does not manage part of a portfolio, as Casanova does. (Rapple Dep. at 75:12-20, 81:18-82:15.) Failing to recognize Rapple contended that Casanova should be compared to research analyst like Malan, and yet had no specific explanation for why Malan was paid more, despite him having more limited duties. (Rapple Dep. at 79:2-21, 81:16-82:15.)

304. Rapple and Mr. van Eck decided that Casanova's pay should not be readjusted. (Rapple Dep. at 78:6-25.)

305. Rapple could not recall anything specific as to why Malan was paid more than Casanova. (Rapple Dep. at 82:8-11.)

306. Rapple told Casanova that Casanova's pay would not be readjusted because based on industry compensation data her pay was comparable to industry peers. (Koepp Decl. Ex. 91 ¶ 4.)

307. Rapple's explanation, however, does not address why Casanova was paid less than her VanEck male peers (Koepp Decl. Ex. 91 ¶ 4), or account for the fact that McLagan survey data is not considered in determining all components of VanEck employees' compensation, including Active profit sharing (Rapple Dep. at 52:12-24).

## VI. VanEck's Culture

### A. The Ladies of 25 Luncheon Meeting

308. On December 11, 2014, a luncheon meeting that was attended by female VanEck employees was held to welcome Cardaci to VanEck and to speak with Cardaci, who a month earlier had taken a senior role at the company. (Cardaci Dep. at 109:2-110:5.)

309. During the luncheon meeting, there was general discussion about the environment for women at VanEck. (Cardaci Dep. at 110:24-111:14.)

310. Several women in attendance raised concerns they had about pay, promotion, maternity leave, work-from-home procedure, and VanEck's inequitable application of these policies to women compared to men. (Cardaci Dep. at 110:24-117:4.)

311. During discussion, Cardaci agreed to raise these concerns with Human Resources. (Cardaci Dep. at 110:24-111:25.)

312. During a subsequent meeting with Smith, Cardaci told Smith that based on what she heard at the Ladies of 25 luncheon meeting, there was a morale issue among VanEck's female employees who believed they were being paid less, treated unfairly with respect to certain policies, and subjected to policies that had an detrimental impact on them based on their sex. (Cardaci Dep. at 125:13-126:7, 314:12-315:6.)

313. At the time of Cardaci's complaint, Smith oversaw VanEck's Human Resources department. (Koepp Decl. Ex. 18; Cardaci Dep. at 125:13-126:12, 168:20-23; Smith Dep. at 16:14-17:15.)

314. Smith said this is the way it has always been and warned Cardaci not to talk to Mr. van Eck about the Ladies of 25 meeting and the issues raised there as it would anger Mr. van Eck. (Cardaci Dep. at 126:13-17.)

B. VanEck's Predominantly Male Social Outings

315. During Cardaci's employment at VanEck, Mr. van Eck hosted annual golf and tennis events along with a barbeque for certain VanEck employees. (Cardaci Dep. at 244:20-245:3.)

316. As a result of methods used for selecting attendees, the attendees to these events, which included Cardaci's male subordinates, were predominantly male. (Cardaci Dep. at 245:4-10, 246:8-248:8, 315:20-316:10; Capuano Dep. at 50:3-23, 53:22-54:20.)

317. Cardaci complained to Rapple about the composition of these events in 2017. (Cardaci Dep. at 248:9-249:2.)

318. Because few women attended these events, male employees had more of an opportunity to build rapport with Mr. van Eck and other senior male employees at VanEck. (Cardaci Dep. at 248:9-249:2.)

319. In 2018, these events were held in conjunction with VanEck's annual sales meeting, which was held in July 2018. (Cardaci Dep. at 249:9-15; Grant Decl. Ex. 40 (Mr. van Eck noting that "company golf/tennis with . . . sales people on July 26 with dinner/drinks at [Mr. van Eck's] house afterwards . . . will be the 'annual tennis event'")).

320. Only five of the more than 50 VanEck employees invited to the barbeque at Mr. van Eck's home, a tennis outing, and a golf outing for the 2018 sales meeting were women. (Koepp Decl. Ex. 93; van Eck Dep. at 319:21-321:8.)

321. In 2019, Capuano raised concerns to Mr. van Eck and Rapple about the 2018 event, noting the optics and a need for a better method for choosing attendees. (Capuano Dep. at 50:24-52:20.)

VII. Cardaci's Performance as CMO

322. Although generally an employee must have been employed at VanEck for 2 years before the end of an applicable calendar year in order to participate in ETF profit sharing or Active profit sharing (see, supra, ¶ 287), Mr. van Eck elected to give Cardaci early participation in ETF profit sharing and Active profit sharing such that she was paid profit sharing for the 2015 compensation year (Rapple Dep. at 121:15-122:18; van Eck Dep. at 162:18-163:6; see, supra, Pl. Resp. ¶ 68 (showing that Cardaci received profit sharing for 2015)).

323. The decision to let Cardaci have early participation in profit sharing reflected that Cardaci was considered an exceptional performer and contributing to the business. (Rapple Dep. at 121:15-122:11; van Eck Dep. at 93:14-19, 98:14-24, 163:4-164:9.)

324. Mr. van Eck admitted Cardaci was not a poor performer "for the first couple of years." (van Eck Dep. at 168:13-21.)

325. Defendants' compilation of negative feedback from Mr. van Eck to Cardaci included only one e-mail reflecting negative feedback from Mr. van Eck to Cardaci in 2017. (See, supra, Pl. Resp. ¶¶ 80, 85.)

326. During Cardaci's tenure as CMO, VanEck's AUM grew from $32 billion in 2014 to more than $43 billion in 2018 (see, supra, ¶ 258), and at the end of 2017, VanEck's AUM was at an all-time high (Grant Decl. Ex. 31; Rapple Dep. at 58:2-23).

327. Part of this growth in AUM was attributable to revamped marketing that Cardaci oversaw for the ANGL ETF. (Pl. Decl. ¶ 60.)

328. The ANGL ETF, which was Lopez's idea, debuted in 2012 and underperformed in terms of AUM and trading volume for several years. (Pl. Decl. ¶ 51.)

329. Cardaci oversaw revamped marketing campaign for the ANGL ETF throughout multiple segments of the marketing department, including: new advertising efforts in print, and on radio and video; enhanced public relations efforts; improved digital marketing through new search engine and social media marketing; changes in marketing content to position ANGL against competitors by highlighting the ETF's uniqueness and performance compared to other high-yield ETFs; and improved sales efforts, including updated marketing materials, efforts to educate VanEck sales people on ANGL, and providing product specialists about ANGL for conference calls and webinars. (Pl. Decl. ¶ 61.)

330. The ANGL ETF became the top performing ETF in 2017 (Cardaci Dep. at 67:18-22), which, as of March 2020, brings in approximately $3,500,000 in annual revenue to VanEck (Pl. Decl. ¶ 62).

331. Cardaci also led the development of content and provided domestic strategic marketing management for VanEck's acquisition of Think ETFs, a group of Dutch ETFs that added more than 1.5 billion to VanEck's assets under management. (Pl. Decl. ¶ 63; Cardaci Dep. at 195:19-196:4.)

332. During Cardaci's tenure as CMO, VanEck launched about 15 new ETFs, growing from approximately 35 ETFs in 2014 to approximately 50 ETFs in 2018. (van Eck Dep. at 116:10-15, 117:22-25.)

## VIII. Jones's Promotion and Mr. van Eck's Pregnancy Comments

333. In March 2017, Cardaci asked Mr. van Eck for approval to promote Jones. (Cardaci Dep. at 165:20-167:3, 222:4-10; Jones Dep. at 41:24-42:4.)

334. After Cardaci recommended Jones for promotion in March 2017, Cardaci followed up with Mr. van Eck several times; on Cardaci's third or fourth attempt, which occurred sometime in the summer of 2017, Cardaci asked Mr. van Eck if he had made a decision, and Mr. van Eck said, "What if she gets pregnant?" (Cardaci Dep. at 165:20-166:13, 222:17-223:9.)

335. Cardaci immediately opposed Mr. van Eck's statement by telling him, "Well, I assume she'll have the baby. She'll go on maternity leave, and she'll either come back or she won't come back to work." Mr. van Eck did not respond. (Cardaci Dep. at 166:14-19, 212:2-8.)

336. A couple of days after Mr. van Eck made the comment, Cardaci complained to Rapple about Mr. van Eck's pregnancy comment. (Cardaci Dep. at 165:20-167:13, 208:18-209:8, 209:13-16.)

337. At the end of September 2017, following Cardaci's complaint and a wait of about six months, Mr. van Eck approved Cardaci's request to promote Jones. (Cardaci Dep. at 166:24-167:3; Grant Decl. Ex. 26.)

338. In the summer of 2013, Mr. van Eck made a similar comment to Capuano in the context of a potential promotion for Capuano. (Capuano Dep. at 40:3-43:9.)

339. During a breakfast at which a potential promotion for Capuano was discussed, Mr. van Eck told Capuano, "You can get pregnant. We just have to plan for it." (Capuano Dep. at 42:3-24.)

340. Capuano had not discussed with Mr. van Eck her desire to have children around the time that Mr. van Eck made the comment. (Capuano Dep. at 44:7-11.)

IX. Cardaci Receives Unfavorable 2017 Compensation

341. A few months after Cardaci opposed Mr. van Eck's pregnancy comment and then complained to Rapple about the pregnancy comment, Mr. van Eck began the process for determining bonuses for the 2017 year. (van Eck Dep. at 89:23-90:18, Rapple Dep. at 44:24-45:3.)

342. At the end of 2017, VanEck's AUM was at an all-time high (Grant Decl. Ex. 31; Rapple Dep. at 58:2-23), and the ETF bonus pool had nearly doubled in size, reaching its highest level since 2011 (see, supra, Pl. Resp. ¶ 64).

343. In February 2018, Mr. van Eck told Cardaci her bonus and profit-sharing compensation for the 2017 year. (Cardaci Dep. at 35:20-38:11.)

344. Despite VanEck's financial success in 2017, Cardaci received only a modest increase ($29,750) in overall compensation from her 2016 compensation, including a 2017 ETF profit sharing allocation of $52,250, which was still less than the average share. Overall, Cardaci's compensation for 2017 increased by less than 5% (4.95%). (See, supra, Pl. Resp. ¶¶ 68-69, 100.)

345. Members of Cardaci's team, including her underperforming male subordinates, Lopez and Vitalone, received substantially larger increases in compensation. (Pl. Decl. ¶ 64; Koepp Decl. Ex. 88.)

346. Lopez's overall compensation increased by $126,000 compared to his 2016 compensation, and Lopez received an ETF profit share allocation of $251,000. Overall, Lopez's compensation increased by 28.6%. (Pl. Decl. ¶ 65; Koepp Decl. Ex. 88.)

347. Vitalone's overall compensation increased by $35,000, amounting to an 11.1% increase from his 2016 compensation. (Pl. Decl. ¶ 66; Koepp Decl. Ex. 88.)

348. Capuano's overall compensation increased by $95,000, amounting to an 23.1% increase from her 2016 compensation. (Pl. Decl. ¶ 67; Koepp Decl. Ex. 88.)

349. Lopez's upswing in compensation came despite performance issues related to Lopez's management of the ETF Product team in 2017 and thereafter. (Rapple Dep. at 111:24-116:14; Capuano Dep. at 123:19-127:12.)

X. Cardaci Complains about Mr. van Eck's Pay Decision

350. During the meeting with Mr. van Eck on February 9, 2018, Cardaci asked Mr. van Eck why there was a disparity between her 2017 compensation numbers and those of her team. (Cardaci Dep. at 35:20-36:6, 36:21-37:9.)

351. Mr. van Eck responded, "Because you had an eh year." (Cardaci Dep. at 36:2-6.)

352. When Cardaci asked Mr. van Eck what "eh" meant, he did not provide a response or give any examples to support his assessment. (Cardaci Dep. at 36:7-20, 37:18-38:4.)

353. Cardaci told Mr. van Eck that she felt blindsided and asked Mr. van Eck that if "eh" was indicative of unhappiness with her, why he did not tell her sooner. (Cardaci Dep. at 37:18-38:4.)

354. Mr. van Eck's "eh" comment was the first time Cardaci had her overall performance questioned in a meeting with Mr. van Eck. (Pl. Decl. ¶ 68.)

355. Mr. van Eck agreed to review Cardaci's compensation for 2017 and told Cardaci that if she disagreed with the amount of her compensation, she should also speak to Phillips. (Cardaci Dep. at 36:11-37:9; Grant Decl. Ex. 14.)

356. Following her meeting with Mr. van Eck, Cardaci complained to Rapple about her 2017 compensation (Cardaci Dep. at 54:2-55:19; Rapple Dep. at 100:5-103:9), and Rapple admitted that she understood Cardaci to be complaining about her pay compared to the pay of men (Rapple Dep. at 110:13-111:2).

357. Rapple informed Mr. van Eck about Cardaci's complaints. (Rapple Dep. at 123:8-124:24.)

358. Rapple confirmed that Cardaci had been complaining about her pay in an e-mail to Mr. van Eck dated March 15, 2018, to which Mr. van Eck responded angrily, stating "cares more about comp than performance." (Rapple Dep. at 125:15-126:25; Grant Decl. Ex. 13.)

359. Following these complaints, Mr. van Eck began to consider firing Cardaci. (van Eck Dep. at 210:5-17.)

360. In connection with his thoughts about firing Cardaci, Mr. van Eck drafted a "Marketing-2017 Review" document purporting to describe a conversation he had with Cardaci in March 2018, which he sent to Phillips and Rapple on March 27, 2018 (van Eck Dep. at 210:5-17; Koepp Decl. Ex. 53.)

361. Mr. van Eck, however, never had the meeting with Cardaci described in the "Marketing-2017 Review" document or gave Cardaci the document. (See, supra, Pl. Resp. ¶ 124.)

362. Phillips and Rapple disagreed with assessments made by Mr. van Eck in the "Marketing-2017 Review" document. (See, supra, Pl. Resp. ¶¶ 119-20.)

363. Rapple also reminded Mr. van Eck of Cardaci's complaints about Mr. van Eck not meeting with Cardaci and suggested he agree to bi-weekly, one-on-one meetings with

Cardaci, at least for the next few months. (Koepp Decl. Ex. 48 at VE003068; Rapple Dep. at 142:21-144:23.)

364. Cardaci had complained to Mr. van Eck and Rapple about her lack of access to and one-on-one meetings with Mr. van Eck. (Cardaci Dep. at 230:5-231:8; Rapple Dep. at 103:10-104:16.)

365. In response to these complaints, Rapple advised Cardaci, "What I do is I just camp out at his door, and I think you should camp out at his door as well." (Cardaci Dep. at 231:9-16.)

366. Mr. van Eck disregarded Phillips's and Rapple's assessments and decided that Cardaci's compensation should not be changed. (See, supra, Pl. Resp. ¶ 121.)

367. Mr. van Eck also rejected Rapple's suggestion that Mr. van Eck meet more regularly with Cardaci one-on-one, citing the fact that Cardaci met with him in group meetings. (See, supra, Pl. Resp. ¶ 122.)

368. Mr. van Eck, however, had routine one-on-one with Cardaci's male peers, including Phillips, Smith, John Wolfe, VanEck's Head of Information Technology, and Rick Potacki, VanEck's Head of Sales. (Pl. Decl. ¶ 69.)

369. Cardaci was not informed of Mr. van Eck's decision concerning her compensation. (Cardaci Dep. at 68:7-19.)

## XI. Cardaci Empaneled for Grand Jury Service

370. On April 6, 2018, Cardaci informed Rapple and Mr. van Eck that she had been called for grand jury service at the United States District Court for the Southern District of New York. (See, supra, Pl. Resp. ¶ 125.)

371. VanEck's jury service policy provides that upon notice of jury service supervisors "may make arrangements to accommodate [employee] absence[s]" resulting from jury service. (Koepp Decl. Ex. 17 at VE0000444.)

372. As of result of Cardaci's grand jury schedule, Cardaci had to miss scheduled ETF huddle meetings on Mondays. (Cardaci Dep. at 282:17-283:6.)

373. When Cardaci's peers missed scheduled huddle meetings, Mr. van Eck regularly sent them notes concerning the meeting to keep them abrest of business. (Cardaci Dep. at 316:11-318:4.)

374. Mr. van Eck, however, did not send Cardaci notes about ETF huddle meetings that she missed as a result of grand jury duty. (Pl. Decl. ¶ 70.)

## XII. Rapple Creates a Paper Trail to Justify Cardaci's Firing

375. On July 26, 2017, Mr. van Eck e-mailed Rapple two documents concerning Cardaci and stated, "Let's discuss." (Grant Decl. Ex. 43; Koepp Decl. Ex. 53; Koepp Decl. Ex. 60.)

376. These documents included the "Marketing-2017 Review" document that was prepared around the time Mr. van Eck started to consider firing Cardaci after she complained about her pay. (See, supra, ¶¶ 358-60.)

377. The "Marketing-2017 Review" document had not been given to Cardaci and the purported meeting described in the document never occurred. (See, supra, ¶ 360.)

378. The second document was one Mr. van Eck had drafted the day before. (Koepp Decl. Ex. 60.)

379. Rapple altered both documents and returned them to Mr. van Eck. (Grant Decl. Ex. 15.)

380. Rapple altered the "Marketing-2017 Review" document to reflect that it was a "recollection" of a conversation despite admitting she did not know whether or not Mr. van Eck ever had this conversation with Cardaci. (Rapple Dep. at 168:3-170:22; Koepp Decl. Ex. 53; Grant Decl. Ex. 15.)

381. Concerning the same document, Mr. van Eck testified that he made the document following the conversation with Cardaci, which is inconsistent with Rapple's testimony that the conversation happened afterward. (See, supra, Pl. Resp. ¶ 124.)

382. Concerning the second document, titled "Cari – Marketing - mid 2018 Review," Rapple altered to make it more "individual" to Cardaci and less like an assessment of the marketing department as whole. (Rapple Dep. at 170:23-173:18; Grant Decl. Ex. 15; Koepp Decl. Ex. 60.)

383. Rapple also altered the document to make it reflect that the document had been given to Cardaci even though Rapple knew that the document had not been given to Cardaci. (Rapple Dep. at 174:24-175:10; Grant Decl. Ex. 15; Koepp Decl. Ex. 60.)

384. Rapple admitted that the memorandum as modified by her was used as justification for firing Cardaci (Rapple Dep. at 174:19-23), and that the documents were modified for "recordkeeping" (Rapple Dep. at 168:10-19).

385. Rapple admitted that she had concerns that the existing record of purported poor performance was insufficient to justify firing Cardaci, that Mr. van Eck made the "Cari – Marketing - mid 2018 Review" after she had this concern, and that she modified the documents after she had this concern. (Rapple Dep. at 192:2-194:3.)

386. Neither document, either in original or altered form, was given to Cardaci. (Rapple Dep. at 152:24-153:22, 157:12-158:6; Grant Decl. Ex. 15; Pl. Decl. ¶ 71.)

## XIII. Cardaci's Grand Jury Service is Extended

387. On August 7, 2018, Cardaci informed Rapple and Mr. van Eck that her grand jury service had been extended to February 16, 2019. (See, supra, Pl. Resp. ¶ 154.)

388. After Cardaci informed Mr. van Eck that her grand jury service was extended, Mr. van Eck only said "[n]oted." (Koepp Decl. Ex. 65.)

## XIV. Cardaci's Termination

389. On August 16, 2018, nine days after Cardaci informed VanEck of his extended jury service (see, supra, Pl. Resp. ¶ 154), Rapple and Mr. van Eck informed Cardaci that her employment at VanEck would be ending (see, supra, Pl. Resp. ¶ 8).

390. Mr. van Eck told Cardaci that VanEck was "going in a different direction and that this was my termination meeting; that this wasn't personal, that he liked working with [Cardaci], but they wanted to bring somebody in with more ETF and digital marketing experience." (Cardaci Dep. at 264:5-12.)

391. Mr. van Eck further said that "he wanted to tell [Cardaci] because he didn't want [Cardaci] to find out about [her] termination when they were going out to the market to find a new CMO." (Cardaci Dep. at 264:13-17.)

392. Rapple presented Cardaci with the proposed separation package and told Cardaci to call if Cardaci had questions. (Cardaci Dep. at 264:23-265:3.)

393. Consistent with the terms of the proposed separation agreement, Cardaci was told that VanEck intended for her to work through the end of the year (i.e. until December 31, 2018). (See, supra, Pl. Resp. ¶ 161.)

394. After VanEck received a letter from Cardaci's counsel asserting claims of discrimination and retaliation, VanEck withdrew the earlier separation agreement and presented Cardaci with a revised separation agreement, which provided that Cardaci's employment would now end on September 14, 2018. (See, supra, Pl. Resp. ¶¶ 165-68; Koepp Decl. Ex. 73.)

## XV. VanEck Fails to Comply with Termination Policies

395. At VanEck, employees exhibiting poor performance are generally given a written performance warning that provides them an opportunity to improve and advises them that failure to improve may lead to termination. (Rapple Dep. at 84:16-86:8; Phillips Dep. at 47:13-21.)

396. In certain instances, VanEck has terminated an employee's employment immediately when there is documentation confirming that conversations about poor performance has taken place, including written performance reviews, and that the employee had been advised of need to improve his or her performance. (Rapple Dep. at 86:13-96:14.)

397. Prior to be informed she was fired, Cardaci did not receive any written warning advising that her employment was in jeopardy because of her purported poor performance and was not otherwise informed in writing or verbally that she was in danger of being fired. (Pl. Decl. ¶ 72.)

398. Cardaci did not receive any written performance reviews outlining her purported poor performance. (Pl. Decl. ¶ 73.)

399. Rapple altered documents to manufacture a record of poor performance for Cardaci despite knowing that those documents had not been given to Cardaci and not knowing whether Mr. van Eck ever met with Cardaci. (See, supra, ¶¶ 375-86.)

## XVI. Cardaci's Replacement

400. In December 2018, Capuano was promoted to Cardaci's former job as head of the marketing department. (See, supra, Pl. Resp. ¶ 182.)

401. Defendants contended that Cardaci was fired because of poor performance with respected to digital marketing and ETF product marketing. (Joint Pretrial Conference Ltr. dated March 7, 2019 at 3-4, ECF No. 15; Answer to First Am. Compl. at 11 (First Defense), ECF No. 23.)

402. Despite contending that Cardaci's purported deficiencies in digital marketing and ETF product marketing required that Cardaci be fired, VanEck's selected a replacement for Cardaci that admittedly has "[n]o direct experience overseeing digital marketing and [a] lack of understanding of technology" (Koepp Decl. Ex. 73 at VE004821), and does not have suitable experience with ETF marketing (see, supra, Pl. Resp. ¶ 178; Grant Decl. Ex 47 (Phillips noting that he would inform Lopez about decision to promote Capuano given that no one came in from the outside or inside with ETF experience)).

403. Defendants now contend that Cadarci was fired for unspecified, general "poor performance." (Defs' Mem. in Supp. Mot. Summ. J. at 26, ECF No. 36.)

Dated: New York, New York
March 11, 2020

VLADECK, RASKIN & CLARK, P.C.

By: */s/ Valdi Licul*
Valdi Licul
Yannick A. Grant
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300
Attorneys for Plaintiff